1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE,

Plaintiff,

v.

DONALD J. TRUMP, President of the United
States; UNITED STATES OF AMERICA;
PAMELA BONDI, in her official capacity as
Attorney General of the United States;
UNITED STATES DEPARTMENT OF
JUSTICE; OFFICE OF FEDERAL
CONTRACTS COMPLIANCE PROGRAMS;
CATHERINE ESCHBACH, in her official
capacity as Director of Office of Federal
Contracts and Compliance Programs; OFFICE
OF MANAGEMENT AND BUDGET;
RUSSELL VOUGHT, in his official capacity
as Director of the Office of Management and
Budget; U.S. DEPARTMENT OF
TRANSPORTATION; SEAN DUFFY, in his
official capacity as the Secretary of
Transportation; FEDERAL TRANSIT
ADMINISTRATION; TARIQ BOKHARI, in
his official capacity as Acting Administrator of
the Federal Transit Administration; U.S.
DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity as Secretary of Homeland Security;

No.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 1
(No. _____)

1
2
3
4
5

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT; SCOTT
TURNER, in his official capacity as Secretary
of Housing and Urban Development; and
DOES 1–100,

Defendants.

6

## **INTRODUCTION**

7      1.      In his first 100 days since assuming the Office of the Presidency for a second-term,

8   President Donald J. Trump endorsed an unprecedented number of Executive Orders—143, to be

9   exact.[1] Many of these Executive Orders are nothing more than short-cut attempts to advance the

10   Trump Administration's agenda by circumventing the law via executive fiat. The *ultra vires*,

11   unconstitutional actions by the Trump Administration addressed in this Complaint threaten

12   Plaintiff City of Seattle with vague directives designed to eliminate lawful policies and programs

13   in the workplace. Plaintiff risks losing committed federal grants and contracts if it does not abide

14   by newly and improperly imposed (and impossibly vague) funding conditions, and faces

15   unjustified False Claims Act investigations and lawsuits, as well as significant financial hardship

16   and uncertainty, based on forced adherence to the Trump Administration's unlawful interpretation

17   of federal anti-discrimination laws in connection with projects that bear no relationship to its

18   decrees.

19      2.      This lawsuit seeks to declare unlawful and enjoin the Trump Administration from

20   enforcing against Plaintiff portions of two Executive Orders that impose unconstitutional and

21   unlawful requirements on Plaintiff as a recipient of federal contracts and grants: (i) Executive

22   Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the

23

24   ---
[1] *See* Garrett Kral, *Executive Action Review: The First 100 Days of Trump's Environmental Policy*, FEDSOC BLOG
25   (May 6, 2025), https://fedsoc.org/commentary/fedsoc-blog/executive-action-review-the-first-100-days-of-trump-s-environmental-policy.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 2
(No. _____)

"Anti-Diversity Order"), [2] issued January 21, 2025; and (ii) Executive Order No. 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Order"),[3] issued January 20, 2025 (together, the "Orders"). These Orders seek to interfere with congressionally authorized federal grants to advance and expedite the Administration's policy agenda of eliminating all diversity, equity or inclusion ("DEI") initiatives, irrespective of the type, scope, or sources of funding used to carry out these efforts.

3.      Generally, a federal law must be enacted by Congress and signed into law by the President. The power to appropriate and spend money, such as through the issuance of federal grants, is conferred by the Constitution on Congress and Congress alone. An Executive Order does not have the force and effect of law and cannot be issued to usurp congressional authority or to advance unconstitutional or illegal policies.

4.      The Anti-Diversity Order, while purporting to protect civil rights, imposes new and unlawful obligations on federal contract and grant recipients by compelling the termination of lawful DEI training and initiatives, and attempts to illegally amend the federal False Claims Act by injecting a new "materiality" standard allegedly related to compliance with federal anti-discrimination laws into the grant agreements.

5.      The Anti-Diversity Order improperly directs the heads of all executive departments and agencies "to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." Anti-Diversity Order, Section 2. The Anti-Diversity Order further instructs the heads of each agency to include terms in every contract or grant requiring grant applicants and recipients to affirmatively certify that their compliance with federal anti-discrimination laws is material to the Government's payment decisions under the False Claims Act. *Id.* Section 3(b)(iv)(A). As set

---

[2] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).
[3] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 3
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    forth below, this requirement is an unlawful, brazen attempt to substitute the Trump
2    Administration's view that all DEI initiatives are unlawful for the body of federal statutes and case
3    law that says otherwise and to intimidate Plaintiff into abandoning such lawful initiatives due to
4    the fear that it will be the subject of spurious investigations and lawsuits.

5          6.    On its face, the Anti-Diversity Order would apply to any appropriation of federal
6    grant money to Plaintiff if the Order is not declared unlawful and enjoined. Defendants' unlawful
7    attempts to expediently reconfigure federal grant programs in service of their policy goals harms
8    Plaintiff by jeopardizing funds needed to support critical local programs and services, including
9    major counterterrorism, emergency response, safety, transportation, and housing projects that
10   benefit Seattle residents, residents of the surrounding metropolitan area, and visitors from all over
11   the world. Despite claiming to only target "illegal" DEI, the overbroad language of the Orders is
12   not reasonably related to any federal interest in Plaintiff's projects.

13         7.    Equally concerning, the broad certification requirements of the Anti-Diversity
14   Order put Plaintiff in the untenable position of either declining critical grant funds or facing
15   enormous potential exposure in a False Claims Act investigation in the not unlikely event the
16   federal government's interpretation of "illegal" DEI waivers from Plaintiff's—and the federal
17   courts'—interpretation of what constitutes illegal discrimination.[4]

18         8.    Likewise, the Gender Order purports to condition the receipt of federal funds on
19   the vague requirements in an *ultra vires* Executive Order, deviating from statutory law. The
20   Gender Order dictates that "[f]ederal funds shall not be used to promote gender ideology" and
21   directs agencies to "assess grant conditions and grantee preferences and ensure grant funds do not
22   promote gender ideology." Gender Order, Section 3(g). But the Gender Order provides no
23   guidance on what might constitute "promotion of gender ideology," and its broad language and

24   _____
     [4] *See* Michael C. Bender & Michael S. Schmidt, *Trump Administration Escalates Harvard Feud With New Justice*
25   *Dept. Investigation*, THE NEW YORK TIMES (May 15, 2025), https://www.nytimes.com/2025/05/15/us/
     politics/harvard-justice-dept-investigation.html.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 4
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

definition of "gender ideology" would sweep in and prohibit common workplace activities and policies that otherwise comply with federal statutory law.

9.     By this action, Plaintiff challenges the Anti-Diversity and Gender Orders as violations of Separation of Powers, the Spending Clause, the Fifth and Tenth Amendments of the United States Constitution, and the Administrative Procedure Act. These Orders are unlawful because they are arbitrary and capricious, contrary to constitutional rights, and issued in excess of the President's authority.

10.     For these reasons, as further detailed below, Plaintiff respectfully requests that the Court declare the Executive Orders unlawful and enjoin Defendants from enforcing or implementing the Orders as to Plaintiff as a recipient of federal contracts and grants.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq*.

12.     Venue is proper in this Court because this is an action against an officer or employee of the United States and agencies of the United States; Plaintiff City of Seattle is located in this judicial district; and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e)(1).

## PARTIES

13.     Plaintiff City of Seattle ("Seattle," "City," or "Plaintiff") is a municipal corporation organized under the laws of the State of Washington. Seattle has legal authority and appropriations authority to spend about $370 million dollars in federal funds during the year beginning January 1, 2025, including funds to support major safety initiatives and vital infrastructure projects as detailed herein.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

14. Defendant Donald J. Trump is the President of the United States of America. He is sued in his official capacity. In that capacity, he issued the Executive Orders that are challenged in this lawsuit.

