The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CITY OF SEATTLE, | No. 2:25-cv-01435-BJR |
| Plaintiff, | PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| v. | **ORAL ARGUMENT REQUESTED** |
| DONALD J. TRUMP, President of the United States; UNITED STATES OF AMERICA; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; OFFICE OF FEDERAL CONTRACTS COMPLIANCE PROGRAMS; CATHERINE ESCHBACH, in her official capacity as Director of Office of Federal Contracts and Compliance Programs; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget; U.S. DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as the Secretary of Transportation; FEDERAL TRANSIT ADMINISTRATION; TARIQ BOKHARI, in his official capacity as Acting Administrator of the Federal Transit Administration; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; and | |

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 1
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

DOES 1–100,

        Defendants.

## I. INTRODUCTION

At stake in this litigation is approximately $370 million in federal grant funds which Plaintiff City of Seattle ("Seattle") has the legal authority to spend. Seattle's congressionally appropriated funds support critical infrastructure programs, counter-terrorism efforts, emergency fire and rescue services, and other programs necessary to promote safety. Yet President Donald Trump and his Administration are imperiling these funds through recent Executive Orders that unlawfully condition receipt of funding on Seattle's compliance with the Administration's policy agenda. These Executive Orders—No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the "Anti-Diversity Order")[1] and No. 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Order")[2] (together, "the Orders")—are fatally unconstitutional and illegal. Seattle is left with the untenable choice of capitulating to the Administration's unlawful orders, accepting the funds and facing burdensome investigations and lawsuits under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, or declining the funds and navigating significant budgetary uncertainty and shortfalls.

Seattle respectfully asks this Court to enjoin Defendants from enforcing the FCA certification requirement (Section 3(b)(iv)) of the Anti-Diversity Order and the federal funding condition (Section 3(g)) of the Gender Order in connection with any grants to Seattle.

---

[1] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).
[2] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 2
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## II. STATEMENT OF FACTS

Pursuant to this Court's Standing Order, undersigned counsel met and conferred over the course of almost three weeks with counsel for Defendants, as addressed in the Declaration of Jeffrey B. Coopersmith.

### A. The Trump Administration Promulgates Unlawful Executive Orders.

Immediately upon taking office, President Trump issued two nebulous and illegal Executive Orders: the Anti-Diversity Order and the Gender Order. The Anti-Diversity Order purports to leverage the significant threat of investigations and penalties under the FCA to police the Administration's indeterminate concept of "illegal DEI and DEIA policies" by requiring all federal contract and grant recipients to certify that they "do[ ] not operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws." Anti-Diversity Order, Section 3(b)(iv)(B).

The Anti-Diversity Order and other statements and actions from the Trump Administration make clear its position that all DEI-related policies or programs violate federal law, regardless of whether they actually accord with federal law or not. The Gender Order incorporates a similarly vague funding restriction which dictates that "[f]ederal funds shall not be used to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *See* Gender Order, Section 3(g). The Gender Order does not define what constitutes "promot[ing] gender ideology," but given the broad definition of "gender ideology" itself, it is clear that the prohibition would include workplace routines and policies that otherwise comply with federal law.

### B. The Executive Orders Endanger the Security of the City of Seattle.

The potential loss of federal funds due to the unlawful Orders poses a significant threat to the City of Seattle, which relies on federal monies to support everything from purchases of police

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 3
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

tactical gear to firefighting training.[3] The Orders have already triggered the imposition of several unlawful conditions by the Agency Defendants across the federal government.

1.  **The Orders Trigger the Agency Defendants to Impose Unlawful Conditions on Seattle's Most Critical Grants.**

In February 2025, U.S. Attorney General Pamela Bondi issued a memorandum (the "DOJ Memo") asserting that the Department of Justice ("DOJ") "will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities" of a broad array of federal fund recipients.[4] The Agency Defendants have followed suit by modifying pre-existing federal grant terms in an effort to implement the Orders' vague directives against Seattle.

