The Honorable Barbara J. Rothstein

1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF WASHINGTON
8                         AT SEATTLE

9

CITY OF SEATTLE,                          Case No. 2:25-cv-01435-BJR

10
                        Plaintiff,        **DEFENDANTS' OPPOSITION TO**
11         v.                             **PLAINTIFF'S PRELIMINARY**
                                          **INJUNCTION MOTION**
12   DONALD J. TRUMP, *et al.*,

13                      Defendants.

14

15          The City of Seattle seeks to enjoin enforcement of two Executive Orders issued more than

16   seven months ago. This motion alleges no imminent, irreparable harm, relying instead on mere

17   speculation that one day one or more federal agencies might open an investigation or try to

18   terminate one or more of the City's federal grants because of hypothetical noncompliance with

19   grant terms prompted by the Executive Orders. These allegations fall far short of the exacting

20   standard required for a preliminary injunction.

21          The City's claims are also unlikely to succeed on the merits. Most of its claims rehash those

22   in *King County v. Turner* concerning specific agency grant terms. While the government continues

23   to contend that those terms are lawful, *see County of King v. Turner*, No. 25-3664 (9th Cir.), there

24

1  is no basis whatsoever for the broader facial relief that the City seeks here. Because the Court has

2  already heard many of these arguments, Defendants do not believe a hearing is necessary.

3  ## FACTS

4        The relevant Executive Orders were issued months ago, in January 2025. The City did not

5  sue then. The relevant agencies updated their grant conditions in March to May 2025. The City

6  did not sue then either. The City now seeks to piggyback on injunctions the Court issued in *King*

7  *County v. Turner* on June 3 and August 12, 2025, and brings largely identical claims to the *Turner*

8  plaintiffs. But rather than joining the *Turner* lawsuit after the first injunction issued—which would

9  have gotten the City relief far sooner—the City waited even longer to file its own lawsuit and

10  injunction motion, in which it pushes for far broader, and legally unjustifiable, relief.

11  **I.    Executive Orders**

12        The City asks the Court to bar Defendants from enforcing against it Section 3(b)(iv) of

13  Executive Order 14,173 (the DEI Order), which was issued on January 21, 2025. This section

14  requires federal agencies to ensure that grant recipients: (i) certify that they do not operate DEI

15  programs "that violate any applicable Federal anti-discrimination laws"; and (ii) agree that the

16  grantee's compliance "with all applicable Federal anti-discrimination laws" is material to the

17  government's payment decisions under the False Claims Act. EO 14173, § 3(b)(iv)(A)-(B).

18        The City also asks the Court to bar Defendants from enforcing against it Section 3(g) of

19  Executive Order 14,168 (the Gender Order), issued on January 20, 2025. This section requires

20  federal agencies to ensure that federal funds are not used to "promote gender ideology." *See* E.O.

21  14168, § 3(g). The Order includes a paragraph defining "gender ideology." *Id.* § 2(f).

22  **II.    Agencies' Implementation of the Orders**

23        HUD changed its grant terms in May to implement both Orders. Dkt. 7 at 5. DHS updated

24  its standard grant terms to implement the DEI Order in April 2025. *Id.* at 4. DOT updated its terms

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

to include the DEI Order in March and April. *Id.* at 5. The City does not assert that DOJ has changed any relevant grant terms. The federal funding allegedly implicated by the changed terms amounts to 4.46% of the City's total budget for fiscal year 2025. *See* Dkt. 7 at 2 ("[a]t stake . . . is approximately $370 million"); https://www.seattle.gov/documents/Departments/Finance Department/25Adopted_26Endorsed/2526Adopted_26Endorsed%20Summary.pdf (Seattle 2025 budget is $8.3 billion).

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The moving party must establish that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* at 20.

Preliminary relief is meant to preserve the status quo pending final judgment. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). When it would instead "order a responsible party to take action," it is "particularly disfavored." *Id.* (citation omitted). In such cases, the moving party "must establish that the law and facts *clearly favor* [his] position, not simply that [he] is likely to succeed." *Id.* (emphasis original).

## ARGUMENT

### I.     The City Does Not Face Imminent, Irreparable Harm

The City has not carried its burden of showing that imminent, irreparable harm "is likely, not just possible," as required to justify an injunction. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011). Speculative injury is not sufficient: "a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis original).

