The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE,

               Plaintiff,

v.

DONALD J. TRUMP, President of the United States; UNITED STATES OF AMERICA; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; OFFICE OF FEDERAL CONTRACTS COMPLIANCE PROGRAMS; CATHERINE ESCHBACH, in her official capacity as Director of Office of Federal Contracts and Compliance Programs; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget; U.S. DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as the Secretary of Transportation; FEDERAL TRANSIT ADMINISTRATION; TARIQ BOKHARI, in his official capacity as Acting Administrator of the Federal Transit Administration; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT

No. 2:25-cv-01435-BJR

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

- 1

1    TURNER, in his official capacity as Secretary
     of Housing and Urban Development; and DOES
2    1-100,

3                    Defendants.

4

5                    **I.    INTRODUCTION**

6        Plaintiff City of Seattle ("Seattle" or "the City") brings this Motion for a Preliminary

7    Injunction against President Donald Trump, multiple executive agencies, and the agencies'

8    respective administrators (collectively, "Defendants").[1] Dkt. No. 7. Having reviewed the Motion,

9    Defendants' Opposition (Dkt. No. 18), and the Reply (Dkt. No. 19), as well as the record of the

10   case and the relevant legal authority, the Court grants the Motion and issues the Preliminary

11   Injunction as outlined in the Conclusion, below. The reasoning for the Court's decision follows.

12                    **II.    BACKGROUND**

13       Seattle challenges the legality of two Executive Orders issued by President Trump at the

14   beginning of his second term: Executive Order No. 14173, "Ending Illegal Discrimination and

15   Restoring Merit-Based Opportunity" (the "DEI Order")[2] and Executive Order No. 14168,

16   "Defending Women From Gender Ideology Extremism and Restoring Biological Trust to the

17

18   _____

19   [1]Defendants are Donald Trump, in his official capacity as President of the United States, Pamela Bondi in her
     official capacity as Attorney General of the United States, the United States Department of Justice ("DOJ"), the
20   Office of Federal Contracts Compliance Programs ("OFCCP"), Catherine Eschbach in her official capacity as Direct
     of OFCCP, the Office of Management and Budget ("OMB"), Russell Vought in his official capacity as Director of
21   OMB, the U.S. Department of Transportation ("DOT"), Sean Duffy in his official capacity as Secretary of
     Transportation, the Federal Transit Administration ("FTA"), Tariq Bokhari in his official capacity as Acting
22   Administrator of the FTA, the U.S. Department of Homeland Security ("DHS"), Kristi Noem in her official capacity
     as Secretary of DHS, the U.S. Department of Housing and Urban Development ("HUD"), Scott Turner in his official
     capacity as Secretary of HUD, and DOES 1-100 (collectively, "Defendants").
23   [2] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633
     (Jan. 21, 2025).

24   ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

25   - 2

Federal Government" (the "Gender Order").[3] Seattle argues that the DEI and Gender Orders are unconstitutional both facially and as applied because they violate the Separation of Powers doctrine, the Spending Clause, the Due Process Clause, and the Tenth Amendment. Seattle further asserts that Defendants have taken action to eliminate and/or condition grant funding based on the terms of the DEI and Gender Orders and such action must be set aside under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), as contrary to constitutional right, in excess of statutory authority, and/or as arbitrary and capricious. Seattle represents that the imposition of the Orders is an attempt by the Trump Administration to impose its ideological agenda on the City. Therefore, Seattle requests that this Court declare that the DEI and Gender Orders are unlawful and unconstitutional and enjoin Defendants from implementing and enforcing the Orders against it.

## A.    Seattle Receives Federal Funding through Federal Agency Grants and Contracts

Each year, Congress exercises its constitutional power of the purse by enacting annual appropriations legislation that allocates taxpayer funds to federal agencies and specifies the purposes for which those funds may be used. Seattle, like most major cities in the United States, relies on funding from these federal agencies to support a wide array of programs and services for its citizens. Much of Seattle's federal funding is provided on a reimbursable basis, meaning that Seattle expends funds on programs and services that the federal government has agreed to reimburse. Seattle claims that as of January 1, 2025, it has "legal and appropriations authority" to spend approximately $370 million in congressionally appropriated funds meant to support critical

---

[3] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

infrastructure programs, counter-terrorism efforts, emergency fire and rescue services, and other services necessary to promote safety. Dkt. No. 1 "Compl." at ¶¶ 85, 89-90. However, Seattle alleges, the Trump Administration is imperiling these funds through the DEI and Gender Orders that unlawfully condition receipt of funding on Seattle's compliance with the Administration's policy agenda.