15. Defendant Department of Justice ("DOJ") is an agency of the United States federal government charged with upholding the rule of law, keeping our country safe, and protecting civil rights. DOJ is an "agency" within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551(1).

16. Defendant Pamela Bondi is the United States Attorney General and DOJ's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

17. Defendant Office of Management and Budget ("OMB") is the largest office within the Executive Office of the President of the United States of America. OMB develops and publishes the President's budget and ensures that agency programs, policies, and procedures comply with the President's policies, including policies in the Executive Orders. OMB is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

18. Defendant Russell Vought is the Director of OMB and OMB's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

19. Defendant Office of Federal Contract Compliance Programs ("OFCCP") is part of the United States Department of Labor and is responsible for ensuring that employers that do business with the federal government comply with laws and regulations requiring nondiscrimination. OFCCP is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

20. Defendant Catherine Eschbach is the Director of OFCCP and OFCCP's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

**Corr Cronin llp**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

21.    Defendant Department of Transportation ("DOT") is an executive department of the federal government of the United States of America. 49 U.S.C. § 102(a). It houses a number of operating administrations, including the Federal Transit Administration ("FTA"). DOT is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

22.    Defendant Sean Duffy is the Secretary of DOT, the highest-ranking official in DOT, and responsible for the decisions of DOT. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

23.    Defendant Federal Transit Administration ("FTA") is an agency of the United States federal government charged with improving public transportation. FTA is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

24.    Defendant Tariq Bokhari is the Acting Administrator of FTA and FTA's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

25.    Defendant Department of Homeland Security ("DHS") is an agency of the United States federal government responsible for national security operations. DHS is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

26.    Defendant Kristi Noem is the Secretary of DHS and DHS's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

27.    Defendant Department of Housing and Urban Development ("HUD") is a federal agency charged with creating strong, sustainable, inclusive communities and qualify affordable homes for all. HUD is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

28.    Defendant Scott Turner is the Secretary of HUD and HUD's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

**Corr Cronin llp**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

# FACTUAL ALLEGATIONS

## I.    THE ANTI-DIVERSITY AND GENDER ORDERS

### A.    The Anti-Diversity Order

29.    On January 21, 2025, one day after his inauguration, President Trump issued the Anti-Diversity Order, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." The Anti-Diversity Order states that "diversity, equity, and inclusion," or "DEI," "diversity, equity, inclusion, and accessibility," or "DEIA" (diversity, equity, inclusion and accessibility) policies are "illegal," "dangerous," and "immoral" and *can* violate federal civil rights laws but also may not. Anti-Diversity Order, Section 1. As expressed in its title, the Anti-Diversity Order mischaracterizes DEIA efforts as contrary to merit-based opportunity.

30.    The Anti-Diversity Order, at Section 1, states that "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," and "DEIA" are "dangerous, demeaning, and immoral race- and sex-based preferences;" "illegal" in violation of "the text and spirit of … Federal civil-rights laws;" "undermine our national unity;" "deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system;" "threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society;" are "illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing;" and are "illegal preferences and discrimination."

31.    Section 2 of the Anti-Diversity Order directs "all executive departments and agencies … to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements" to "protect the civil rights of all Americans and to promote individual initiative, excellence, and hard

work" and "to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities."

32.     Section 3(b)(ii) of the Anti-Diversity Order instructs the OFCCP to "immediately cease … [p]romoting 'diversity;'" "[h]olding Federal contractors and subcontractors responsible for taking 'affirmative action;'" and "[a]llowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin."

33.     In an effort to raze DEI efforts even more broadly by improperly leveraging the federal False Claims Act ("FCA"), Section 3(b)(iv) requires each agency head to "include in every contract or grant award: (A) a term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code" and, concerningly, "(B) a term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws."

34.     Section 3729(b)(4) of Title 31 of the U.S. Code is a provision of the False Claims Act ("FCA"). In general, the FCA prohibits a person from submitting a false or fraudulent claim to the U.S. government for payment. Liability can arise under the FCA if a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The statute defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(2)(4).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 9
(No. _____)

35.     The Anti-Diversity Order purports to amend the FCA's definition of "material" by establishing that a federal grant recipient's compliance with "all applicable Federal anti-discrimination laws" is, in all instances, material to the government's decision to pay out grant funds. In reality, the statute enacted by Congress says no such thing and the United States Supreme Court has made plain that the FCA's materiality standard is based on the underlying facts and circumstances. *See Univ. Health Servs. v. U.S.*, 579 U.S. 176, 191 (2016) ("[M]ateriality cannot rest on a 'single fact or occurrent as always determinative.'") (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)).

36.     Indeed, the FCA's materiality standard is "demanding" and cannot be met "merely because the government designates a particular … requirement as a condition of payment." *Id.* at 194. Thus, the Supreme Court has already considered, and rejected, the Trump Administration's position that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 194.

37.     The certification requirement in the Anti-Diversity Order represents an unlawful, *ultra vires* attempt by the Trump Administration to unilaterally amend the federal False Claims Act for the sole purpose of leveraging the prospect of the statute's enormous penalties to prevent federal grant recipients like Plaintiff from engaging in lawful activities.

38.     Individuals who the government claims violate the FCA, including through execution of allegedly false certifications of compliance that are material to the government's decision to pay, face onerous investigations and, if found liable, are subject to treble damages and per-claim penalties of up to $28,619 per claim submitted. 31 U.S.C. § 3729(a)(1); 89 Fed. Reg. 106308 (Dec. 30, 2024).

39.     Despite the enormous potential liability for executing an inappropriate certification under the FCA, the Anti-Diversity Order does not define key terms such as "diversity," "equity,"

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

or "inclusion," nor does it identify which specific DEI programs, initiatives, or policies the Trump Administration may consider unlawful under existing anti-discrimination laws. In the absence of such guidance, contractors and grant recipients are at sea as to whether the programs they administer to promote diversity, or equity, or inclusion "violate any applicable Federal anti-discrimination laws" that could result in termination of their grants or contracts, and/or subject them to civil investigations and/or liability under the FCA.

40.     Adding to the uncertainty, the President's own Deputy Chief of Staff has publicly declared that "[a]ll [Diversity, Equity and Inclusion] must be abolished nationwide."[5]

41.     The inscrutability and indeterminacy of the Anti-Diversity Order forces Plaintiff to choose between the devastating financial consequences of losing grant money or the possibility of incurring massive costs and liability under the False Claims Act.

42.     Against this backdrop of legal uncertainty, Plaintiff is faced with an impossible choice when it accepts and spends federal grant money—either submit to the Administration's policies through unlawful means or forgo vital funding for major infrastructure and safety initiatives, as detailed below.

**B.     The Gender Order**

43.     Through the Gender Order, the Trump Administration has taken the unprecedented step of directing federal agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications[,] or other messages." Gender Order, Section 3(e).

44.     Section 2(a) of the Gender Order states that a person's "sex" is an "immutable biological classification as either male or female" and that it "does not include the concept of 'gender identity.'" Specifically, Section 2 of the Gender Order establishes that it is the "policy of

---

[5] Stephen Miller (@StephenM), X (Jan. 12, 2025, 9:36 AM), https://x.com/StephenM/status/1878450912621994410.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 11
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." Section 2 further states that "the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy."