For example, in April 2025, the Department of Homeland Security ("DHS") modified its Standard Terms and Conditions to require grant recipients to certify that "[t]hey do not, and will not during the term of [a grant award], operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws."[5] Applicants must certify "under penalty of perjury" that they will comply with the updated DHS Standard Terms and Conditions. *Id.* at § IX(2). Later, on July 28, 2025, DHS issued its Notice of Funding Opportunity ("NOFO") for the Fiscal Year 2025 Homeland Security Grant Program, which funds several grants on which Seattle relies. *See* Scoggins Decl. ¶ 19. The newly issued Homeland Security Grant Program NOFO requires applicants to identify whether any "subrecipient [of the grant] has any DEI practices" and tasks the FEMA Office of Civil Rights with "ensuring compliance with and enforcement of federal civil rights obligations in connection with programs and services conducted by FEMA" consistent with the Anti-Diversity Order. *Id.* ¶ 20, Ex. A. The

---

[3] *See, e.g.*, Maxey Decl. ¶ 26; *see also* Scoggins Decl. ¶ 9.
[4] *See* U.S. Dep't of Just., Office of the Att'y Gen., Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.
[5] U.S. Dep't of Homeland Sec., FY 2025 DHS Standard Terms and Conditions, Version 3 (Apr. 18, 2025), https://www.dhs.gov/sites/default/files/2025-08/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 4
(Case No. 2:25-cv-01435-BJR)

Corr Cronin llp
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

NOFO gives Seattle *just two weeks* to identify what would be considered "DEI practices" and weigh the risks of outlining them for the Administration or forgoing critical funding. *Id.* ¶ 20.

In May 2025, the Office of Housing and Urban Development ("HUD") amended its Applicant and Recipient Assurances and Certifications—which applicants are required to complete to receive grants and submit grant applications—to require Seattle to certify that it "[w]ill not use Federal funding to promote diversity, equity, and inclusion ("DEI") mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws."[6] Kim Decl. ¶ 14. In June 2025, HUD issued a letter (the "HUD Letter") providing that "the FY2025 grant agreement[s]" will "emphasize conformity with applicable Administration priorities and executive orders." Kim Decl. ¶ 16. A recipient must also "agree[] that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the FCA]." *Id.* The HUD Letter proscribes that recipients "shall not use grant funds to promote 'gender ideology' as defined in the [Gender Order]." *Id.*[7]

In April 2025, the Department of Transportation ("DOT") modified the Federal Transit Administration's Master Agreement governing several Seattle grants.[8] The updated version, known as "MA 33," incorporates the Anti-Diversity and Gender Orders and requires recipients to certify that they "do[] not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws." Wood Decl. ¶ 7.

---

[6] U.S. DEP'T OF HOUS. & URBAN DEV., FORM HUD 424-B: APPLICANT AND RECIPIENT ASSURANCES AND CERTIFICATIONS (Jan. 27, 2023), https://www.hud.gov/sites/dfiles/OCHCO/documents/424B.pdf; *see also* U.S. DEP'T OF HOUS. & URBAN DEV., RESPONSE TO COSCDA AND NCDA REGARDING FY 2025 CONSOLIDATED PLAN GUIDANCE (June 5, 2025) https://ncdaonline.org/wp-content/uploads/2025/06/6-5-2025-HUD-Response-to-COSCDA-NCDA.pdf.

[7] *See City of Fresno, et. al. v. Turner, et al.*, No. 3:25-cv-07070 (N.D. Cal. Aug. 20, 2025) (HUD letter required City of Fresno affirm it shall not use grant funds to "promote 'gender ideology.'").

[8] FED. TRANSIT ADMIN., FTA MASTER AGREEMENT, VERSION 33 (Apr. 25, 2025), https://www.transit.dot.gov/funding/grants/grantee-resources/sample-fta-agreements/fta-master-agreement-version-33-april-25.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 5
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Recipients must agree that their "compliance" with MA 33 "in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA]." *Id.* Also in April 2025, DOT issued a letter (the "DOT Letter") clarifying that certain activities "presumptively" violate federal law, including "policies or practices designed to achieve so-called 'diversity, equity, and inclusion' or 'DEI' goals." Wood Decl. ¶ 19. The DOT Letter warns grant recipients that they could be subject to audits, "possible recovery of funds," or termination of funding if DOT determines the recipient violated the funding agreement. *Id.* ¶ 20.