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

First, the City's own delay in seeking preliminary relief "undercut[s its] claim of irreparable harm." *Garcia*, 786 F.3d at 746. The Orders were issued in January, but the City waited more than six months to file suit, months after numerous materially similar motions seeking emergency relief from these Orders were filed and resolved.[1] This delay is particularly inexcusable given that the City asks this Court to declare the Orders invalid on their face. *See Garcia*, 786 F.3d at 746 (two-month delay cut against showing of irreparable harm). Only once this Court issued injunctions on similar claims in *Turner* did the City seek relief—and the broader relief in the former of facial challenges to these EOs—that it now asks this Court to grant. *Hologic, Inc. v. Senorx, Inc.*, No. C-08-00133, 2008 WL 1860035, at *19 (N.D. Cal. Apr. 25, 2008) ("tactical delay" in seeking emergency relief weighs against finding of irreparable harm). And the City's own evidence demonstrates no urgency here. For example, while the City emphasizes the "*just two weeks*" one NOFO gave applicants to gather information regarding their DEI practices (Dkt. 7 at 5)—that two-week deadline passed more than a month ago. *See* Scoggins Decl. ¶ 20 & Ex. A.

Second, the City's predictive harms are too speculative to meet its burden. *See, e.g.*, Eder Decl., ¶¶ 13–14 (speculating about loss of services in absence of federal funds). The City "must establish a likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014). And its allegations certainly do not justify emergency relief preventing implementation of the Orders as to any and all federal funds that the City has or may obtain.

Third, the City has failed to establish that the harm it may suffer is irreparable. The gravamen of the City's injury is monetary—the classic example of reparable harm. *L.A. Memorial*

---

[1] *See National Urban League v. Trump*, 25cv471 (D.D.C.) (Complaint filed February 19, 2025; PI filed February 28, 2025; PI Order issued May 2, 2025); *National Association of Diversity Officers in Higher Education et al., v. Trump et al.*, 25cv333 (D. Md.) (Complaint filed February 3, 2025; TRO/PI filed February 13, 2025; PI Order issued February 21, 2025); *San Francisco AIDS Foundation et al., v. Trump et al.*, 25cv1824 (N.D. Cal.) (Complaint filed February 20, 2025; PI filed March 3, 2025; PI Order issued June 9, 2025).

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  *Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980). That fact fatally undermines the

2  City's assertions of irreparable harm.

3      **II.    The City Has Not Shown Likely Success on the Merits**

4          **A.  The City's Separation-of-Powers and Spending Clause Claims Fail**

5          The Court has seen the City's separation-of-powers and spending-clause arguments before.

6  They track the separation-of-powers arguments in *Turner*, pending before the Ninth Circuit, and

7  fail for the same reasons. The funding conditions contemplated by the Orders are authorized by

8  statute. They require the City to (1) certify that it complies with federal antidiscrimination law and

9  acknowledge that such compliance is material to the government's grant award and (2) agree that

10  program funds will not be put to specific unapproved uses. Both types of condition are lawful.

11              **i.    Material Antidiscrimination Assurances Are Not New**

12          HUD's, DOT's, and DHS's requirements that recipients certify their compliance with

13  federal anti-discrimination law and agree that compliance is material to the government's payment

14  decisions for purposes of the False Claims Act are neither novel nor unlawful. They do not impose

15  any new obligations on recipients, but merely call attention to their pre-existing legal obligations.

16          Title VI of the Civil Rights Act of 1964 requires recipients of federal assistance to comply

17  with federal antidiscrimination law, and "direct[s]" federal agencies to enforce that compliance

18  through "rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d-1. HUD, DOT,

19  and DHS thus have long required grant recipients to assure, as a condition of payment, that they

20  will comply with federal antidiscrimination law. 24 C.F.R. § 1.5 (HUD); 49 C.F.R. § 21.7 (DOT);

21  6 C.F.R. § 21.7 (DHS); 44 C.F.R. § 7.7 (FEMA); *see Guardians Ass'n v. Civil Serv. Comm'n*, 463

22  U.S. 582, 629–30 (1983) (Marshall, J., dissenting) (collecting, more than 40 years ago, agency

23  regulations requiring such assurances). Accordingly, the Fourth Circuit recently unanimously