### B.    The DEI and Gender Orders

#### 1.    The DEI Order

On January 21, 2025, President Trump issued the DEI Order, the stated purpose of which is to "protect individual Americans" by "ending illegal preferences and discrimination" in the federal government and private sectors. DEI Order, Secs. 1 & 2. According to the DEI Order, "the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) [policies]." *Id*. at Sec. 1. The DEI Order claims that these DEI and DEIA policies are "illegal," "violate the text and spirit of our longstanding Federal civil-rights laws," and "threaten the safety of American men, women, and children[.]" *Id*. at Sec. 1.

The DEI Order instructs "all executive departments and agencies [] to terminate all discriminatory and illegal preferences," "enforce [] longstanding civil-rights laws," and "combat illegal private-sector DEI preferences." *Id*. at Sec. 2. To that end, among other requirements, the Order requires the head of each federal agency to include in every contract or grant award:

> (A)  A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

- 4

discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code [the "False Claims Act"]; and

(B)  A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

Sec. 3(b)(iv)(A), (B).

## 2.     The Gender Order

Also in January 2025, President Trump issued the Gender Order. The Gender Order states that it is "the policy of the United States to recognize two sexes, male and female" and that these "sexes are not changeable and are grounded in fundamental and incontrovertible reality." Gender Order, Sec. 2. The Order further states that:

'Gender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

*Id*. at Sec. 2(f).

The Gender Order directs federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and further directs that "[f]ederal funds shall not be used to promote gender ideology." *Id*. at Sec. 3(e), (g). To that end, the Gender Order instructs each federal agency to "assess grant conditions and grantee preferences and ensure that grant funds do not promote gender ideology." *Id*. at Sec. 3(g).

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

- 5

### C.    Federal Agencies Are Imposing the Terms of the DEI and Gender Orders on Grants

#### 1.    DOT Grants

In April 2025, DOT modified the Federal Transit Administration Master Agreement (the "April 2025 FTA MA"), which governs several of Seattle's DOT grants. The April 2025 FTA MA now includes the following provision:

> (1) Pursuant to [the DEI Order], the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act] [and that] by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

April 2025 FTA MA Sec. 12(n).[4]

Also in April 2025, Sean Duffy, in his capacity as the Secretary of Transportation, wrote a letter to all DOT grant recipients ("the DOT Letter")[5] stating:

> Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards- such as through contracts or the provision of other benefits-based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.

---

[4] FED. TRANSIT ADMIN., *FTA Master Agreement, Version 33* (Apr. 25, 2025), https://www.transit.dot.gov/funding/grants/grantee-resources/sample-fta-agreements/fta-master-agreement-version-33-april-25.

[5] U.S. DEP'T OF TRANSP. *Follow the Law Letter to Applicants* (Apr. 24, 2025), https://www.transportation.gov/sites/dot.gov/files/202505/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  The DOT Letter warns grant recipients that they may be subject to audits, "possible recovery of

2  funds," or termination of funding if DOT determines that the recipient is violating the funding

3  agreement.

4          **2.    HUD Grants**

5          In May 2025, HUD amended its Assurances and Certifications Form ("the HUD

6  Assurances and Certifications Form")[6] that every HUD grant applicant is required to complete in

7  order to submit applications and receive grants. The HUD Assurances and Certifications Form

8  now contains language requiring grantees to certify that they "[w]ill not use Federal funding to

9  promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that

10 violate any applicable Federal anti-discrimination laws." In addition, on June 5, 2025, HUD

11 General Deputy Assistant Secretary Claudette Fernandez circulated a letter ("the HUD Letter")

12 that decreed that HUD "FY2025 grant agreement[s]" shall "emphasize conformity with

13 applicable Administration priorities and executive orders" and specifically proscribes recipients

14 from using "grant funds to promote 'gender ideology' as defined in the [Gender Order]."[7]

15 Further, the HUD Letter stated that a recipient must also "agree[] that its compliance in all

16 respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's

17 payment decisions for purposes of [the False Claims Act]."

18

19

20

21
22
23

---

[6] U.S. DEP'T OF HOUS. & URBAN DEV., *Form HUD 424-B: Applicant and Recipient Assurances and Certifications* (Jan. 27, 2023), https://www.hud.gov/sites/dfiles/OCHCO/documents/424-B.pdf.
[7] U.S. DEP'T OF HOUS. & URBAN DEV., Response to COSCDA and NCDA Regarding FY 2025 Consolidated Plan Guidance (June 5, 2025) https://ncdaonline.org/wp-content/uploads/2025/06/6-5-2025-HUD-Response-to-COSCDA-NCDA.pdf.