45.     Relevant to Plaintiff's claims, Section 3(g) of the Gender Order prohibits the use of any federal funds "to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Section 7(a) of the Gender Order further requires each agency to submit an update on the Gender Order's implementation within 120 days, including "agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of" the Executive Order.

46.     Defendants, therefore, threaten to penalize federal contractors, grantees, and applicants such as Plaintiff by withholding funds based on vague and overbroad criteria. It is entirely unclear under the Gender Order what action or inactions might run afoul of its prohibitions. Defendants have no authority to impose such arbitrary and vague conditions on federal grant recipients.

47.     The Gender Order applies broadly to all federal grant recipients and applicants, regardless of whether the grant bears any relation to gender-related initiatives. And, even more problematically, the Gender Order provides no guidance as to what the government might view as "funding gender ideology."

## II.     LITIGATION HISTORY

48.     In *King County et al. v. Turner et al.*, No. 2:25-cv-00814-BJR (W.D. Wash. 2025), this Court granted the King County plaintiffs' first and second motions for a preliminary injunction and enjoined Defendants Turner, HUD, Duffy, DOT, and Matthew Welbes and the FTA from imposing or enforcing certain conditions on any DOT or Continuum of Care ("CoC") grants

awarded to the plaintiffs; withholding any money on such conditions; requiring plaintiffs to certify to enjoined conditions; or delaying grant agreements to plaintiffs on such basis. *See* Dkt. 169 (June 3, 2025).

49.     The conditions at issue required a grant recipient (1) to agree that its compliance in all respects with all applicable federal anti-discrimination laws is material to the government's payment decisions for purposes of the False Claims Act, (31 U.S.C. § 3729(b)(4), pursuant to Anti-Diversity Order; to agree that it does not operate any programs promoting DEI initiatives that violate any applicable federal anti-discrimination laws pursuant to the Anti-Diversity Order; (3) to cooperate with federal officials in the enforcement of federal immigration law; and (4) to comply with all applicable federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of federal funds for such grants.

50.     On July 10, 2025, the plaintiffs in *King County* filed a Second Amended Complaint, adding multiple plaintiffs and defendants. *See* Dkt. 184. The *King County* plaintiffs filed a third motion for a preliminary injunction on July 14, 2025, seeking an order extending the relief previously granted to new jurisdictions, barring HHS from applying unlawful conditions at any stage of the grant-making process, and barring HUD from doing the same. *See* Dkt. 186. Plaintiffs in *King County* seek relief by August 14, 2025.

51.     The City of Seattle is not a party to the abovementioned litigation. In this lawsuit, Plaintiff seeks broader relief: not just to invalidate the unlawful requirements of the Anti-Diversity Order and Gender Order as to specific grants the City receives, but instead to declare that the Orders are entirely unenforceable as against Plaintiff City of Seattle.[6]

---

[6] For ease of reference, a Notice of Related Cases has been submitted with this Complaint.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 13
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

### III.    IMPLEMENTATION OF ORDERS

52.    The Trump Administration has undertaken significant steps to implement these unlawful Orders by directing federal agencies to condition disbursement of federal grant funds on vague and arbitrary notions of what constitutes "DEI" and "gender ideology."

53.    The Orders and the agency actions deployed to realize them create significant uncertainty regarding these funds because they authorize the federal agencies such as those agencies described below to deny or revoke funding if the recipient does not certify compliance with, or if the Administration concludes the recipient does not meet, the vague and undefined requirements of the Orders.

54.    The following agency actions are just a few representative examples of the types of grant terms the Administration is attempting to implement to enforce its own policy agenda and circumvent the legal process. *All* federal grant scenarios pose the threat of having grant funds denied or revoked if federal agencies conclude that Plaintiff's internal operations are at odds with the Trump Administration's ambiguous interpretation of the anti-discrimination laws, or its vague definition of "gender ideology."

### A.    U.S. Department of Transportation Grants

55.    Congress has established grant programs administered by the United States Department of Transportation ("DOT"), acting through the United States Federal Transit Authority ("FTA"), Federal Highway Administration ("FHWA"), Office of the Secretary of Transportation ("OST"), and Federal Railroad Administration ("FRA") that provide federal funds to state and local governments for public transportation projects.

56.    The DOT has implemented the Orders to condition federal funds on compliance with the vague and overbroad DEI and gender ideology requirements.

57.    DOT grants are subject to the DOT FTA Master Agreement ("MA"). The current iteration—version 33—of the MA, published on April 25, 2025, is known as "MA 33" and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 14
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

contains new provisions that appear to be related to the Orders, thus confirming the DOT's intention to adopt and enforce the policies outlined in the Orders.

58.     MA 33 at Section 12(n), for example, contains the following provisions under the heading "Federal Anti-Discrimination":

> (1) Pursuant to section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code. (2) Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.[7]

59.     The MA further states that a grant recipient must comply with all federal laws, regulations, and requirements. The MA defines a "federal requirement" as "[a]n applicable … executive order[.]" Section 15(i).

60.     Plaintiff is a recipient of numerous FTA grants, which fund transportation infrastructure projects such as light rail and rapid transit.

61.     The DOT's intention to enforce the Orders against Plaintiff is not a hypothetical threat. On April 24, 2025, Secretary of Transportation Sean Duffy wrote a letter to "All Recipients of US Department of Transportation Funding"[8] (the "DOT Letter") clarifying the agency's intention to enforce the Orders. The letter begins by ominously reminding grant recipients that "[a]s recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and

---

[7] *See* FED. TRANSIT ADMIN., *FTA Master Agreement, Version 33* (Apr. 25, 2025), https://www.transit.dot.gov/funding/grants/grantee-resources/sample-fta-agreements/fta-master-agreement-version-33-april-25.

[8] *See* U.S. DEP'T OF TRANSP. *Follow the Law Letter to Applicants* (Apr. 24, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-05/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

regulations." Although claiming that the agency is merely trying to uphold the constitutional principles espoused in the Civil Rights Act of 1964, the letter goes on to threaten grant recipients who engage in diversity-promoting activities, stating that such activities "presumptively" violate Federal law:

> Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, ***presumptively violates Federal law***. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards- such as through contracts or the provision of other benefits-based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.[9]

62.    DOT proclaims that its letter "provides notice of the Department's existing interpretation of Federal law" and warns that "[n]oncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."[10] The letter threatens that grant recipients may be subject to audits and "possible recovery of funds" or termination of funding for violations of the funding agreement.[11]

63.    As Plaintiff continues to be presented with new funding opportunities that incorporate MA 33, it directly and repeatedly confronts the quandary of accepting federal funding conditioned on execution of a problematic FCA certification that incorporates the vague and undefined terms from the Anti-Diversity Order.

---

[9] *Id*. at p. 2 (emphasis added).
[10] *Id*. at p. 3.
[11] *Id*.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 16
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**B.      U.S. Department of Housing and Urban Development Grants**

64.      The United States Department of Housing and Urban Development ("HUD") has also implemented the Orders to condition federal funds on compliance with the vague and overbroad DEI and gender ideology requirements.

65.      On April 29, 2025, a HUD press release decreed that the Department had "[a]ligned all programs, trainings, and grant agreements with the President's Executive Orders, removing diversity, equity, inclusion (DEI)" and that "HUD ended DEI."[12]

66.      On June 5, 2025, HUD General Deputy Assistant Secretary Claudette Fernandez circulated a letter which decreed that Community Planning and Development ("CPD") fiscal year 2025 formula grant agreements shall "emphasize conformity with applicable Administration priorities and executive orders," including the Gender Order, which is specifically referenced. Grantees are "encouraged" to review the Presidential executive orders as they develop plans, which must be submitted to HUD by August 16, 2025, to avoid losing funds for program year 2025. A grantee "shall not use grant funds to promote 'gender ideology,'" as defined in the Gender Order.[13]

67.      HUD uses a consolidated planning process to identify housing and community development priorities to align and focus funding from formula block grant programs.