### 2. Seattle Faces Imminent Harm from the Unlawful Orders and Grant Conditions.

Seattle faces imminent harm and severe budgeting uncertainty from the imposition of these new conditions, jeopardizing essential public services these funds support. For example, Seattle uses DOJ funds to support law enforcement programs that prevent and reduce crime, provide victim services, law enforcement training, implement community-based programs, and purchase crime-solving equipment. Maxey Decl. ¶ 13. DOJ funds support Seattle's critical efforts to detect and combat child exploitation through its Northwest Regional Internet Crimes Against Children Task Force. *Id.* ¶ 15. Without these funds, Seattle's ability to prevent, investigate, and solve crimes would be significantly impaired. *Id.* ¶¶ 17, 21, 28, 29.

Seattle relies on DHS funds to support a wide array of public safety and preparedness functions. Among other things, DHS funds support Seattle's search and rescue teams, hazmat responses, detection of bioterrorism threats, emergency medical care, and waterfront emergencies. Scoggins Decl. ¶¶ 11, 16–18, 22; Maxey Decl. ¶¶ 22, 25–27. These funds are also used to coordinate regional law enforcement trainings throughout Washington State. Scoggins Decl. ¶ 25; Maxey Decl. ¶ 23. A loss of DHS funding would leave the Seattle area far less prepared to deal with public safety threats, detect nuclear and biological attacks, respond to terrorist actions, and provide important regional training. Scoggins Decl. ¶ 25; Maxey Decl. ¶ 29.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 6
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Seattle uses HUD funds to provide safe living environments for its residents. Kim Decl. ¶¶ 5, 21. These funds play a critical role for affordable housing, supporting at-risk residents, reducing crime and homelessness, and revitalizing low-income areas of Seattle. *Id.* ¶¶ 20–21, 23, 29. Without HUD funds, Seattle will lose access to supportive housing and care services. *Id.* ¶ 32.

Finally, Seattle relies heavily on DOT funds to expand and support its transit infrastructure and to support pedestrian and roadway safety projects. Woods Decl. ¶¶ 3–4, 8. The grants fund improvements to and maintenance of Seattle's mass transit system, support ADA accessibility, and enhance rider safety. *Id.* ¶¶ 5(a)–(f). A loss in DOT funding would stall Seattle's efforts to provide safe streets, delay transit expansion, and impact maintenance of existing transit systems. *Id.* ¶ 15.

The federal funds Seattle uses are unrelated to the DEI, DEIA, and gender ideology goals of the Orders. By threatening funding, the Orders undermine Seattle's ability to protect public safety, support emergency shelter and services, and enforce its criminal and traffic laws.

### III.  ARGUMENT

A preliminary injunction is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All these factors heavily favor Seattle.

**A.    Seattle Is Likely to Prevail on the Merits of Its Claims.**

Seattle is likely to prevail on the merits—the most important element of *Winter*—because the Orders are facially unconstitutional and violate the Administrative Procedure Act ("APA"). *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).

**1.    The Orders Violate Separation of Powers Principles.**

The Orders violate the Separation of Powers doctrine. The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*,

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 7
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

897 F.3d 1225, 1231 (9th Cir. 2018). No part of the Constitution permits the Executive to unilaterally amend or cancel appropriations that Congress has duly enacted. "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effect its own policy goals." *Id.* at 1235. When Congress attaches conditions to federal funds, it must do so "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (cleaned up). Without an express delegation of congressional authority, the President's power to impose conditions on federal funds "is at its lowest ebb." *San Francisco*, 897 F.3d at 1233 (cleaned up). As this Court just recognized, "These budget decisions are not mere technical exercises, they reflect difficult judgments (and compromises) about how best to allocate our nation's resources … [U]nder the constitution, it is Congress—not the President—that has the authority to make those judgments." *See* Order Granting Plaintiffs' Third Mot. for Prelim. Inj. at 1–2, *King County et al. v. Turner et al.*, 2:25-cv-00814-BJR (Aug. 12, 2025).