24  stayed a district court injunction barring federal agencies from requiring grant recipients, pursuant

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    to the DEI Order and another executive order, to certify that they do not operate unlawful DEI

2    programs. Order Granting Defendants' Motion for a Stay Pending Appeal, *Nat'l Ass'n of Diversity*

3    *Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), Dkt. 29.[2]

4        The antidiscrimination condition contemplated by the DEI Order, again, simply requires

5    recipients to certify their compliance with existing law. *See id.* at 7. The only difference is that it

6    notes DEI programs as an example of a context in which a recipient might violate the law. But the

7    City cannot plausibly argue that the addition of that one specific example somehow makes these

8    longstanding, statutorily required conditions impermissible. The conditions challenged here are

9    plainly lawful under Title VI and regulations issued under Title VI. 42 U.S.C. § 2000d-1.

10       The DEI Order's certification requirement also merely provides notice of existing law.

11   Under Title VI, the federal government "extends assistance in reliance on the assurance of

12   compliance" with federal antidiscrimination laws. *Guardians*, 463 U.S. at 630 (Marshall J.,

13   dissenting). Certifications of that compliance can thus support claims under the False Claims Act,

14   which imposes civil liability on persons who knowingly make false statements "material" to a

15   claim for payment from the government. 31 U.S.C. § 3729(a). The terms at issue here thus merely

16   put grant recipients on notice of what was always true under Title VI: that their certification of

17   compliance with federal anti-discrimination laws is "material," *i.e.*, that it is "capable of

18   influencing" the government's payment decision. *Universal Health Servs., Inc. v. United States ex*

19   *rel. Escobar*, 579 U.S. 176, 193 (2016) (quotation marks omitted). Providing such notice, and

20   asking recipients to acknowledge it, adds nothing to grant recipients' preexisting obligations.

21

22

23

24   _____
[2] The merits of this case were fully briefed on August 14, 2025, and argued before the Fourth Circuit on September 11, 2025. As of this filing, it remains pending.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1                    ii.       **HUD's Gender-Related Grant Terms Are Lawful**

2          Like the *Turner* plaintiffs, the City challenges HUD's incorporation of the Gender Order

3    into grant terms. The terms are lawful here for the same reasons as in *Turner.*

4          For example, before HUD can disburse CoC grant funds, it must have the recipient agree

5    to both terms specified by Congress and "terms and conditions" HUD establishes to carry out the

6    program in "an effective and efficient manner." 42 U.S.C. § 11386(b)(8). The latter provision

7    comfortably encompasses the gender-related terms. By prohibiting recipients from using grant

8    funds to promote "gender ideology," HUD ensures that its grant funds are used effectively and

9    efficiently for their intended purpose: to house and provide supportive services to the homeless.

10         In *Turner*, this Court relied on the canon of *ejusdem generis* in ruling that subsection

11   11386(b)(8) did not authorize the gender ideology term, which the Court described as a

12   "substantive" condition unlike others listed in the subsection, such as reporting requirements.

13   *Turner*, Dkt. 169 at 34. But many of the terms listed in subsection (b) are, in fact, substantive

14   conditions that implicate policy choices. Recipients must agree, for example, "to ensure . . . that

15   individuals and families experiencing homelessness are involved . . . in constructing, rehabilitating,

16   maintaining, and operating [funded] facilities . . . ." 42 U.S.C. § 11386(b)(3). They must take steps

17   to ensure that children served by the project are enrolled in school and can access community

18   support services. *Id.* § (b)(4)(D). And they must place children in housing as close as possible to

19   their original school. *Id.* § (b)(7). Considering all conditions required in that subsection, the canon

20   of *ejusdem generis* actually confirms that Congress granted HUD authority to impose a broad

21   range of conditions on CoC recipients, from the ministerial to the substantive, so long as they are

22   designed to enhance the program's efficiency and effectiveness.