24  ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

25  - 7

### 3.    DHS Grants

In April 2025, DHS also updated its standard terms and conditions that apply to all new DHS awards and grants in FY 2025 ("the DHS Standard Terms and Conditions").[8] The updated DHS Standard Terms and Conditions state: "By accepting the grant award, recipients [] certify[] that [t]hey do not and will not during the term of [a grant award], operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." In July 2025, DHS issued a Notice of Funding Opportunity ("NOFO") for the Fiscal Year 2025 Homeland Security Grant Program. The newly issued NOFO requires applications to identify whether any "subrecipient [of the grant] has any DEI practices." Dkt. No. 12 "Scoggins Decl.", Ex. A.

### D.    The DEI and Gender Orders Threaten Seattle's Federal Funding

Seattle claims that all of its programs that depend on federal funding are at risk of having the funding denied or revoked because Seattle has a policy of promoting diversity and gender equality through multiple city-run programs. For instance, the Race and Social Justice Initiative, which is codified by City of Seattle Ordinance 126799, authorizes the Seattle Office for Civil Rights to take action to end institutional racism within the City government, with the goal of eliminating institutional racism and achieving racial equity. Seattle Municipal Code § 3.14.943(A)-(C) (2025). The City also supports the Women- and Minority-Owned Businesses Program, which promotes access, consideration, and economic opportunities for women and minority-owned businesses.

---

[8] U.S. DEP'T OF HOUS. & URBAN DEV., *FY 2025 DHS Standard Terms and Conditions, Version 3* (Apr. 18, 2025), https://www.dhs.gov/sites/default/files/2025 04/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

- 8

Seattle claims that these programs comply with federal and state antidiscrimination laws and it is entitled to continue its efforts to promote diversity and gender equality in its workforce and programs, but it has lost, and is at risk of losing more, federal funding because the relevant federal agencies have concluded that Seattle's "internal operations are at odds with the Trump Administration's ambiguous interpretation of [] anti-discrimination laws, or its vague definition of 'gender ideology'" as set forth in the DEI and Gender Orders. Compl. at ¶ 54. In short, Seattle claims that the Administration's effort to bring Seattle into conformity with the Administration's political agenda is endangering the health and welfare of City residents.

## III.    DISCUSSION

### A.    Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking preliminary injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. An injunction may also be awarded where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor," provided that the plaintiff can also demonstrate the other two *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (citation and internal quotation marks omitted). Under either standard, the plaintiff bears the burden of making a clear showing that it is entitled to this extraordinary remedy. *California v. Trump*, 379 F. Supp. 3d 928, 937 (N.D. Cal. 2019) (citing *Earth Island Inst. v. Carlton*, 626 F.3d

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

462, 469 (9th Cir. 2010)). The most important *Winter* factor is likelihood of success on the merits. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

In considering the likelihood of success on the merits, the court is not strictly bound by the rules of evidence, as the "preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "Because of the extraordinary nature of injunctive relief, including the potential for irreparable injury if not granted, a district court may consider evidence outside the normal rules of evidence, including: hearsay, exhibits, declarations, and pleadings." *Nat'l Rifle Assoc. of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 926 (C.D. Cal. 2019) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009)).

## B.    Seattle Is Likely to Succeed on the Merits of the APA Claim

The APA broadly "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Under the APA, agencies must "engage in reasoned decisionmaking," and courts are empowered to "hold unlawful and set aside agency action . . . found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *National Urban League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020); 5 U.S.C. § 706(2). Here, Seattle alleges that Defendants have run afoul of all three limitations under the APA.[9]

---

[9] The parties do not dispute that the contested actions constitute final agency actions within the meaning of the APA.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

- 10

1

2

### 1.    Defendants' Actions Violate the APA as Contrary to the Constitution and in Excess of Statutory Authority

The APA mandates that a court "shall … hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C). Seattle argues that in attempting to condition the disbursement of federal funds on grounds not authorized by Congress, but rather on Executive Branch policy, *i.e.*, the DEI and Gender Orders, Defendants are acting in violation of the Separation of Powers doctrine and in excess of statutory authority. Compl. at ¶ 185(1), (2).[10] Because the Separation of Powers doctrine and the APA's "in excess of statutory authority" standard both turn on the same essential question— whether the agency acted within the bounds of its authority, either as conferred by the Constitution or delegated by Congress—the Court addresses these two claims in a single analysis.