68.      HUD's "Consolidated Plan" is a five-year plan which is carried out through "Annual Action Plans," which provide a concise summary of the actions, activities, and the specific federal and non-federal resources that will be used each year to address the priority needs and specific goals identified by the Consolidated Plan. Federal grantees report on accomplishments

---

[12] *See* U.S. Dep't of Hous. & Urban Dev., *HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days*, (Apr. 29, 2025) https://www.hud.gov/news/hud-no-25-059.

[13] *See* U.S. Dep't of Hous. & Urban Dev., Response to COSCDA and NCDA Regarding FY 2025 Consolidated Plan Guidance ("HUD Letter") (June 5, 2025) https://ncdaonline.org/wp-content/uploads/2025/06/6-5-2025-HUD-Response-to-COSCDA-NCDA.pdf.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 17
(No. _____)

**Corr Cronin llp**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  and progress toward consolidated plan goals in the Consolidated Annual Performance and

2  Evaluation Report ("CAPER").

3      69.    In May 2025, HUD circulated a new 424-B Assurances and Certifications Form

4  ("Certification"),[14] which HSD must execute as part of the Annual Action Plan. The Certification

5  contains new language requiring grantees to certify that they "[w]ill not use Federal funding to

6  promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that

7  violate any applicable Federal anti-discrimination laws." This language was not included in the

8  2024–2028 Consolidated Plan.

9      70.    In addition to facing the dilemma of accepting federal funding conditioned on

10  execution of a problematic certification that incorporates the vague and undefined terms from the

11  Anti-Diversity Order, Plaintiff also faces significant budgetary uncertainty from the loss of these

12  federal funds, as many programs, although financed directly by the City, are reimbursable through

13  HUD.

14  **C.    U.S. Department of Homeland Security Grants**

15      71.    The United States Department of Homeland Security ("DHS") has implemented

16  the Orders to condition federal funds on compliance with the vague and overbroad DEI and gender

17  ideology requirements.

18      72.    On April 18, DHS issued an update to its standard terms and conditions ("Standard

19  Terms") that apply to the federal awards and grants issued by DHS. DHS's updated Standard

20  Terms apply to "all new federal awards" in fiscal year 2025.[15]

21      73.    The Standard Terms, at section C, paragraph XVII(2)(A) provides: "By accepting

22  the grant award, recipients are certifying that [t]hey do not and will not during the term of this

23

24  [14] U.S. DEP'T OF HOUS. & URBAN DEV., *Form HUD 424-B: Applicant and Recipient Assurances and Certifications*
    (Jan. 27, 2023), https://www.hud.gov/sites/dfiles/OCHCO/documents/424-B.pdf.

25  [15] U.S. DEP'T OF HOUS. & URBAN DEV., *FY 2025 DHS Standard Terms and Conditions, Version 3* (Apr. 18, 2025),
    https://www.dhs.gov/sites/default/files/2025-04/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 18
(No. _____)

financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws."

74.    The Standard Terms define DEI as "diversity, equity, and inclusion" and DEIA as "diversity, equity, inclusion, and accessibility." The Standard Terms define "discriminatory equity ideology," by reference to Executive Order 14190, as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations."[16] Executive Order 14190 provides examples of such ideology, including the idea that an individual's "status as privileged ... is primarily determined by the individual's race, color, sex, or national origin" and the belief that people exhibit implicit, unconscious racial biases. *Id.* Section 2(b)(ii)–(iii).

75.    Section C, paragraph XXXI of the Standard Terms provides, "[r]ecipients must comply with all requirements of Presidential Executive orders related to grants, the full text of which are incorporated by reference."

76.    An example of an affected program is BioWatch, a system designed to provide early detection of airborne biological threats, particularly those linked to bioterrorism, operated by state and local governments. When detection of a potential threat occurs, it sets in motion a coordinated effort by emergency responders, public health officials, and law enforcement. As described further below, BioWatch is a critical counter-terrorism program for many local jurisdictions, including Plaintiff.

77.    On June 4, 2025, the Director of BioWatch Field Operations announced that the April 18, 2025 version of the DHS Standard Terms will apply to fiscal year 2025 BioWatch applications.

78.    Plaintiff is a recipient of DHS's BioWatch grant and intends to apply for fiscal year 2025 BioWatch grants. As such, these scenarios pose the threat of having grant funds denied or

---

[16] Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025).

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

revoked if executive agencies conclude that Seattle's internal operations are at odds with the Trump Administration's interpretation of the anti-discrimination laws, or its vague definition of "gender ideology."

**D.    U.S. Department of Justice Grants**

79.    In addition to agency-specific pronouncements that the Orders are being enforced with respect to federal grants, DOJ has implemented the Orders to condition federal funds on compliance with the vague and overbroad DEI and gender ideology requirements.

80.    On February 5, 2025, U.S. Attorney General Pamela Bondi issued a memorandum ("DOJ Memo") reciting the Anti-Diversity Order and asserting that DOJ's Civil Rights Division "will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds."[17] Although Plaintiff is a City and not a private entity, DOJ's interpretation of the administration's policy is clear: root out and punish anyone who engages in what it considers "illegal" DEI.

81.    Despite these serious and actionable threats, the Administration's Orders, federal agency directives such as the DOT Letter and HUD Letters, and the DOJ Memo, do not define or describe the prohibited activities that would subject a grant recipient to penalties such as the termination of its grants or contracts or FCA liability. Nowhere do these pronouncements define (1) "diversity, equity, and inclusion;" (2) "diversity, equity, inclusion, and accessibility;" (3) "environmental justice;" (4) "equity;" (5) "equity-related;" much less (6) what it means to be "promoting DEI." Nor do they define or describe the standards which these activities will be scrutinized against to determine permissibility.

---

[17] *See* U.S. DEP'T OF JUST., OFFICE OF THE ATT'Y GEN., Remarks by Attorney General Merrick B. Garland on Uvalde Report Release (Jan. 18, 2024), https://www.justice.gov/ag/media/1388501/dl?inline.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 20
(No. _____)

82.     Moreover, the Anti-Diversity Order's reference to "illegal" DEI appears to be pretextual. What Plaintiff may view as legal or illegal based on federal judicial interpretation of anti-discrimination law is at odds with the Administration's public comments. As new directives pour from these Orders, Plaintiff is at a loss regarding the meaning of the Order, forcing Plaintiff to choose between potential legal liability or self-censorship in the face of legal uncertainty. The potential loss of federal funds irreparably harms the City not only by threatening the loss of federal funds, but also by creating acute budgetary uncertainty. *See King Cnty. et al. v. Turner et al.*, No. 2:25-cv-00814-BJR, Dkt. 169 (Order Granting Plaintiffs' First and Second Motions for Preliminary Injunctions) (W.D. Wash. June 3, 2025).

83.     The potential loss of federal funds will inflict irreparable harm not only by threatening Plaintiff with the loss of federal funds for vital programs that its residents and visitors depend on, but also by creating acute budgetary uncertainty as described below.

### IV.     THREATENED LOSS OF FEDERAL FUNDING

84.     Although Plaintiff's claims in this action are not premised on any specific grant or contract, this section of the Complaint is intended to illustrate the reach of the unlawful Orders by the various federal agencies who award federal grant money and the means used by the Trump Administration to advance its policy agenda expediently but unlawfully.