Section 3(b)(iv) of the Anti-Diversity Order and Section 3(g) of the Gender Order unconstitutionally infringe upon Congress's power to set funding conditions. The Anti-Diversity Order directs Seattle to certify it "does not operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws." Section 3(b)(iv)(B). Similarly, the Gender Order instructs agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Section 3(g). Congress did not authorize these conditions, and the Executive may not unilaterally declare otherwise.

The Anti-Diversity Order also unlawfully circumvents the Bicameralism and Presentment requirements of Article I. *See* U.S. CONST. art. I, § 7, cl. 2–3. First, the Anti-Diversity Order unconstitutionally exceeds the President's powers under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* The Act prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. The Anti-Diversity Order, especially when viewed in context of the Administration's pronouncements, unilaterally expands

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 8
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

the definition of "federal anti-discrimination law" by including any DEI or DEIA initiative as a form of illegal discrimination. *See, e.g.*, DOT Letter (declaring that "policies or practices designed to achieve so-called 'diversity, equity, and inclusion' or 'DEI' goals" "presumptively" violate federal law). Wood Decl. ¶ 19. But only Congress may amend legislation, not the Executive.

Second, the Anti-Diversity Order improperly seeks to impose FCA liability on Seattle by revising the FCA to impose a new statutory materiality standard that is inconsistent with existing case law interpreting the FCA. The FCA imposes liability on anyone who "knowingly makes, uses or causes to be made or used, a false record or statement *material* to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (emphasis added). The statute defines "material" as "having the natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id*. at § 3729(b)(4). However, the Anti-Diversity Order expands this definition by forcing Seattle to certify "that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decision for purposes of section 3729(b)(4) of title 31, United States Code." Anti-Diversity Order, Section 3(b)(iv). This certification requirement is unlawfully being applied to Seattle's grants for a variety of projects unrelated to DEI. *See* Wood Decl. ¶¶ 3–7, 10 (infrastructure); Scoggins Decl. ¶ 16, 19–20 (search and rescue training); Kim Decl. ¶¶ 8, 14, 16 (affordable housing).

The wholesale declaration that compliance with "all applicable Federal anti-discrimination laws" is material to the federal government's decision to pay *all* federal grant dollars is an *ultra vires* amendment of the FCA definition of "materiality", which requires that the false statement have a "natural" tendency to influence the receipt of government money. The Supreme Court recognizes that the materiality standard is "demanding" and is enforced "rigorously" by the federal courts "to shield government contractors from 'onerous and unforeseen FCA liability as the result of noncompliance with any of potentially hundreds of legal requirements established by contract.'" *United States ex rel. Bashir v. Boeing Co.*, 765 F. Supp.3d 1111, 1128 (W.D. Wash. 2025) (quoting

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 9
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010)). As the Supreme Court held in *Universal Health Services v. Escobar*, "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." 579 U.S. 176, 194 (1989). The Court added that although "the Government's decision to expressly identify a provision as a condition of payment is relevant," it is "not automatically dispositive." *Id*. Put simply, the Anti-Diversity Order's certification requirement undermines *Universal Health* by declaring through executive fiat that compliance with all anti-discrimination laws as interpreted by the Administration is material to Congress's decision to dispense federal dollars, regardless of the nature of the grant. This is inconsistent with the text of the FCA and its judicial interpretation, thus violating separation of powers principles.

### 2. The Orders Violate the Spending Clause.

The Orders violate the Spending Clause. First, the Orders allow the Administration to retroactively impose unclear requirements related to "illegal" DEI and "gender ideology" on preexisting federal funding awards. When Congress imposes conditions on federal funds, "it must do so unambiguously" so that jurisdictions can "exercise their choice knowingly, cognizant of the consequences of their participation." *S. Dakota v. Dole*, 483 U.S. 203, 203 (1987) (quotation and citation omitted). "Because states must opt-in to a federal program willingly, fully aware of the associated conditions, Congress cannot implement new conditions after-the-fact." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017); *Nat'l Fed. of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 577 (2012). The Orders impose novel conditions that Seattle was unaware of and could not have assented to when choosing to receive federal funding because both Orders ostensibly apply to all "federal funds," including funds already appropriated by Congress or awarded to Seattle. *See* Gender Order, § 3(g) ("Federal funds shall not be used to promote gender

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 10
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

ideology."); DOJ Memo at 2 (as to Anti-Diversity Order, DOJ will "investigate, eliminate, and penalize illegal DEI and DEIA preferences … that receive federal funds."). The Orders cannot impose new conditions that Seattle did not consent to at the time Congress appropriated funds.