23         Additionally, the City alleges that FTA's current Master Agreement (MA) "incorporates

24   the . . . Gender Orders." Dkt. 7 at 5:12–13. This is not true (and explains why this Court did not

DEFENDANTS' OPPOSITION TO PLAINTIFF'S                        UNITED STATES ATTORNEY
PRELIMINARY INJUNCTION MOTION                             700 STEWART STREET, SUITE 5220
[Case No. 2:25-cv-01435-BJR] - 7                          SEATTLE, WASHINGTON 98101
                                                                 (206) 553-7970

see this challenge in *Turner*). The MA incorporates several Executive Orders explicitly—but not the Gender Order—and requires recipients to comply with all "applicable" Orders. *See* FTA MA (33), https://www.transit.dot.gov/sites/fta.dot.gov/files/2025-04/FTA-Master-Agreement-v33-04-25-2025.pdf, at 7 ("applicable . . . executive order[s]"); 58, 60, 64, 66, 78, 85, 86, 90 (specific orders) (Apr. 25, 2025). And the City does not even argue that DHS or DOJ have incorporated the Gender Order into grant terms. Its challenge against these agencies fails for this reason alone.

## B. The City's Due Process Claims Are Unlikely To Succeed

The City's facial and as-applied void-for-vagueness challenges under the Due Process Clause to the Executive Orders and grant provisions fail both at the threshold and on the merits.

### i.    The City's Due Process Claims Fail as a Threshold Matter

The City argues the Executive Orders are "vague," and therefore allow the Defendants to enforce them in an arbitrary and discriminatory manner and fail to give fair notice regarding the conduct that falls within their scope. *See* Compl. ¶¶ 157–64. This argument is baseless.

To begin with, the void-for-vagueness doctrine under the Due Process Clause is inapplicable in a challenge to Executive Orders. The doctrine "guarantees that ordinary people have 'fair notice' of the conduct a *statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018) (plurality) (emphasis added). When courts have applied this doctrine beyond the statutory context, they have applied it to mandatory regulations of the general public's primary conduct. *See, e.g.*, *FCC v. Fox Tv. Stations, Inc.*, 567 U.S. 239, 253 (2012) (applying the doctrine to "[a] conviction or punishment" obtained under a "statute or regulation"); *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (noting the Fifth Amendment's "requirement of clarity" applies when the government imposes "civil penalties"). The Due Process Clause prohibits uneven enforcement, and ensures notice, of requirements with which *the public* must comply. *Grayned v. City of*

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Rockford*, 408 U.S. 104, 108 (1972). No such concerns arise if the President gives his subordinates in the Executive Branch an unclear directive.

The City's challenge to the Orders is also flawed because it is facial. The appropriate posture for Due Process vagueness challenges is as-applied. *See Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 822 (9th Cir. 2003) (proper inquiry is "whether the statute is impermissibly vague *in the circumstances of this case*"). That is because such challenges "rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

The Supreme Court carved out a limited exception to the general rule against Due Process facial challenges in *Johnson v. United States*, concerning a criminal statute. 576 U.S. 591 (2015). But the Supreme Court has extended *Johnson* only once outside the criminal context, to a civil-removal statute—and justified the extension because "deportation is a particularly severe penalty, which may be of greater concern to a convicted alien than any potential jail sentence." *Dimaya*, 584 U.S. at 157 (citation omitted); *see Kashem v. Barr*, 941 F.3d 358, 376–78 (9th Cir. 2019) (*Johnson* exception is exceedingly narrow and relied on "exceptional circumstances"). Whatever *Johnson*'s reach may be, it surely has no application to presidential directives to subordinates.

The City's facial challenge here demands a stunning expansion of the doctrine. Presidential policy directives often outline policy initiatives and priorities in broad terms. Under the City's theory, however, any President's policy directives to their own Executive Branch appointees must be set out with the same degree of specificity required of a criminal statute directed toward the public. The Court should summarily reject this argument.

### ii.    The City's Due Process claims fail on the merits

Even if the Court reaches the merits of the City's Due Process claims, it should reject them. The claim based on potential loss of grant funding fails for lack of a constitutionally protected

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    property interest at stake. And the claim based on potential arbitrary enforcement fails because a

2    requirement that a grantee abide by existing law by definition cannot be vague.

3    **_Loss of contracts/grants._** To have a property interest protected by the Due Process Clause,

4    "a person clearly must have more than an abstract need or desire" or "unilateral expectation of it.