The Separation of Powers doctrine recognizes that the "United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.")). "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th

---

[10] Seattle also argues that Defendants' actions must be set aside under the APA as contrary to the Spending Clause and the Tenth Amendment. It is not necessary for the Court to address these claims because, as set forth below, the Court concludes that Defendants' actions are contrary to the Separation of Powers doctrine and in excess of statutory authority.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28, 2473 (1990)). In contrast, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *San Francisco*, 897 F.3d at 123. It follows that an executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). When an agency is charged with administering a statute, "both [its] power to act and how [it is] to act [are] authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *San Francisco*, 897 F.3d at 1235.

Seattle argues that the DEI and Gender Orders violate the Separation of Powers doctrine by unconstitutionally infringing on Congress' power to set funding conditions. Specifically, section 3(b)(iv) of the DEI Order requires federal agencies to ensure that grant recipients: (i) certify that they do not operate any DEI programs "that violate any applicable Federal anti-discrimination laws"; and (ii) agree that the recipient's "compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions" under the False Claims Act. DEI Order, §3(b)(iv)(A)-(B). And section 3(g) of the Gender Order requires federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Gender Order, §3(g). Seattle asserts that any attempt to limit its funding based on the foregoing must be set aside because Congress has not authorized such conditions on the funding.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Seattle also argues that the DEI Order runs afoul of the Separation of Powers doctrine for at least two additional reasons. First, the Order, especially when viewed in context with the Administration's pronouncements, unilaterally expands the definition of "federal anti-discrimination laws" as codified in Title VI of the Civil Rights of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq*. Second, the Order unilaterally expands the definition of "material" for purposes of the False Claims Act, 31 U.S.C. § 3729(b)(4). Seattle claims that the foregoing violates the Separation of Powers doctrine because "only Congress may amend legislation, not the Executive." Dkt. No. 7 "PI Mot." at 9.

Defendants counter that the funding conditions contemplated by the DEI and Gender Orders are authorized by statute. With respect to the DEI Order, Defendants point out that Title VI requires recipients of federal assistance to comply with federal antidiscrimination law, and "direct[s] federal agencies to enforce that compliance through "rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d-1. To that end, HUD, DOT, and DHS regulations "have long required" grant recipients to certify, as a condition of payment, that they will comply with federal antidiscrimination laws. Dkt. No. 18, "Opp." at 5. Defendants also claim that the requirement that all grant recipients agree that their compliance with all antidiscrimination laws is material to the government's payment decisions "merely puts[s] grant recipients on notice of what was always true under Title VI: that their certification of compliance with federal anti-discrimination laws is 'material'" to the government's decision to release the funds. *Id*. at 6.

As for the Gender Order, Defendants claim that currently only HUD incorporates the terms of the Gender Order into its grants.[11] Defendants argue that HUD has the authority to do so

---

[11] Defendants assert that Seattle's claim that the April 2025 FTA MA incorporates the Gender Order is incorrect and further points out that Seattle does not allege that DHS or DOJ have incorporated the Gender Order into their grants.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

because the Homeless Assistance Act—the statute that funds HUD Continuum of Care grants—allows HUD to impose "such other terms and conditions" that the HUD Secretary "may establish to carry out [the program] in an effective and efficient manner." 42 U.S.C. § 11386(b)(8). According to Defendants, prohibiting the use of grant funds to promote "gender ideology" clearly falls within this catchall provision because it ensures that the Continuum of Care program is administered effectively and efficiently.

This Court has previously rejected Defendants' argument that the funding conditions contemplated by the DEI Order are not contrary to the Constitution nor in excess of statutory authority because they "simply" require grant recipients to certify that they will comply with federal antidiscrimination laws, a requirement long included in federal grants. The Court's reasoning in its prior order in *King County v. Turner* is equally controlling as to the issues before the Court in this case:

> The problem with Defendants' argument is that they fail to acknowledge the evidence in the record that demonstrates that Defendants interpret federal antidiscrimination laws in a manner that is inconsistent with well-established legal precedent. For example, on April 4, 2025, DOT Secretary Duffy issued a letter "To All Recipients of U.S. Department of Transportation Funding" in which he stated that "*any* policy, program, or activity" that is "designed to achieve so called "diversity, equity, and inclusion,' or 'DEI[]' goals[] presumptively violates Federal law" even if the policy, program, or activity is "described in neutral terms." Secretary Duffy's statement can easily be interpreted to mean that a federal grant recipient that has a "policy" to accommodate individuals with disabilities so that those individuals can participate in an "activity" has "presumptively violate[d] Federal law." This, of course, is inconsistent with well-established federal precedent that requires entities that receive federal funds to provide reasonable accommodations for qualified individuals with disabilities so that they can participate in their programs. *See e.g.*, *U.S. Dept. of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 604 (1986) ("Section 504 prohibits discrimination against any qualified handicapped individual under 'any program or activity receiving Federal financial assistance.'"); *Muir v. United States Dept. of Homeland Security*, 2025 WL 2088450, *6 (D.C. Cir. July 25, 2025) ("Section 504 of the Rehabilitation Act prohibits discrimination against disabled persons by recipients

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

of federal funds."); *Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014) (It is a basic tenet of the Rehabilitation Act of 1973 "that the government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result").