85.     Like other major United States cities, Seattle relies heavily on federal funding. Beginning January 1, 2025, Seattle has legal and appropriations authority to spend approximately $370 million in federal grant funds.

86.     Multiple critical programs for Seattle's residents and visitors are placed at risk due to the Executive Orders. These programs include federal monies allocated from the Department of Justice and the Department of Homeland Security for the funding of items such as police tactical gear, fire department needs, health services, and more.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 21
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

87.     Among other priorities, these federal dollars also provide services for vulnerable residents needing access to food, medical care, shelter, and other housing assistance. If that funding were eliminated, harm would be felt by Seattle's most vulnerable residents immediately.

88.     The Orders introduce significant budgetary uncertainty into Seattle's projected financial plans for the fiscal year 2025–2026. Much of Seattle's federal funding is provided on a reimbursable basis. Seattle expends funds to provide programs and services that the federal government has agreed to reimburse. Seattle is currently funding large capital projects to build and maintain public infrastructure and maintain ongoing programs for its residents based on the federal government's commitment to reimburse Seattle for these costs. Threats and uncertainty regarding the federal government's funding presents an unacceptable fiscal and budgetary challenge.

89.     Seattle's internal budget guidance, for example, instructs that grants and other funding agreements are included in a proposed budget if they "have been received for at least three consecutive prior years and can reasonably expect to continue in the new year." Because Seattle cannot discern from the unconstitutionally vague Orders which activities the Defendants would consider lawful, they cannot predict which funding sources will continue and which founding sources will not.

90.     The Executive Orders introduce significant budgetary uncertainty into Plaintiff's financial plans for fiscal year 2025–2026. Much of Plaintiff's federal funding is provided on a reimbursable basis. Plaintiff expends funds to provide programs and services that the federal government has agreed to reimburse. Seattle is currently funding large capital projects to build and maintain public infrastructure, as well as essential ongoing programs for its residents and visitors, based on the federal government's commitment to reimburse them for these costs. Threats and uncertainty regarding the federal government's funding presents an unacceptable fiscal and budgetary challenge.

**Corr Cronin llp**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**A. Seattle's Transportation Funding**

91.    The Seattle Department of Transportation ("SDOT") relies heavily on federal grant funds to support its transit and critical infrastructure projects.

92.    Seattle's total active federal grants for transportation-related projects are valued at $440 million, funding important transportation programs and infrastructure capital projects. Projects supported by these grants are in various phases, ranging from outreach, planning, and design, to construction and maintenance.

93.    DOT provides federal funds to Seattle for critical road and street infrastructure projects. For example, Safe Streets and Roads for All ("SS4A") is a competitive grant program that provides funding for improving roadway safety through the development, refinement, and subsequent implementation of comprehensive safety action plans.

94.    This essential infrastructure funding is threatened by DOT's unlawful attempts to impose the terms of the Orders upon grant recipients like Seattle.

95.    For instance, on March 17, 2025, DOT updated the terms of the SS4A 2024 grant agreements which had been signed by grant recipients as far back as October 2024 in DOT's online grants award system, to incorporate a new version of that agreement with requirements related to DEI and gender ideology, which patently do not have anything to do with pedestrian and roadway safety. SDOT, which administers the existing SS4A grants for Seattle, did not receive notice from DOT that it was changing the terms.

96.    Section 24.2 Federal Law and Public Policy Requirements of the revised SS4A grant terms and conditions, dated March 17, 2025, now states the following:

> (a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S.

Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b)  Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c)  Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.[18]

97.     SDOT is a recipient of a fiscal year 2022 SS4A grant, which was executed in 2024, and has applied for and/or intends to apply for fiscal year 2025 SS4A grants.

98.     SDOT is also a recipient of a DOT RAISE ("Rebuilding American Infrastructure with Sustainability and Equity") grant, which was executed in 2023. RAISE is a competitive grant program that provides funding to advance capital investments in surface transportation infrastructure that will have a significant local or regional impact.

99.     On April 23, 2025, DOT updated the Federal Law and Public Policy Requirements associated with the SDOT's RAISE grant. The new requirements, found at Section 19.2, are identical to the language quoted in Paragraph 13 above and expressly incorporate the Anti-Diversity Order and certification requirement.[19]

---

[18] *Id*. at p. 25.
[19] *See* U.S. Dep't of Transp., Fed. Highway Admin., *RAISE FY2022 General Terms and Conditions* (Apr. 23, 2025) (PDF), raise-fy2022-fhwa-general-terms-and-conditions-20250423.pdf.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 24
(No. _____)

Corr Cronin llp
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**B.  Seattle's Housing Funding**

100.    The Seattle Human Services Department ("HSD") administers tens of millions of federal dollars that connect Seattle residents with critical resources, including food and health care. Pursuant to a Master Services Agreement with the King County Regional Homelessness Authority ("KCRHA"), HSD also supports initiatives to provide outreach to people experiencing homelessness. Further, HSD also provides federal grant money to the Office of Housing ("OH"), a Seattle executive office which administers affordable housing programs.

101.    HUD funds a number of critical programs under the Consolidated Plan and Annual Action Plan, including the Community Development Block Grant ("CDBG") Program, Emergency Solutions Grants ("ESG") Program, Housing Opportunities for Opportunities for Persons with Aids ("HOPWA") Program, and the HOME Investment Partnerships ("HOME") Program.

102.    To take just one example of those mentioned, Community Development Block Grant ("CDBG") is a critical program funded by the federal government. CDBG primarily serves low- to moderate-income populations in Washington. The CDBG Program provides annual grants on a formula basis to cities to develop viable urban communities by providing safe housing and a suitable living environment.

103.    In 2025, $8,917,476 in federal funding was allocated by HUD to HSD's CDBG program.

104.    The CDBG Program has played a critical role in revitalizing low-income areas of Seattle. The Program has had a substantial positive economic impact on Southeast Seattle, which is one of the nation's most diverse neighborhoods.

105.    All these programs covered under the Annual Action Plan are an economic investment in the City of Seattle, as providing affordable housing within residents' means strengthens the job market and the economy.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

106.     Based on its historical interactions with HUD, HSD relies on the continued availability of these funds in supporting the above-mentioned programs. Furthermore, HSD and OH have incurred expenses for CDBG and HOME in anticipation of reimbursement from HUD.

107.     Thus, tens of millions of dollars of critical housing and services funds are at risk due to HUD's unlawful actions. If these funds become unavailable, then HSD likely could not continue to support many of these vital services through state and local funding alone, and the financial repercussions would be felt immediately.

108.     In other words, the Certification and HUD Letter create significant budgetary uncertainty for the City of Seattle, thereby presenting an actual and imminent harm to these projects and services.

## C. Seattle Fire Department and Seattle Police Department Funding

109.     Seattle Fire Department ("SFD") and Seattle Police Department ("SPD") receive federal funds from the DHS and DOJ that they use to save lives and protect property.

110.     As discussed above, one critical program that is federally funded through a DHS grant is BioWatch, a system designed to provide early detection of airborne biological threats, particularly those linked to bioterrorism, operated by state and local governments. Over the past decade, Seattle has relied on BioWatch funds to monitor the city's air for biohazards to help protect its residents. SFD pays the State Department of Health and a private laboratory to collect and analyze air samples from within the city. The BioWatch grant, in turn, refunds SFD for these costs. The program is designed to detect intentional, biological attacks. If detection of a hazard were to occur, SFD would engage in a coordinated effort by emergency responders, public health officials, and law enforcement to address the hazard. SFD's 2025 budget reflects approximately $2 million in funds from BioWatch.