Second, the Orders improperly impose conditions wholly unrelated to the funds. It is well-established that conditions placed on congressional spending must have some nexus with the purpose of the implicated funds. *Dole*, 482 U.S. at 208 (conditions may be illegitimate if unrelated to the program). The Orders' attempt to condition all federal funds on compliance with the Administration's DEI and "gender ideology" policy views runs afoul of the nexus requirement, as there is no nexus between the Orders and Seattle's threatened funding in the areas of, for example, transportation, law enforcement, emergency preparedness, and housing. This is precisely the opposite of what the nexus test requires.

Finally, the Orders are unduly coercive. "Congress cannot use the spending power in a way that compels local jurisdictions to adopt certain policies." *Santa Clara*, 250 F. Supp. 3d at 533. Offering a financial inducement that is "so coercive as to pass the point at which pressure turns into compulsion" is unacceptable. *Dole*, 482 U.S. at 211. The Orders are just that kind of coercive inducement. Conditioning *all* federal funding—$370 million—on compliance with the Administration's opinion on DEI and gender issues crosses the line from pressure to compulsion. The Anti-Diversity Order applies to a broad swath of entities that receive federal funds, and the Gender Order applies to federal funds without limitation. The Orders target all federal funding and overstep the bounds of the Spending Clause.

### 3. The Orders are Unconstitutionally Vague.

Seattle is likely to succeed in showing that the Orders violate the Fifth Amendment's vagueness doctrine because the Orders impose unclear prohibitions that leave Seattle guessing as to what conduct the Orders prohibit and how to avoid liability. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City*

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 11
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*of Rockford*, 408 U.S. 104, 108 (1972). "[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). To satisfy due process, laws must (1) "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and (2) "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108.

The Orders contain "expansive, standardless language" that "creates huge potential for arbitrary and discriminatory enforcement." *Santa Clara*, 250 F. Supp. 3d at 535. The Anti-Diversity Order requires certification that a contractor and grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," yet fails to define any specific activities that would constitute promotion of DEI. Anti-Diversity Order, § 3(b)(iv)(B). The Gender Order bans the use of federal funds to "promote gender ideology," but does not define what "promote" such ideology means. Gender Order, § 3(g).

Despite the Orders' breadth and vagueness, they include a range of penalties, including cancellation of existing contracts, loss of eligibility for future contracts, discontinuation of federal grants, and potential liability under the FCA. *See, e.g.*, Anti-Diversity Order § 4(a) (directing the Attorney General to take "appropriate measures to . . . to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish "deter[rence]"). The Anti-Diversity Order requires contractors and grantees to agree that compliance with the Order's vague and undefined terms is "material" to funding for purposes of the FCA, thus invoking the specter of vexatious whistleblower litigation carrying enormous litigation costs and the threat of significant monetary damages.

### 4. The Orders Violate the Tenth Amendment.

Seattle will succeed in showing that the Orders violate the Tenth Amendment because the potential loss of hundreds of millions of federal dollars is akin to "a gun to the head." *NFIB*, 567

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 12
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

U.S. at 581 (2012). The Tenth Amendment prohibits the federal government from commandeering state and local officials to enforce federal laws. *Printz v. United States*, 521 U.S. 898, 935 (1997). The federal government may not compel states to enact or administer a federal regulatory program. *New York v. United States*, 505 U.S. 144, 188 (1992). This is true regardless of whether the federal government "directly commands" a state to regulate or "indirectly coerces" a state to adopt a federal regulatory system as its own. *NFIB*, 567 U.S. at 578. Coercion occurs where executive orders "would have significant effects on [localities'] ability to provide services to their residents and … they may have no legitimate choice regarding whether to accept the government's conditions in exchange for those funds." *Santa Clara*, 250 F. Supp. 3d at 533.