5    He must, instead, have a legitimate claim of entitlement to it." _Town of Castle Rock v. Gonzalez_,

6    545 U.S. 748, 756 (2005) (citation omitted). The Supreme Court has identified a narrow set of

7    government benefits, so-called "new property," that are so protected, such as tenured positions

8    and welfare benefits. _See Bd. of Regents of State Colls. v. Roth_, 408 U.S. 564, 576–77 (1972)

9    (collecting cases). But the constitutional protection afforded to these entitlement-like benefits

10   should not extend to ordinary government contracts. _See generally Eloyan v. United States_, No.

11   2:19-cv-9565, 2020 WL 7382316, at *5–6 (C.D. Cal. Oct. 21, 2020) (collecting cases). As the

12   Second Circuit warned, "the doctrinal implications of constitutionalizing all public contract rights

13   would raise substantial concerns." _S & D Maint. Co. v. Goldin_, 844 F.2d 962, 966 (2d Cir. 1988).

14   Here, the City has not shown that it has any constitutionally protected entitlement-like

15   grants subject to termination. _See Nat'l Urb. League v. Trump_, 783 F. Supp. 3d 61, 97 (D.D.C.

16   2025) (denying materially identical challenge to Orders because challengers had "not identified a

17   protected property or liberty interest that these provisions threaten."). A benefit "is not a protected

18   entitlement if government officials may grant or deny it in their discretion." _Castle Rock_, 545 U.S.

19   at 756. And government contracts generally allow for "[t]ermination at the convenience of the

20   Government," 48 C.F.R. § 49.502, as do many government grants, _see_ 2 C.F.R. § 200.340(a)(4)

21   (agency may terminate award "to the extent authorized by law, if an award no longer effectuates

22   the program goals or agency priorities"). In fact, courts have upheld the government's right to

23   terminate a contract for convenience even absent a termination clause. _See G.L. Christian & Assoc._

24   _v. United States_, 160 Ct. Cl. 1 (1963) (reading a termination for convenience clause into the

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  contract by operation of law); *see also Northrop Grumman Corp. v. United States*, 46 Fed. Cl.

2  622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad.").

3  That is the antithesis of a constitutionally protected entitlement.

4          And all this reasoning is particularly applicable to government grants, because grant funds

5  remain monies of the United States until the purpose of the grant is accomplished. *Bennett v. Ky.*

6  *Dep't of Educ.*, 470 U.S. 656, 669 (1985); *e.g.*, *In re Joliet-Will Cmty. Action Agency*, 847 F.2d

7  430, 432 (7th Cir. 1988) (holding grant money, despite being transferred to the grant recipient,

8  remained assets of the federal government). The City cannot claim it holds a constitutionally

9  protected property interest in funds that never become the City's property at all.

10         Finally, the City's vagueness argument fails on the substance. The Supreme Court has

11  rejected challenges to "vagueness" in government funding conditions. *See Nat'l Endowment for*

12  *the Arts v. Finley*, 524 U.S. 569, 588–89 (1998). In *Finley*, plaintiffs brought vagueness challenges

13  to a funding provision that required the National Endowment for the Arts to "take[] into

14  consideration general standards of decency and respect for the diverse beliefs and values of the

15  American public." *Id.* at 572 (citation omitted). The Court acknowledged that these terms were

16  "undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could

17  raise substantial vagueness concerns." *Id.* at 588. But "when the Government is acting as patron

18  rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at

19  589. This Court should similarly reject the City's attempt to impose a demanding vagueness

20  standard on the government when it "is acting as patron rather than as sovereign." *Id.*

21         ***Potential future enforcement.*** The City's claims that the Executive Orders fail to give

22  proper notice of prohibited conduct and provide for arbitrary future enforcement are also unlikely

23  to succeed, because a requirement that a grantee abide by existing law cannot be vague.

24

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    The Due Process Clause requires that laws "give the person of ordinary intelligence a

2    reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide

3    explicit standards for those who apply them." *Grayned*, 408 U.S. at 108. While this doctrine

4    demands scrutiny of statutes and regulations that identify a *new* conduct for punishment, the

5    provisions at issue here do no such thing. Instead, as discussed above, the challenged provisions

6    "apply only to conduct that violates *existing* federal anti-discrimination law." *Diversity Officers*,

7    at 7 (Harris, J., concurring) (emphasis added). The City thus cannot argue it will not be given a

8    "reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108.