Likewise, on May 19, 2025, U.S. Deputy Attorney General Todd Blanche sent a memorandum to all United States Attorneys, among others, in which he stated that federal fund recipients may run afoul of the False Claims Act if they allow transgender individuals to use bathrooms consistent with their gender identities (*i.e.*, "allow[] men to intrude into women's bathrooms"). Deputy Attorney General Blanche's statement contradicts the decisions of multiple appellate courts that have held that federal law forbids discrimination based on transgender status. *See e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020) (transgender student's exclusion from bathroom constituted Title IX discrimination); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) ("[D]iscrimination against transgender persons is sex discrimination for Title IX purposes . . . .").

And as recently as July 29, 2025, U.S. Attorney General Pam Bondi issued a memorandum titled "Guidance for Recipients of Federal Funds regarding Unlawful Discrimination" in which she purports to "clarif[y] the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ("DEI") programs." Among other "clarifications", Attorney General Bondi states that the use of "[f]acially neutral criteria (*e.g.*, 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." This "clarification," however, is inconsistent with Supreme Court precedent that has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria "out of a desire . . . to improve racial diversity and inclusion"—even where the decision-maker was "well aware" the race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (internal quotation marks and citation omitted) (citing, inter alia, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015). Nor does Supreme Court precedent prohibit the use of diversity statements for the purpose of advancing racial diversity goals; to the contrary, in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, the Court described these goals as "commendable" and "worthy" (though insufficient to justify race-based admissions). 600 U.S. 181, 214-15, 230 (2023) ("[N]othing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise."); *United States v. Skrmetti,* 145 S. Ct. 1816, 1854 (2025) (Thomas, J., concurring) (suggesting strict scrutiny does not apply to "a university's decision to

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

credit 'an applicant's discussion of how race affected his or her life'" simply because it is "inextricably bound up with" the applicant's race) (cleaned up).

The above demonstrates that Plaintiffs are at the mercy of Defendants' interpretation of federal antidiscrimination laws, regardless of how those laws are interpreted by the courts. Indeed, this has already played out in this case where HUD recently informed King County that it was rejecting King County's CDBG Consolidated Plan submission for Program Year 2025 because HUD "is questioning the accuracy of King County's ... certification that the [CDBG] funds described in [the plan] will be administered in conformity with applicable laws, including Executive Orders." Among other reasons HUD expressed concern was King County's use of words such as "equity," "migrant," and "immigrant" throughout the plan. In order to assuage HUD's concerns, King County was instructed to replace "all 'equity' references" throughout the plan with "activities and actions that do not violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964" and to replace all references to "migrant" and "immigrant" with "legal/documented migrant/immigrant." However, as Plaintiffs aptly point out, "[n]o case law ... suggests that using words like 'equity' or 'migrant' violates any law," thus refuting Defendants' claim that the challenged funding requirements "merely require grant recipients to agree to comply with existing federal laws, like federal antidiscrimination laws."

*King County, et al. v. Turner*, 2025 WL 2322763, *12-13 (W.D. Wash. Aug. 12, 2025) (internal citations to docket omitted). Defendants wholly ignore the foregoing and add no additional arguments in this case. Thus, the Court concludes once again that the DEI Order does not simply require that grant recipients comply with federal antidiscrimination laws; rather, the Order is meant to advance the Trump Administration's own interpretation of "discrimination" through the threat of the loss of federal funding and/or FCA investigations and penalties.[12, 13]

---

[12] This Court also previously noted that the terms of the DEI Order actually conflict with the at least some of the statutory provisions authorizing federal grants, noting that "[f]ar from barring diversity-related 'inclusion,' Congress *requires* consideration of diversity when allocating HUD funds." *Turner*, 2025 WL 2322763, *14 (emphasis in original) (citing 42 U.S.C. § 5307(b)(2) (requiring the HUD Secretary to set aside funds for "[s]pecial purpose grants," including grants to "historically Black colleges"); § 5307(c) (requiring CDBG funds be allocated to provide "assistance to economically disadvantaged and minority students"); 42 U.S.C. § 12831(a) (requiring that HOME fund recipients "establish and oversee a minority outreach program . . . to ensure the inclusion, to the maximum extent possible, of minorities and women, and entities owned by minorities and women . . . in all contracts[] entered into by the participating jurisdiction")).