111.     Continuation of the BioWatch monitoring program is an important component of our city's preparedness to counter a potential terrorist attack. If deprived of these funds, SFD would

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 26
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

lack access to technology to protect its community and prepare to respond to an airborne bioweapon.

112.    On June 4, 2025, SFD received a communication from the DHS Director of BioWatch Field Operations announcing that the updated DHS Standard Terms and Conditions (April 18, 2025 version) will apply to fiscal year 2025 BioWatch applications. As of this date, the application for 2025 funds has not been released.

113.    Additionally, SPD is the regional lead agency for the Urban Area Security Initiative ("UASI") grant, and SFD, as well as other first responder and law enforcement agencies, receives these funds. Washington State is one of the largest UASI recipients.

114.    UASI funding is primarily used for structural collapse training, including responses to bombings and earthquakes. UASI funds are also used for technical rescue team training, which prepares first responders to handle complex, high-risk emergencies that go beyond standard firefighting or emergency services operations. SFD offers its technical rescue team training to first responders throughout the region, so that many jurisdictions have an opportunity to train for the most dangerous of scenarios. A loss in funding for either technical rescue team or structural collapse training would have immediate and long-term effects on SFD and its neighboring first responders.

115.    Without this critical training, SPD, SFD and other jurisdictions risk reduced readiness for high-stakes emergencies such as building failures and earthquakes—scenarios that require precision, coordination, and advanced skills

116.    DHS grants support a range of regional efforts to coordinate and prepare for natural disasters and terrorist acts, including planning, organization, equipment purchase, training exercises, management, and administration. Collectively, the adverse impacts of eliminating federal funding for public safety priorities would leave Seattle, and its regional area by extension,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 27
(No. _____)

far less prepared to deal with threats such as forest fires, earthquakes, nuclear and biological attacks; or other terrorist actions.

### V.    PLAINTIFF'S LAWFUL EFFORTS TO PROMOTE DIVERSITY

117.    The City of Seattle complies with federal anti-discrimination laws as interpreted in binding judicial opinions by the United States Supreme Court, Ninth Circuit, and lower federal courts and as lawfully promulgated in applicable statutes and regulations. For the avoidance of any doubt, Plaintiff has complied, is complying, and will continue to comply, with these laws.

118.    The Trump Administration's gloss on what constitutes "unlawful discrimination" in violation of federal anti-discrimination law does not change the lawfulness of these programs, as determined by Congress and the judicial branch. That is, the current administration cannot override the law by Executive fiat.

119.    Seattle displays its lawful commitment to local diversity through multiple programs, including Seattle's Race and Social Justice Initiative ("RSJI"), which is codified by City of Seattle Ordinance 126799. Seattle Municipal Code § 3.14.943(A)–(C) (2025) authorizes the Seattle Office for Civil Rights to, among other tasks: develop analytical tools to help identify equity impacts of policies, practices, and decision making; develop guidelines for outreach, communication, and community engagement to improve the scope and effectiveness of external City efforts to ensure all communities receive information and have an opportunity to shape city policies and services; and assist City departments in policy development and actions that improve fairness and opportunity in employment, business, and other City government organizational practices. Seattle's RSJI program complies with federal and state anti-discrimination law.

120.    Likewise, Seattle supports the Women- and Minority-Owned Businesses ("WMBE") Program, which promotes access, consideration, and economic opportunities for women and minority-owned businesses. The City of Seattle actively supports utilization of WMBE on City contracts and supports the Citywide WMBE Program through the Department of Finance

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  and Administrative Services. City departments have outreach plans for engagement, each City

2  department has an outreach plan for engagement with the WMBE community, and the Department

3  of Finance and Administrative Services studies and publishes performance indicators regarding

4  WMBE utilization.

5      121.    Seattle is entitled to continue its efforts to promote diversity in its workforce and

6  its programs. It is committed to following existing civil rights laws and in fact bases its efforts on

7  its desire to value and protect the civil rights of all its employees, residents, and visitors.

8      122.    The Trump Administration, through the abovementioned unlawful Anti-Diversity

9  Order, is attempting to suppress Seattle's lawful DEI efforts by threatening loss of federal funding

10 and potential monetary sanctions if it promotes "equitable" treatment, even if that means nothing

11 more than advocating for objectively fair treatment, equal opportunity, or compliance with federal

12 civil rights laws.

## CAUSES OF ACTION

### COUNT I
### Separation of Powers
### (Against All Defendants)

16     123.    Plaintiff repeats and incorporates by reference each and every allegation previously

17 alleged as if fully set forth herein.

18     124.    Plaintiff states this cause of action against all Defendants, seeks preliminary and

19 permanent injunctions, and challenges the Orders and any agency action seeking to implement the

20 Orders both facially and as applied to it.

21     125.    Plaintiff's cause of action arises from the principle of non-statutory review to enjoin

22 Executive Officers and Departments from enforcing illegal, *ultra vires* Presidential action.

23     126.    The U.S. Constitution vests Congress, not the President, with the exclusive

24 authority over federal spending under Article I, Section 8, and Article I, Section 9, Clause 7. The

25 Anti-Diversity and Gender Executive Orders usurp this power by directing federal agencies to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 29
(No. _____)

**Corr Cronin llp**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1   unilaterally terminate or modify federal grants and contracts, despite lacking any congressional

2   authorization to do so.

3        127.    Article I of the Constitution vests Congress with the powers to make laws and

4   control the public fisc. The Presentment Clause provides that "[e]very Bill which shall have passed

5   the House of Representatives and the Senate, shall, before it become a Law, be presented to the

6   President of the United States." U.S. CONST. art. I, § 7, cl. 2. The Appropriations Clause provides

7   that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made

8   by Law," U.S. CONST. art. I, § 7, and the Spending Clause vests Congress with the power to use

9   Treasury funds for the "general Welfare of the United States," U.S. CONST. art. I, § 8, cl. 1.

10       128.    Thus, it is Congress, not the President, which is vested with the power of the purse.

11  The President does not have unilateral power to withhold federal funds that have been previously

12  appropriated by Congress and signed into law, and the President does not have the power to impose

13  his own conditions on the use of funds when Congress has not delegated to him the power to do

14  so.

15       129.    As part of its power over the public fisc, Congress appropriates billions of dollars

16  every year in social service, research, healthcare, and educational grants. Congress may specify

17  how its grants are used, generally bypassing statutes, or in the annual appropriations bill. None of

18  the congressional conditions placed on the grants administered or disbursed contain the unique

19  restrictions described in the Orders relating to "diversity, equity, inclusion, and accessibility," or

20  the promotion of "gender ideology."

21       130.    No provision of the U.S. Constitution authorizes the Executive to enact, amend, or

22  repeal statutes, including appropriations approved by Congress and signed into law by the

23  President. The Executive cannot unilaterally amend or cancel appropriations that Congress has

24  duly enacted. By directing agencies to terminate congressionally appropriated grants based on the

25  President's own policy preferences, the Orders violate the Separation of Powers in attempting to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 30
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations. These mandates exceed the President's powers under Article II, and thus unconstitutionally infringe upon those powers vested in Congress and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses. *See* U.S. CONST. art. I, § 7, cl. 2, 3; *see also* U.S. CONST. art. II.