Here, the Orders coerce Seattle to adopt the Administration's view of DEI and "gender ideology" by ordering that all federal funding be withheld unless Seattle complies with the Administration's vague and unlawful Orders. The Orders wield critical federal funding as a gun with which to coerce Seattle into accepting the Administration's conditions in exchange for funds they were promised and funds they expect to receive. Thus, the Orders violate the anti-commandeering principle of the Tenth Amendment.

### 5. The Orders and Grant Conditions Violate the APA.

The APA requires the Court to "hold unlawful and set aside agency action" that is "arbitrary," "capricious," "not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2). The exemplar grant conditions promulgated by the Agency Defendants to implement the Orders demonstrate a violation of each of these requirements.[9]

---

[9] Imposition of the grant conditions constitutes a "final agency action" under 5 U.S.C. § 704 because it "mark[s] the consummation of the agency's decision-making process" and is a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Defendants have already threatened Seattle with FCA liability if it does not honor the Administration's vague orders.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 13
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

The grant conditions flow from the Orders and are "in excess of statutory authority" and "not in accordance with law" because they are not the result of a congressional delegation of authority and violate numerous constitutional protections. 5 U.S.C. § 706(2). As this Court just explained, "the Separation of Powers doctrine and 'in excess of statutory authority' standard both turn on the same essential question—whether the agency acted within the bounds of its authority, either as conferred by the Constitution, or delegated by Congress." Order Granting Plaintiff's Third Mot. for Prelim. Inj. at 22, *King Cnty. et al. v. Turner et al.* (citation omitted). The grant conditions are also arbitrary and capricious because they are not the result of "reasoned decisionmaking" and are neither "reasonable" nor "reasonably explained." *Michigan v. EPA*, 576 U.S. 743, 750; *Ohio v. EPA*, 603, U.S. 279, 292 (2024) (cleaned up). An agency must offer "a satisfactory explanation for its action," and cannot rely on "factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Agency Defendants offer no reasonable explanation for imposing new grant conditions beyond "rote incorporation of [the Orders]," which this Court has held is insufficient. *See* Order Granting Plaintiffs' First & Second Mot. for Prelim. Inj. at 38, *King Cnty. et al. v. Turner et al.*, No. 2:25-cv-00814-BJR (June 3, 2025). For example, the HUD Letter merely states that "FY2025 grant agreement[s]" will "emphasize conformity with applicable Administration priorities and executive orders." Kim Decl. ¶ 16. This bare proclamation is not reflective of "reasoned" decision-making. Indeed, HUD's wholesale reliance on the Orders demonstrates its failure to follow its own regulations requiring notice-and-comment rulemaking when it imposes binding obligations. *See* 24 C.F.R. § 10.1 ("It is the policy of [HUD] to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to … grants …"). The Agency Defendants cannot demonstrate that their grant conditions were the result of "reasoned decisionmaking." The conditions are arbitrary and capricious.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 14
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**B.       Seattle Will Suffer Irreparable Harm If the Orders Are Not Enjoined.**

Seattle is being challenged to accept unlawful conditions on an impossible timeline at the risk of incurring financial penalties, or give up funds it was already awarded and, in several instances, already accounted for in budget and project planning. The threat of the loss of federal funds immediately and irreparably harms Seattle, through continuous budget uncertainty (Eder Decl. ¶¶ 6–7); the loss of essential housing services for residents (Kim Decl. ¶ 8); cutting off pedestrian and roadway safety projects (Wood Decl. ¶ 10); and hamstringing law enforcement and first responder training and responsiveness (Maxey Decl. ¶ 29; Scoggins Decl. ¶ 9). *See Santa Clara*, 250 F. Supp. 3d at 537–38 ("[B]eing forced to comply with an unconstitutional law or else face financial injury" constitutes a constitutional injury) (citation omitted); *see* Order Granting Plaintiffs' First and Second Mot. for Prelim. Inj. at 39–40, *King Cnty. et al. v. Turner et al.* (citation omitted) (plaintiffs faced a likelihood of irreparable injury where they faced "having to choose between accepting conditions that they believe are unconstitutional, and risking the loss of hundreds of millions of dollars in federal grant funding, including funding that they have already budgeted and are committed to spending.").