9    The City's arguments erroneously assume that the Executive Orders purport to penalize

10   conduct *beyond* those prohibited by existing antidiscrimination laws. But, on their face, they do

11   not, and thus any lack of clarity over when a DEI program might run afoul of those statutes would

12   not be remedied by enjoining the Executive Order. In any future enforcement proceeding, the City

13   may maintain that some challenged conduct is lawful. But none of that is remotely ripe, let alone

14   a sound basis for preemptively enjoining enforcement of multiple broad policy directives. *See S.F.*

15   *A.I.D.S. Found. v. Trump*, No. 25-cv-01824-JST, 2025 WL 1621636, at *23 (N.D. Cal. June 9,

16   2025) ("While the term 'DEI' is undefined and vague, the limiting qualifier implicating only DEI

17   programs that "violate any applicable Federal anti-discrimination law" is sufficiently defined

18   because it incorporates by reference the body of existing federal law.").

19              **C.  The Executive Orders Do Not Violate the Tenth Amendment**

20   The City's argument that the Orders unlawfully "coerce [it] to adopt the Administration's

21   view of DEI and 'gender ideology'" by setting funding conditions fails because the federal

22   government can lawfully use federal dollars to induce localities to adopt policies, and localities are

23   free to choose to forgo funding if they dislike those policies.

24

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    The anticommandeering doctrine prevents the federal government from "compel[ling] the

2    States to enact or enforce a federal regulatory program." *Murphy v. NCAA*, 584 U.S. 453, 472

3    (2018). But it does not apply "when Congress evenhandedly regulates an activity in which both

4    States and private actors engage." *Id.* at 475–76. And there is no question that the federal

5    government can, constitutionally, use conditions on federal funds to "induce the States to adopt

6    policies that the Federal Government itself could not impose." *NFIB v. Sebelius*, 567 U.S. 519,

7    537–38 (2012). Here, the Orders apply to agencies' grants of federal funds to *any* recipient—

8    private parties and nonprofits, not just States or local governments. *See* E.O. 14168, § 3(g); EO

9    14173, § 3(b)(iv). Given that broad sweep, the City does not and cannot make "the heavy lift" that

10   the challenged executive orders "command[] the States to deploy their executive or legislative

11   power." *Haaland v. Brackeen*, 599 U.S. 255, 284–85 (2023).

12   The offer to accept these funds based on certain conditions is by no means "a gun to the

13   head" of the City. Dkt. 7 at 12 (citing *NFIB*). The City always has the option to forgo federal funds

14   if they are conditioned on terms that the City finds unpalatable, and to instead raise funds from tax

15   revenues. *See Oklahoma v. United States*, 62 F.4th 221, 235 (6th Cir. 2023) (funding conditions

16   "present[] States with a choice, not a command"). That the latter option may be politically difficult

17   does not transform the City's disagreement with federal policy into a constitutional violation.

18   *NFIB*, 567 U.S. at 579 ("The States are separate and independent sovereigns. Sometimes they have

19   to act like it."). Moreover, the federal funding allegedly implicated by the challenged provisions

20   amounts to 4.46% of the City's total budget for fiscal year 2025—less than half of the amount in

21   issue in *NFIB*. This purported threat does not meet the high standard set by the Supreme Court.

22   *Compare NFIB*, 567 U.S. at 577–80 (coercive to threaten Medicaid funding accounting for more

23   than 10 percent of States' budgets on average) *with South Dakota v. Dole*, 483 U.S. 203, 211

24

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   (1987) (not coercive to withhold five percent of a State's federal highway funding, which

2   constituted one-half of one percent of the State's budget).

3             **D.  The City Is Unlikely To Succeed on Its APA Claims**

4             To the extent that the City seek as-applied relief against specific agency determinations,

5   the agencies did not act arbitrarily or capriciously in imposing the challenged terms. There is

6   nothing arbitrary or capricious about requiring federal grantees to comply with federal

7   antidiscrimination laws or to certify that they are doing so. To the contrary, federal law already

8   prohibits grantees from violating those laws, and the conditions flow naturally from the purposes

9   of the grants and the need for the grant program to remain effective and efficient, as Congress

10  directed. *See supra* § II.A. Thus, even assuming that the imposition of the conditions is subject to

11  arbitrary-and-capricious review, notwithstanding the absence of any statutory standards governing