[13] Nor is the Court persuaded by Defendants' terse citation to *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), Dkt. No. 29, in which the Fourth Circuit stayed a district court's grant

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

- 16

This Court has also previously rejected Defendants' argument that HUD's incorporation of the terms of the Gender Order in its grants is authorized by Congress and does so again here. This Court is not persuaded that the catchall provision of the Homeless Assistance Act which allows the HUD Secretary to establish "such other terms and conditions" necessary to carry out the Act in an "effective and efficient manner" confers the authority to impose the terms of the Gender Order in Continuum of Care grants. Under the canon *ejusdem generis*, or "of the same kind," "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)). The Homeless Assistance Act does outline several conditions that grant recipients must agree to. These enumerated conditions require recipients, among other things, "to monitor and report to the Secretary the progress of the project"; "to ensure . . . that individuals and families experiencing homelessness are involved" in the project; "to maintain the confidentiality of records", to ensure that "children being served in the program are enrolled in school" and to "monitor and report" the receipt of any matching funds. 42 U.S.C. § 11386(b). However, each of these enumerated conditions concerns program administration, accountability, and service delivery—the operational mechanics of implementing federally funded homelessness programs. None touches upon, much

---

of a preliminary injunction pertaining to the DEI Order and another executive order. The district court had concluded that the plaintiffs demonstrated a strong likelihood of success on the merits of their facial free speech and vagueness claims and, therefore, enjoined the defendants from acting on the plaintiffs' grants with respect to certain provisions in the challenged executive orders. *See generally Nat'l Ass'n of Diversity Officers in Higher Educ v. Trump*, 767 F. Supp. 3d 243. Defendants do not explain how this out-of-Circuit, unpublished decision that raises different challenges to the DEI Order (and another executive order not at issue in this case) impacts the relevant legal framework as applied to the unique facts of this case.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

less regulates, recipients' ideological positions or policy viewpoints. Under *ejusdem generis*, any additional conditions imposed under the Act must be "of the same kind" as those listed—that is, tied to the effective and lawful use of grant funds, not to the recipient's compliance with unrelated political or cultural policies. A condition barring recipients from "promoting gender ideology," or any other politically charged policy matter, bears no resemblance to the administrative, procedural, and performance-based conditions enumerated by Congress. Such a condition introduces a substantively distinct and extraneous objective, one untethered from the statutory purpose of ensuring efficient program administration. It therefore falls outside the permissible scope of conditions authorized by the Homeless Assistance Act and violates the limiting principle embodied in the canon of *ejusdem generis*.

For the foregoing reasons, the Court concludes that Seattle is likely to prevail in its claim that by imposing the terms of the DEI and Gender Orders on federal grants, Defendants have run afoul of the Separation of Powers doctrine, are acting in excess of statutory authority, and that under the APA, their actions must be set aside.

## 2. Defendants' Actions Are Arbitrary and Capricious

Seattle also asserts that the challenged conditions must be set aside as "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A); Compl. at ¶ 185(3). The APA requires agencies to engage in "reasoned decisionmaking," and their actions must be "reasonable and reasonably explained." *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). An agency must offer "a satisfactory explanation for its action," and cannot rely on "factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins*. Co., 463 U.S. 29, 43 (1983). Seattle maintains that Defendants have not followed

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

these prescriptions and have failed to provide reasonable explanations for any of the challenged

funding conditions.

Defendants counter that there "is nothing arbitrary or capricious about requiring federal

grantees to comply with federal antidiscrimination laws or to certify that they are doing so." Opp.

at 14. However, as this Court has already determined, the DEI Order does not simply require that

grant recipients comply with federal antidiscrimination laws; rather, the Order is meant to

advance the Trump Administration's own interpretation of "discrimination" through the threat of

the loss of federal funding and/or FCA investigations and penalties. Thus, the Court concludes

that Seattle is likely to succeed on the merit of their claim that Defendants' imposition of the DEI

and Gender Orders is arbitrary and capricious, which is an independent ground for setting aside

Defendants' actions.[14]

## C.    Irreparable Injury

A plaintiff seeking a preliminary injunction must establish that it is likely to suffer