131.    The Executive Branch does not have the authority to condition the payment of federal funds in adherence to its policy priorities. Indeed, even Congress may not "'surprise[] states with post acceptance … conditions' on federal funds and 'impose conditions on federal grants that are unrelated to the federal interest in particular national projects or grants.'" *Washington v. Trump*, 768 F. Supp. 3d 1239, 1262 (W.D. Wash. 2025) (quoting *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019) (brackets and ellipses in original). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effect its own policy goals." *City & Cnty. of San Francisco v. Trump*, 987 F.3d 1225, 1235 (9th Cir. 2018). When "Congress [does] not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers." *Id.*

132.    By directing agencies to terminate or withhold congressionally appropriated funds, the Orders attempt to expend public funds to advance the President's policy preferences, rather than those of Congress. This exceeds the President's powers under Article II and unconstitutionally infringes upon those powers vested in Congress.

133.    The Anti-Diversity Order also independently unconstitutionally exceeds the President's powers as the federal courts have interpreted Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, which prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance, insofar as it purports to expand the reach of federal anti-discrimination law.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

134.    The Anti-Diversity Order also improperly seeks to amend the Federal False Claims Act by amending the definition of "material" under the statute. Not only does the President lack power to adopt or amend legislation, the proposed revision to the materiality standard conflicts with the existing definition of materiality as interpreted by the U.S. Supreme Court in *Univ. Health Servs. v. United States*, 579 U.S. 176, 191 (2016).

135.    The general statement in the Orders about nominal adherence to the law does not suffice to evade judicial review. The Administration's assertions that its policy preferences have legal force undermines any credible claim that it acts solely against conduct that violates federal law as interpreted by the courts.

136.    These actions exceed the President's powers under Article II, unconstitutionally infringe upon those powers vested in Congress, and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses.

137.    Plaintiff is entitled to a declaration that the Orders violate the constitutional principles of the separation of powers doctrine and impermissibly claim for the executive power that is reserved to Congress.

138.    Plaintiff is further entitled to a preliminary and permanent injunction preventing Defendants from enforcing or implementing the Orders against Plaintiff.

**COUNT II**
**Spending Clause**
**(Against All Defendants)**

139.    Plaintiff repeats and incorporates by reference all previously alleged allegations as if fully set forth herein.

140.    Plaintiff states this cause of action against all Defendants, seeks preliminary and permanent injunctions, and challenges the Orders and any agency action seeking to implement the Orders both facially and as applied to it.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 32
(No. _____)

141.    The Taxing and Spending Clause of the United States Constitution is one of Congress's enumerated powers. *See* U.S. CONST. art. I, § 8, cl. 1. Under the Spending Clause, "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States…"

142.    "Incident to this power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980) (opinion of Burger, C.J.)).

143.    However, the Executive does not have the authority to refuse to spend the funds Congress has appropriated. *City & Cnty. of San Francisco*, 897 F.3d at 1232 (citing *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)).

144.    For the reasons discussed above, *supra* Count I, Defendants have violated the Spending Clause for the same reasons they have violated Separation of Power principles; that is, by purporting to allow the Executive to elect not to spend federal funds that Congress has allocated to the City through its appropriations powers.

145.    Additionally, the Executive Orders are independently unconstitutional under the Spending Clause because they do not meet several factors under *Dole* for attaching conditions to federal grants.

146.    Under *Dole*, "(1) the expenditure must 'advance the general welfare'; (2) any attached condition must be 'unambiguous[ ]'; (3) conditions must relate 'to the federal interest in particular national projects or programs'; (4) conditions cannot violate another constitutional provision; and (5) conditions cannot 'be so coercive … [that] pressure turns into compulsion.'" *W.*

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1141 (11th Cir. 2023) (quoting *Dole*, 483 U.S. at 207–11).

147.    As discussed above, the Executive Orders purport to impose conditions on the expenditure of funds that are not reasonably related to the federal interest in grant objectives and therefore do not pass muster under the Spending Clause. For instance, the Executive's interest in banning DEI has nothing to do with whether the City of Seattle should receive BioWatch funding for early detection of airborne biological and bioterrorism threats.

148.    The Executive Orders are additionally unlawful under the Spending Clause because their terms are ambiguous. For instance, the Anti-Diversity Order does not define "DEI," leaving Plaintiff in the untenable position of speculating whether its programs and policies comport with the Orders.

149.    The Orders are also unlawful because they are unduly coercive, as they threaten significant percentages of Plaintiff's budget and introduce significant uncertainty into its financial programs and planning.

150.    Plaintiff is entitled to a declaration that the Orders violate the Spending Clause and impermissibly seize for the executive branch power that is reserved to Congress.

151.    Plaintiff is further entitled to a preliminary and permanent injunction preventing Defendants from enforcing or implementing the Orders.

**COUNT III**
**Fifth Amendment Due Process Clause (Vagueness)**
**(Against All Defendants)**

152.    Plaintiff repeats and incorporates by reference each and every allegation previously alleged as if fully set forth herein.

153.    Plaintiff states this cause of action against all Defendants, seeks preliminary and permanent injunctions, and challenges the Orders and any agency action seeking to implement the Orders both facially and as applied to it.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 34
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

154.    Plaintiff's cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, *ultra vires* Presidential action.

155.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."

156.    Due process requires that parties "know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Clear guidance ensures "those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

157.    Under the Fifth Amendment to the United States Constitution, a governmental enactment, such as the Orders, is unconstitutionally vague if it fails to provide a person of ordinary intelligence with fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement. Differently stated, governmental enactments are unconstitutionally void for vagueness when their prohibitions are not clearly defined.

158.    The Anti-Diversity Order requires certification, enforceable through the FCA, that a contractor and grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," without definition or guidance as to what these terms mean. Likewise, the Anti-Diversity Order directs the Attorney General to take "appropriate measures . . . to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify … potential civil compliance investigations" to accomplish such "deter[rence]."

159.    The vagueness of the Anti-Diversity Order's terminology requires subjective interpretation by the President and federal agencies and therefore lends itself to discriminatory enforcement. By the Anti-Diversity Order's terms (or lack thereof), each agency head is authorized to exercise unfettered discretion to determine whether any aspect of a federal grant, training or program is "equity-related."

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

160.    Similarly, the Gender Order does not explain what it means to "promote" "gender ideology," which can result in loss of federal grant funding.

161.    Accordingly, Plaintiff has not received fair—or any—notice of what is prohibited under the Orders, which makes it impossible to come into compliance with the Orders.

162.    For example, the Orders leave Plaintiff guessing about whether it may accept federal grants and continue to train its own employees on best practices for serving the diverse population of residents and visitors to Seattle.

163.    Specifically, the Orders leave the City of Seattle confounded about whether it can accept federal grants and continue to lawfully operate its Race and Social Justice Initiative, which is the "City's policy and goal to end institutional racism within City government, working toward a vision where racial disparities will be eliminated and racial equity achieved" throughout Seattle. *See* City of Seattle Ordinance 126799.

164.    Similarly, the Gender Order provides no definition of what constitutes "promotion" of "gender ideology," leaving Seattle to guess as to what actions Defendants would consider a violation of the Order. Likewise, the Anti-Diversity Order provides no definition of "illegal DEIA," leaving Seattle to guess as to whether the Trump Administration would view its RSJI and similar diversity efforts as unlawful discrimination.

165.    The DOT Letter, however, makes clear that the DOT will view *any* DEI-related program as inherently suspect and presumptively unlawful: "Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates federal law."[20]

166.    Despite the Orders' breadth and vagueness, they include a range of penalties, including cancellation of existing contracts, loss of eligibility for future government contracts,

---

[20] DOT Letter at 2.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 36
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

discontinuation of federal grants, and potential liability under the FCA. The Orders require contractors and grantees to agree that compliance with the government's vague terms is "material" to funding for purposes of the FCA, thus invoking the specter of vexatious whistleblower litigation carrying enormous litigation expense and the threat of significant monetary damages.