The loss of funding from HUD, for instance, would deprive Seattle of the ability to support essential housing and infrastructure services for Seattle residents, such as its Emergency Solutions Grant Program, which assists vulnerable Seattle families with regaining stability in permanent housing, improving and operating shelters, and re-housing the homeless. Kim Decl. ¶ 22. Without this funding, thousands of Seattle-area residents would struggle to secure housing.

The loss of funding would also force Seattle to significantly curtail many of its existing community safety programs. Absent DHS funding, Seattle could not fund Task Force 1, a highly trained Urban Search & Rescue team that carries out complex rescues, such as structural collapse rescue, flood and swiftwater rescues, hazardous materials responses, emergency medical care, and K9 search teams. Scoggins Decl. ¶ 17; *see* Order Granting Third Prelim. Inj. at 34, *King Cnty. et*

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 15
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*al. v. Turner et al.*, (citation omitted) ("[T]he harms Plaintiffs have alleged are quintessentially irreparable in nature and can be avoided only by entry of the requested injunction.").

The Orders' extensive harms reach Seattle's ability to carry out its day-to-day operations and fulfill its legal obligations to its residents and millions of visitors each year. As this Court recognized in *King County*, by accepting the funding conditions, Seattle may still well lose promised funds if the Administration determines that it does not comply with the Orders' vague requirements. *Id.* This looming risk is itself an independent injury.

### C. The Equities Weigh in Seattle's Favor.

The final factors, which merge here, weigh heavily in Seattle's favor. *Baird*, 81 F.4th at 1040 ("When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'") (quoting *Nken*, 556 U.S. at 435)). The ongoing deprivation of Seattle's constitutional rights is significantly outweigh the Administration's alleged interest in vague spending restrictions that violate the Constitution and the APA. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (cleaned up); *see also Zepeda v. U.S. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983) (the government cannot claim it is "harmed in any legally cognizable sense by being enjoined from constitutional violations."). A preliminary injunction is necessary to prevent violations of Seattle's constitutional rights and to protect the safety and interests of its residents.

### IV. CONCLUSION

For the foregoing reasons, the City of Seattle respectfully asks this Court to enjoin Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them and all other federal Departments and Agencies from enforcing Section 3(b)(iv) of the Anti-Diversity Order and Section 3(g) of the Gender Order against Seattle.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 16
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  DATED this 26th day of August, 2025.

2                                          CORR CRONIN LLP

3

4  *s/ Jeffrey B. Coopersmith*
   Jeffrey B. Coopersmith, WSBA No. 30954
   Emily J. Harris, WSBA No. 35763
5  Eric A. Lindberg, WSBA No. 43596
   Kathryn Joy, WSBA No. 60056
6  Rachel E. Hay, WSBA No. 60245
   Renee M. Howard, WSBA No. 38644
7  1015 Second Avenue, Floor 10
   Seattle, Washington 98104-1001
8  Ph: (206) 625-8600 | Fax: (206) 625-0900
   jcoopersmith@corrcronin.com
9  eharris@corrcronin.com
   elindberg@corrcronin.com
10 kjoy@corrcronin.com
   rhay@corrcronin.com
11 rhoward@corrcronin.com

12 *Attorneys for Plaintiff City of Seattle*

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 17
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

CERTIFICATE OF SERVICE

I hereby certify that I am employed by Corr Cronin LLP and that on the date below, I electronically filed: Plaintiff's Motion for Preliminary Injunction; Declaration of Jeffrey B. Coopersmith; Declaration of Daniel Eder; Declaration of Tanya Kim; Declaration of Brian Maxey; Declaration of Harold D. Scoggins; Declaration of Sharman Wood; Declaration of Gregory Wong; and Proposed Order Granting Plaintiff's Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF system and, I caused to be served on the following counsel pursuant to counsel's August 14, 2025 agreement to accept service via email:

Annalisa Cravens: annalisa.cravens@usdoj.gov
Sarah Bishop: sarah.bishop@usdoj.gov

Dated this 26th day of August, 2025.

*s/ Megan Johnston*
Megan Johnston, Legal Assistant
Corr Cronin LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001
(206) 625-8600
mjohnston@corrcronin.com

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – 18
(Case No. 2:25-cv-01435-BJR)

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900