12  the choice of conditions, but *cf. Lincoln v. Vigil*, 508 U.S. 182, 192–94 (1993), the conditions are

13  "rational," and the Court should not "substitute its judgment" for that of the agencies. *Motor*

14  *Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

15            The agencies also are not required to provide additional explanation of their funding

16  priorities. Rather, an agency's determination must be upheld if "its path may reasonably be

17  discerned." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1181 (9th Cir. 2019) (quotation marks

18  omitted). Here, the rationale for the conditions is self-evident on their face, reflecting the agencies'

19  desire to prevent violations of federal anti-discrimination law and to prohibit use of federal grant

20  funds for actions that are unlawful or do not advance the interests of the relevant program.

21  **III.       The public interest and balance of equities do not favor an injunction**

22            A preliminary injunction also is not appropriate here because the balance of the equities

23  and the public interest tip in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009)

24  (holding "[t]hese factors merge when the Government is the opposing party"). While the City

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 14

1    could be compensated for any hypothetical lost money after a ruling on the merits, *see supra* § I,

2    the same may not be true of the federal government if an injunction is imposed. The City's motion

3    hinges on the importance of their federal grant money, suggesting they may not be able to

4    reimburse the government if it later prevails. *See Dep't of Educ. v. California*, 604 U.S.---, 2025

5    WL 1008354, at *1 (U.S. Apr. 4, 2025). And even if the City were able to repay the money, the

6    federal government maintains an interest in ensuring that its funds are spent according to the

7    conditions it sets.

8    **IV.    Any injunctive relief should be narrowly tailored and permit lawful agency action**

9         It is a bedrock principle of equity that "injunctive relief should be no more burdensome to

10   the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*,

11   442 U.S. 682, 702 (1979). Thus, if the Court grants the City's motion, any injunction should be

12   narrowly tailored to apply only with respect to any specific grants or contracts involving the City,

13   and to leave intact the Executive's discretion to engage in further consideration of the topic at hand

14   and implement new policies consistent with law. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390,

15   395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions

16   of the parties until a trial on the merits can be held."). For the many reasons set out in this brief, it

17   should not be applied facially, or to the Executive Orders on any basis.

18   **V.    Any injunction should be stayed pending any appeal and secured by a bond**

19        If the Court issues an injunction, Defendants respectfully request it be stayed pending the

20   Solicitor General's decision whether to appeal and pending any authorized appeal.

21        Moreover, under Rule 65(c), courts "may issue a preliminary injunction or a temporary

22   restraining order only if the movant gives security in an amount that the court considers proper to

23   pay the costs and damages sustained by any party found to have been wrongfully enjoined or

24

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
PRELIMINARY INJUNCTION MOTION
[Case No. 2:25-cv-01435-BJR] - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    restrained." If the Court grants an injunction here, it should require the City to post a bond for the

2    value of any grants subject to the injunction.

3                                    <u>**CONCLUSION**</u>

4           For the foregoing reasons, Defendants request the Court deny the City's motion.

5           DATED this 16th day of September, 2025.

6                                              Respectfully submitted,

7                                              TEAL LUTHY MILLER
                                               Acting United States Attorney
8
                                               *s/ Annalisa L. Cravens*
9                                              ANNALISA L. CRAVENS, TX 24092298

10                                             *s/ Sarah Louise Bishop*
                                               SARAH LOUISE BISHOP, NY No. 5256359
11                                             Assistant United States Attorneys
                                               United States Attorney's Office
12                                             Western District of Washington
                                               700 Stewart Street, Suite 5220
13                                             Seattle, Washington 98101
                                               Phone: 206-553-7970
14                                             Fax:    206-553-4067
                                               Email:  annalisa.cravens@usdoj.gov
15                                             Email:  sarah.bishop@usdoj.gov

16                                             *Attorneys for Defendants*

17                                             I certify that this memorandum contains 4,916
                                               words, in compliance with the Local Civil Rules
18

19

20

21

22

23

24

DEFENDANTS' OPPOSITION TO PLAINTIFF'S                        UNITED STATES ATTORNEY
PRELIMINARY INJUNCTION MOTION                               700 STEWART STREET, SUITE 5220
[Case No. 2:25-cv-01435-BJR] - 16                           SEATTLE, WASHINGTON 98101
                                                            (206) 553-7970