---

[14] Seattle has asserted several other claims under the APA and Constitution. *See* Compl. at ¶¶ 139-178, 185(1). The Court does not reach these claims at this stage, in part because "[t]he court need only find that plaintiff is likely to succeed on one of his claims for [the likelihood-of-success] factor to weigh in favor of a preliminary injunction," and a ruling on Seattle's additional claims would not affect the relief afforded. *American Fed. of States, County and Municipal Employees, ALF-CIO v. Social Security Administration*, 778 F. Supp. 3d 685, 760 (D. Md 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F.Supp.3d 36, 52-53 (D.D.C. Feb. 3, 2025). Furthermore, the Court adheres to the "fundamental and longstanding principle of judicial restraint" that requires courts to "avoid reaching constitutional questions in advance of the necessity of deciding them." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 2024 WL 5692756, at *14 (9th Cir. May 14, 2025) (vacating district court's "entry of judgment for Plaintiffs on the constitutional due process claim" where judgment was granted in Plaintiffs' favor on APA claim) (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)); *see also Washington v. Trump*, 441 F. Supp. 3d 1101, 1125 (W.D. Wash. 2020) ("[A] court should not reach a constitutional question if there is some other ground upon which to dispose of the case. Given that this Court has already determined that Defendants' [action] violates the APA and, therefore, can dispose of the case on that basis, the Court exercises restraint and declines to reach the constitutional claims raised by Washington.") (cleaned up, citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009); *Harmon v. Brucker*, 355 U.S. 579, 581 (1958)). Because Seattle is likely to prevail on its claims that the challenged actions are contrary to the Separation of Powers doctrine, in excess of statutory authority, and arbitrary or capricious, and must therefore be set aside under the APA—the Court's inquiry into the likelihood-of-success factor is at an end.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. Such harm "is

2    traditionally defined as harm for which there is no adequate legal remedy, such as an award of

3    damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent–*

4    *A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991)).

5    "[A] plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary

6    injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988

7    (emphasis removed).

8         Defendants argue that Seattle has not met its burden because its alleged harm is too

9    speculative and, even if it did occur, is reparable. Once again, this Court disagrees with

10   Defendants. Seattle has submitted substantive and detailed evidence demonstrating the ways in

11   which loss of federal grant funds would be devastating and irreparable for the City. For instance,

12   Seattle alleges that it relies on DOJ and DHS grants to support a wide array of public safety, law

13   enforcement, first responder, and anti-terrorism services, including the BioWatch and Urban Area

14   Security Initiative grants. Seattle asserts that loss of DOJ and DHS funding would mean that it

15   would be far less prepared to deal with public safety threats, detect nuclear and biological attacks,

16   respond to terrorist actions, and provide important regional training. Scoggins Decl. ¶ 25; Dkt.

17   No. 11 "Maxey Decl." ¶ 29. Seattle also alleges that it receives significant DOT funding to

18   support critical transportation and infrastructure projects. It claims that it is currently funding

19   third-party contracts to design and construct large capital projects to improve and maintain public

20   infrastructure, as well as essential ongoing programs for its residents, businesses, and visitors

21   based on the federal government's commitment to reimburse the City for these expenses. It

22   asserts that it would have to shutdown these projects if the federal funding was not provided as

23

24   ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

25   - 20

promised and, "[i]n the case of some existing public works contracts, the cost of shutting down a project for loss of funding may exceed the cost of completing it." Dkt. No. 14 "Wood Decl." at ¶ 21.

Nor is Seattle's harm merely speculative. As Seattle points out, on September 25, 2025—*during the course of this litigation*—HUD notified Seattle that it was "disproving" nearly $9 million in Community Development Block Grant ("CDBG") funding that had been previously awarded to the City for the 2025 fiscal year, due to Seattle's purported lack of compliance with the DEI and Gender Orders. Dkt. No. 20, "Kim Decl." at ¶¶ 5, 7-8, 13. Seattle uses CDBG and other HUD funding to provide safe living environments for its residents. *Id*. at ¶¶ 5, 21. The funds play a critical role in providing affordable housing, supporting at-risk residents, reducing crime and homelessness, and revitalizing low-income areas of Seattle. *Id*. ¶¶ 20–21, 23, 29. Without HUD funds, Seattle residents will lose access to these supportive housing and care services. *Id*. ¶ 32.