167.    Plaintiff conducts trainings, performs research, provides services, and engages in advocacy to serve diverse populations. Plaintiff does not know which of its activities are prohibited by the Orders. As the DOT Letter states, even "neutral" policies and activities will be considered "presumptively illegal" if they serve unspecified "DEI goals." Because of this uncertainty, Plaintiff is justifiably fearful that conducting these activities might imperil its direct or indirect federal funding.

168.    The Orders violate the Due Process Clause of the Fifth Amendment to the Constitution and are void for vagueness because they infringe on Plaintiff's constitutionally protected right to operate its lawful programs and provide inadequate notice of the conduct they purport to prohibit.

169.    Plaintiff is entitled to a declaration that the Orders are unconstitutionally vague in violation of the Fifth Amendment.

170.    Plaintiff is further entitled to a preliminary and permanent injunction preventing the Agency Defendants from enforcing or implementing the Orders.

**COUNT IV**
**Tenth Amendment**
**(Against All Defendants)**

171.    Plaintiff repeats and incorporates by reference all previously alleged allegations as if fully set forth herein.

172.    Plaintiff states this cause of action against all Defendants, seeks preliminary and permanent injunctions, and challenges the Orders and any agency action seeking to implement the Orders both facially and as applied to it.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 37
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

173.   The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited to it by the States, are reserved to the States respectively, or to the people." U.S. CONST. amend X.

174.   Under the Tenth Amendment, the federal government may not "coerce[ ] a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012). Coercion occurs when "pressure turns into compulsion." *Id.* at 580.

175.   Courts in the Ninth Circuit have found coercion under the Tenth Amendment where the application of executive orders "would have significant effects on [localities'] ability to provide services to their residents and … they may have no legitimate choice regarding whether to accept the government's conditions in exchange for those funds." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 533 (N.D. Cal. 2017).

176.   The potential loss of all federal funding placed at risk by the Orders here is coercive under the Tenth Amendment. The Orders thus violate the anti-commandeering principle of the Tenth Amendment.

177.   Plaintiff is entitled to a declaration that the Gender Order and Anti-Diversity Order violate the anti-commandeering principle of the Tenth Amendment.

178.   Plaintiff is further entitled to a preliminary and permanent injunction preventing all federal departments and agencies from enforcing or implementing the Orders by taking any action to withhold, freeze, or condition federal funds from Plaintiff.

**COUNT V**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**(Contrary to Constitution, Excess of Statutory Authority, Arbitrary, and Capricious)**
**(Against All Defendants)**

179.   Plaintiff repeats and incorporates by reference all previously alleged allegations as if fully set forth herein.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 38
(No. _____)

180.     Plaintiff states this cause of action against all Defendants, seeks preliminary and permanent injunctions, and challenges the Orders and any agency action seeking to implement the Orders both facially and as applied to it.

181.     Plaintiff brings this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

182.     Defendants have taken actions to eliminate grant funding for recipients such as Plaintiff that have DEIA programs and activities without defining what types of programs and activities are banned as "DEI" or "DEIA" and without any prior determinations of their illegality by the federal courts.

183.     They have also conditioned federal funds on a requirement that recipients refrain from engaging in "gender ideology," a vague term used by the federal government making it unclear how Plaintiff is to comply.

184.     These agency actions cut off federal funding, through contracts or grants, to any program or activity that is "DEI" or "DEIA"—or related to "DEI" or "DEIA"—without any prior determination of (a) why they are considered to be "DEI" or "DEIA" or (b) why they are illegal pursuant to criteria that is articulable, discernible, and publicly known.

185.     The agencies' actions in response to the unlawful Orders constitute agency actions that should be set aside for at least three reasons:

(1)     The agencies' actions taken pursuant to the Orders are contrary to constitutional right, power, privilege, or immunity in violation of 5 U.S.C. § 706(2)(B), as more particularly described in Counts I, II, and IV, above.

(2)     The agencies' actions taken pursuant to the Orders are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C), as more particularly described in Count III, above. *See Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 868

1    (W.D. Wash. 2020) ("[A]dministrative agencies may not act outside the
2    scope of the authority delegated to them by Congress.").

3       (3)   The agencies' actions are arbitrary and capricious, in violation of 5 U.S.C.
4    § 706(2)(A). The Orders include vague and subjective terms that lend
5    themselves to conflicting interpretations and appear designed to authorize
6    discriminatory and arbitrary enforcement. The arbitrariness and
7    capriciousness of the Orders is further demonstrated by the utter lack of
8    nexus between the subject matter of the Orders and the grant-related
9    activities of Plaintiff. *See Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v.*
10   *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must
11   examine the relevant data and articulate a satisfactory explanation for its
12   action including a 'rational connection between the facts found and the
13   choice made.'") (quoting *Burlington Truck Lines v. United States*, 371 U.S.
14   156, 168 (1962)).

15      186.   The Court should hold unlawful and set aside the actions of the agencies acting
16   pursuant to the Orders.

17                       **VI.    PRAYER FOR RELIEF**

18   WHEREFORE, Plaintiff respectfully requests the following relief:

19      a.   A declaratory judgment under 28 U.S.C. § 2201(a) that the Orders and any
20   implementing agency actions are unlawful and unconstitutional;

21      b.   Preliminary and permanent injunctions enjoining Defendants, their officials,
22   agents, employees, assigns, and all persons acting in concert or participating with
23   them and all other federal Departments and Agencies from implementing and
24   enforcing the Orders against Plaintiff;

25

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

c.    A permanent injunction mandating that Defendants and all other federal Departments and Agencies modify or otherwise rectify contracts, subcontracts, agreements, and/or any other such binding documents entered into with Plaintiff that contains unlawful terms, clauses, or provisions in furtherance of the Orders;

d.    Costs and reasonable attorneys' fees as permitted by law; and

e.    Any such further relief as the Court may deem just and equitable.

DATED: July 31, 2025

CORR CRONIN LLP

*s/Jeffrey B. Coopersmith*
Jeffrey B. Coopersmith, WSBA No. 30954

*s/ Emily J. Harris*
Emily J. Harris, WSBA No. 35763

*s/Eric A. Lindberg*
Eric A. Lindberg, WSBA No. 43596

*s/Kathryn Joy,*
Kathryn Joy, WSBA No. 60056

*s/Rachel E. Hay*
Rachel E. Hay, WSBA No. 60245

*s/Renee M. Howard*
Renee M. Howard, WSBA No. 38644

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington  98104-1001
Ph: (206) 625-8600 | Fax: (206) 625-0900
jcoopersmith@corrcronin.com
eharris@corrcronin.com
elindberg@corrcronin.com
kjoy@corrcronin.com
rhay@corrcronin.com
rhoward@corrcronin.com

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 41
(No. _____)

1

2

ANN DAVISON
SEATTLE CITY ATTORNEY

3

*s/ Ghazal Sharifi*
Ghazal Sharifi, WSBA No. 47750

4

*s/Kerala Cowart*
Kerala Cowart, WSBA No. 53649

5

6

*s/Rebecca Widen*
Rebecca Widen, WSBA No. 57339

7

8

ANN DAVISON
SEATTLE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7095
Ph: (206) 684-8200
Ghazal.Sharifi@seattle.gov
Kerala.Cowart@seattle.gov
Rebecca.Widen@seattle.gov

9

10

11

12

*Attorneys for Plaintiff City of Seattle*

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 42
(No. _____)