And as this Court has previously concluded in *King County v. Turner*, the "looming risk" of acute budgetary uncertainty due to Defendants' unlawful actions is an injury in of itself. *King County, et al. v. Turner*, 2025 WL 2322763, *16 (W.D. Wash. Aug. 12, 2025) ("Defendants have not denied that Plaintiffs would be assuming the risk by not signing the agreements. They merely complain that Plaintiffs have not provided details as to when exactly the loss will occur. But this argument misses the point. It is this looming risk itself that is the injury, and one that Plaintiffs are already suffering."); *see also Santa Clara*, 250 F. Supp. 3d at 537 ("The threat of the Order and the uncertainty it is causing impermissibly interferes with the Counties' ability to operate, to provide key services, to plan for the future, and to budget. The Counties have established that,

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

absent an injunction, they are likely to suffer irreparable harm.").[15]

In addition, Seattle has provided substantial evidence demonstrating that this harm is not, as Defendants suggest, merely monetary in nature. Adequate financial compensation simple does not exist for the destabilization of immediate and future budgets, termination of multi-year transportation projects, upheaval of low-to-moderate income individuals and families, loss of access to health care services to vulnerable populations, and the risk to public safety. Therefore, the Court concludes that the harms Plaintiff has alleged are quintessentially irreparable in nature and can be avoided only by entry of the requested injunction.

### D.    Balance of Equities and Public Interest Favor Seattle

In deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters*, 869 F.3d at 866 (quoting *Winter*, 555 U.S. at 24). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted). Where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The Court concludes that the balance of equities tips decidedly in Seattle's favor. Defendants argue that Seattle could be compensated for "any hypothetical lost money after a

---

[15] Nor is the Court persuaded by Defendants' contention that Seattle has failed to demonstrate imminent harm arising from the Gender Order as it pertains to DHS, DOJ, or DOT grants. Defendants argue that the City has not shown that those agencies have incorporated the Order into their funding conditions. But once again, Seattle need not await formal implementation. The credible threat of enforcement, coupled with the resulting uncertainty and instability in future funding, is sufficient to establish imminent and irreparable harm.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ruling on the merits," but this Court has already rejected the contention that monetary relief could adequately remedy the harm the City would likely suffer absent injunctive relief. Defendants further assert that the federal government has an interest in ensuring that federal funds are spent in accordance with its chosen conditions. Yet the government has no legitimate interest in enforcing conditions that were likely imposed in violation of the Constitution or the APA. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (there is no legitimate government interest in violating federal law); *Washington v. U.S. Dept. of Transportation*, 2025 WL 1742893, *30 (W.D. Wash. June 24, 2025) (same). For these reasons, and those discussed above, the irreparable harm Seattle faces without an injunction causes the balance of equities to weigh sharply in the City's favor.

**E.     The Court Denies Defendants' Request for a Bond and Request to Stay**

Defendants request that if this Court issues an injunction, it be stayed pending any appeal and further requests that this Court require Seattle to post a bond for the value of the grants subject to the injunction pursuant to Fed. R. Civ. P. 65(c). The Court denies both requests. Defendants have not met the standard for a stay. *See, e.g., Maryland v. Dep't of Agriculture*, JKB-25-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("It is generally logically inconsistent for a court to issue a TRO or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites."). Nor have Defendants demonstrated that they will suffer any material harm from the injunction the Court issues today. "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citations and internal quotation marks omitted, emphasis in original). "In particular, the

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (cleaned up). Therefore, the Court denies Defendants' requests for a bond and to stay the injunction.

## IV.    CONCLUSION

For the foregoing reasons:

1.    Plaintiff's Motion for Preliminary Injunction is GRANTED;

2.    Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them and all other federal Departments and Agencies are enjoined from enforcing Section 3(b)(iv) of the Anti-Diversity Order and Section 3(g) of the Gender Order against Seattle;

3.    Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them and all other federal Departments and Agencies shall immediately treat any actions taken to implement or enforce Section 3(b)(iv) of the Anti-Diversity Order and Section 3(g) of the Gender Order against Seattle as null, void, and rescinded, and may not retroactively apply such conditions to grant agreements executed during the effective period of this preliminary injunction. Defendants shall immediately take every step necessary to effectuate this order, including clearing any administrative, operational, or technical hurdles to implementation;

4.    Defendants' counsel shall provide written notice of this Order to all Defendants, agencies, and their employees on the third day following issuance of this Order;

5.    By the end of the third day after issuance of this Order, Defendants shall file on this Court's electronic docket and serve upon Plaintiff a Status Report documenting the actions

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

they have taken to comply with this Order, including a copy of the notice and an explanation as to whom the notice was sent; and

      6.     This Order remains in effect pending further orders from this Court.

IT IS SO ORDERED.

Dated this 31st of October, 2025.

Barbara Jacobs Rothstein
U.S. District Court Judge