UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE; CITY OF CLEVELAND; CITY OF COLUMBUS; CITY OF DURHAM; CITY OF PORTLAND; ALLEGHENY COUNTY; HENNEPIN COUNTY; PRINCE GEORGE'S COUNTY; and RAMSEY COUNTY,

　　　　　　Plaintiffs,

v.

DONALD J. TRUMP, President of the United States; UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as the Secretary of Transportation; FEDERAL AVIATION ADMINISTRATION; BRYAN BEDFORD, in his official capacity as Administrator of the Federal Aviation Administration; FEDERAL HIGHWAY ADMINISTRATION; SEAN MCMASTER, in his official capacity as Administrator of the Federal Highway Administration; FEDERAL RAILROAD ADMINISTRATION; DAVID FINK, in his official capacity as Administrator of the Federal Railroad Administration; FEDERAL TRANSIT ADMINISTRATION;

No. 2:25-cv-01435-BJR

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 1
No. 2:25-cv-01435-BJR

MATTHEW WELBES, in his official capacity as Executive Director of the Federal Transit Administration; DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; HEALTH RESOURCES AND SERVICES ADMINISTRATION; THOMAS J. ENGELS, in his official capacity as Administrator of Health Resources and Human Services; DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of the Department of Agriculture; ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the Environmental Protection Agency; DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as Secretary of the Department of Energy; DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, in her official capacity as Secretary of the Department of Labor; OFFICE OF FEDERAL CONTRACTS COMPLIANCE PROGRAMS; ASHLEY ROMANIAS, in her official capacity as Director of Office of Federal Contracts and Compliance Programs; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget; and DOES 1–100,

Defendants.

## INTRODUCTION

1. In his first 100 days since assuming the Office of the Presidency for a second-term, President Donald J. Trump endorsed an unprecedented number of Executive Orders—143, to be exact.[1] Many of these Executive Orders are nothing more than short-cut attempts to advance the

---

[1] *See* Garrett Kral, *Executive Action Review: The First 100 Days of Trump's Environmental Policy*, FEDSOC BLOG (May 6, 2025), https://fedsoc.org/commentary/fedsoc-blog/executive-action-review-the-first-100-days-of-trump-s-environmental-policy.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 2
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Trump Administration's agenda by circumventing the law via executive fiat. The *ultra vires*, unconstitutional actions by the Trump Administration addressed in this Complaint threaten Plaintiffs City of Seattle, City of Cleveland, City of Columbus, City of Durham, City of Portland, Allegheny County, Hennepin County, Prince George's County, and Ramsey County ("Plaintiffs") with vague directives designed to eliminate lawful policies and programs in the workplace. Plaintiffs risk losing committed federal grants and contracts if they do not abide by newly and improperly imposed (and impossibly vague) funding conditions. Even if Plaintiffs do comply with the unlawful conditions, they risk losing committed federal grants and contracts and facing unjustified and costly False Claims Act investigations because of the vagueness of the conditions and the apparent discrepancy between judicial interpretation of federal anti-discrimination laws and the Trump Administration's unlawful interpretation of those same laws. This impossible choice poses significant financial hardship and uncertainty for Plaintiffs regarding the continued funding of a wide range of essential projects that bear no relationship to the Trump Administration's decrees.

2.    This lawsuit seeks to declare unlawful and enjoin the Trump Administration from enforcing against Plaintiffs portions of two Executive Orders that impose unconstitutional and unlawful requirements on Plaintiffs as recipients of federal contracts and grants: (I) Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the "Anti-Diversity Order"), [2] issued January 21, 2025; and (ii) Executive Order No. 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Order"), [3] issued January 20, 2025 (collectively, the "Orders"). These Orders seek to interfere with congressionally authorized federal grants to advance and

---

[2] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[3] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 3
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

expedite the Administration's policy agenda of eliminating all diversity, equity or inclusion ("DEI") initiatives, and diversity, equity, inclusion and accessibility initiatives ("DEIA"), irrespective of the type, scope, or sources of funding used to carry out these efforts.

3. Generally, a federal law must be enacted by Congress and signed into law by the President. The power to appropriate and spend money, such as through the issuance of federal grants, is conferred by the Constitution on Congress and Congress alone. An Executive Order does not have the force and effect of law and cannot be issued to usurp congressional authority or unlawfully advance policy.

4. The Anti-Diversity Order, while purporting to protect civil rights, imposes new and unlawful conditions on federal contract and grant recipients in an attempt to compel the termination of lawful DEI training and initiatives. It also attempts to illegally amend the "materiality" standard of the False Claims Act by forcing recipients to concede that their compliance with the Trump Administration's interpretation of federal anti-discrimination laws is necessarily material to grant funding, in order to more easily threaten recipients with burdensome False Claims Act investigations and penalties.

5. The Anti-Diversity Order instructs the heads of each agency to include terms in every contract or grant requiring grant applicants and recipients to affirmatively certify that their compliance with federal anti-discrimination laws is material to the Government's payment decisions under the False Claims Act. Anti-Diversity Order, Section 3(b)(iv)(A). As set forth below, this requirement is an unlawful, brazen attempt to force Plaintiffs to substitute the Trump Administration's view that all DEI and DEIA initiatives are unlawful for the body of federal statutes and case law that says otherwise, and to intimidate Plaintiffs into abandoning such lawful initiatives due to the fear that they will be the subject of spurious investigations and lawsuits.

6. On its face, the Anti-Diversity Order would apply to any appropriation of federal grant money to Plaintiffs if the Order is not declared unlawful and enjoined. Defendants' unlawful

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 4
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

attempts to expediently reconfigure federal grant programs in service of their policy goals harms Plaintiffs by jeopardizing funds needed to support critical local programs and services, including major counterterrorism, emergency response, safety, transportation, and housing projects that benefit city residents, residents of surrounding metropolitan areas, and visitors from all over the world.  Despite claiming to only target "illegal" DEI, the overbroad language of the Orders is not tailored as such and is not reasonably related to any federal interest in Plaintiffs' projects.

7.    Equally concerning, the broad certification requirements of the Anti-Diversity Order put Plaintiffs in the untenable position of either declining critical grant funds or facing enormous potential exposure in a False Claims Act investigation in the not unlikely event the federal government's interpretation of "illegal" DEI differs from Plaintiffs'—and the federal courts'—interpretation of what constitutes illegal discrimination.[4]

8.    The Anti-Diversity Order also improperly directs the heads of all executive departments and agencies to require recipients to certify that they do not operate *any* programs promoting DEI.  Anti-Diversity Order, Section 3 (b)(iv)(B).  As set forth below, this requirement is unlawful, goes far beyond any statutory authority, and is a clear attempt to force the Administration's view of DEI and DEIA initiatives on Plaintiffs as to *all* of Plaintiffs' programs, not just those programs that are federally funded.  This substantial overreach further evidences the real purpose behind the Orders: to force the Trump Administration's views and policies on Plaintiffs rather than to manage the disbursement of federal funds under its congressionally designated authority.

9.    Likewise, the Gender Order purports to condition the receipt of federal funds on the vague requirements in an *ultra vires* Executive Order, deviating from statutory law.  The Gender Order dictates that "[f]ederal funds shall not be used to promote gender ideology" and

---

[4] *See* Michael C. Bender & Michael S. Schmidt, *Trump Administration Escalates Harvard Feud With New Justice Dept. Investigation*, THE NEW YORK TIMES (May 15, 2025), https://www.nytimes.com/2025/05/15/us/politics/harvard-justice-dept-investigation.html.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 5
No. 2:25-cv-01435-BJR

directs agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Gender Order, Section 3(g). But the Gender Order provides no guidance on what might constitute the "promotion" of gender ideology. "Promotion" is such a vague term that it lends itself to discriminatory enforcement, and the Gender Order's broad definition of "gender ideology" could, and likely would, sweep in and prohibit common workplace activities and policies that otherwise comply with federal statutory law.

10. By this action, Plaintiffs challenge the Anti-Diversity and Gender Orders as violations of the Separation of Powers, the Spending Clause, and the Fifth and Tenth Amendments of the United States Constitution. Plaintiffs also challenge agency implementation of the Orders' conditions described above as violations of the Administrative Procedure Act. These conditions are unlawful because they are arbitrary and capricious, contrary to constitutional rights, and issued in excess of the President's authority.

11. For these reasons, as further detailed below, Plaintiffs respectfully request that the Court declare the Executive Orders unlawful and enjoin Defendants from enforcing or implementing the Orders as to Plaintiffs as recipients of federal contracts and grants, as courts across the country have already done.

## JURISDICTION AND VENUE

12. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq*.

13. Venue is proper in this Court because this is an action against an officer or employee of the United States and agencies of the United States; Plaintiff City of Seattle is located in this judicial district; and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e)(1).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 6
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**PARTIES**

14.     Plaintiff City of Seattle ("Seattle") is a municipal corporation organized under the laws of the State of Washington.  Seattle has legal authority and appropriations authority to spend about $370 million dollars in federal funds during the year beginning January 1, 2025, including funds to support major safety initiatives and vital infrastructure projects as detailed herein.

15.     Plaintiff City of Cleveland ("Cleveland") is a municipal corporation organized under the laws of the State of Ohio.  During the year beginning January 1, 2025, Cleveland has legal authority to accept approximately $260 million dollars in federal funds, and these funds are appropriated for the purposes specified in the grants, including supporting major health initiatives and vital infrastructure projects as described herein.

16.     Plaintiff City of Columbus ("Columbus") is a municipal corporation organized under the laws of the State of Ohio.  It is a home rule charter city.  During the year beginning January 1, 2025, Columbus has legal authority to accept approximately $393 million dollars in federal funds, including funds to support critical city and regional workforce development initiatives, vital health and wellness programming, major public safety and crime prevention efforts, and regional infrastructure projections.

17.     Plaintiff City of Durham ("Durham") is a municipal corporation organized under the laws of the State of North Carolina.  Durham is a designated entitlement community.  In fiscal year 2025, from July 1, 2024 through June 30, 2025, Durham's total federal grant expenditures exceeded $35 million dollars.

18.     Plaintiff City of Portland ("Portland") is a municipal corporation organized under the laws of the State of Oregon.  Portland has approximately $337 million in active federal grants.

19.     Plaintiff Allegheny County ("Allegheny County") is a body corporate and politic organized under the laws of the State of Pennsylvania.  Allegheny County has legal authority and

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 7
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

appropriations authority to spend approximately $618 million dollars in federal funds during fiscal year 2025.

20.    Plaintiff Hennepin County ("Hennepin County") is a political subdivision of the State of Minnesota, organized and existing under the laws of the State of Minnesota. Hennepin County has budgeted approximately $273.6 million in federal funds in 2026.

21.    Plaintiff Prince George's County ("Prince George's County") is a body corporate and politic organized under the laws of the State of Maryland. Prince George's County has legal authority and appropriations authority to spend approximately $194 million dollars in federal funds during the fiscal year beginning July 1, 2025, including funds to support vital housing programs for low-income residents, transportation and infrastructure projects, and for major public health initiatives as detailed herein.

22.    Plaintiff Ramsey County ("Ramsey County") is a political subdivision of the State of Minnesota, organized and existing under the laws of the State of Minnesota, with its county seat in Saint Paul. Ramsey County has legal authority and appropriations to spend approximately $115 million dollars in federal funds in fiscal year 2026, including funds for critical health and housing services, victim services, nutrition services, workforce training and employment services, criminal justice and emergency planning and response initiatives, and important infrastructure projects.

23.    Defendant Donald J. Trump is the President of the United States of America. He is sued in his official capacity. In that capacity, he issued the Executive Orders that are challenged in this lawsuit.

24.    Defendant Department of Homeland Security ("DHS") is an agency of the United States federal government responsible for national security operations. DHS is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 8
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

25.    Defendant Markwayne Mullin is the Secretary of DHS and DHS's highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

26.    Defendant Department of Justice ("DOJ") is an agency of the United States federal government charged with upholding the rule of law, keeping our country safe, and protecting civil rights.  DOJ is an "agency" within the meaning of the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 551(1).

27.    Defendant Todd Blanche is the United States Acting Attorney General and DOJ's highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in her official capacity.

28.    Defendant Department of Transportation ("DOT") is an executive department of the federal government of the United States of America.  49 U.S.C. § 102(a).  It houses a number of operating administrations, including the Federal Transit Administration ("FTA").  DOT is an "agency" within the meaning of the APA.  *See* 5 U.S.C. § 551(1).

29.    Defendant Sean Duffy is the Secretary of DOT, the highest-ranking official in DOT, and responsible for the decisions of DOT.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

30.    Defendant Federal Aviation Administration ("FAA") is an agency of the United States federal government charged with regulating civil aviation.  FAA is an "agency" within the meaning of the APA.  *See* 5 U.S.C. § 551(1).

31.    Defendant Bryan Bedford is the Administrator of FAA and FAA's highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 9
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

32.    Defendant Federal Highway Administration ("FHWA") is an agency of the United States federal government charged with regulating highway transportation.  FHWA is an "agency" within the meaning of the APA.  *See* 5 U.S.C. § 551(1).

33.    Defendant Sean McMaster is the Administrator of FHWA and FHWA's highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

34.    Defendant Federal Railway Administration ("FRA") is an agency of the United States federal government charged with regulating railroad safety.  FRA is an "agency" within the meaning of the APA.  *See* 5 U.S.C. § 551(1).

35.    Defendant David Fink is the Administrator of FRA and FRA's highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

36.    Defendant Federal Transit Administration ("FTA") is an agency of the United States federal government charged with improving public transportation.  FTA is an "agency" within the meaning of the APA.  *See* 5 U.S.C. § 551(1).

37.    Defendant Matthew Welbes is the Executive Director of FTA and FTA's highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

38.    Defendant Department of Health and Human Services ("HHS") is a federal agency charged with providing effective health and human services and fostering sound, sustained advances in the sciences underlying medicine, public health, and social services.  HHS is an "agency" within the meaning of the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 551(1).

39.    Defendant Robert F. Kennedy, Jr. is the Secretary of HHS and HHS' highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 10
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

40. Defendant Department of Housing and Urban Development ("HUD") is a federal agency charged with creating strong, sustainable, inclusive communities and qualify affordable homes for all. HUD is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

41. Defendant Scott Turner is the Secretary of HUD and HUD's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

42. Defendant Health Resources and Services Administration ("HRSA") is a federal agency charged with providing health care to people who are geographically isolated and economically or medically vulnerable. HRSA is an "agency" within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551(1).

43. Defendant Thomas J. Engels is the Administrator of HRSA and HRSA's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

44. Defendant Department of Agriculture ("USDA") is a federal agency charged with developing and implementing national policies related to food, agriculture, natural resources, rural development, nutrition, and other related issues. USDA is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

45. Defendant Brooke Rollins is the Secretary of USDA and the USDA's highest ranking official. She is charged with supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

46. Defendant Environmental Protection Agency ("EPA") is a federal agency charged with developing and enforcing environmental policies and regulations to address issues related to pollution of air, water, and land. EPA is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 11
No. 2:25-cv-01435-BJR

47. Defendant Lee Zeldin is the Administrator of the EPA and the EPA's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

48. Defendant Department of Energy ("DOE") is a federal agency charged with managing national energy policy and production, energy and nuclear research, and United States nuclear security programs. DOE is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

49. Defendant Chris Wright is the Secretary of DOE and DOE's highest ranking official. He is charged with supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

50. Defendant Department of Labor ("DOL") is a federal agency charged with promoting the welfare of wage earners, job seekers, and retirees, ensuring fair labor standards, and fostering safe working conditions. DOL is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

51. Defendant Lori Chavez-DeRemer is the Secretary of DOL and DOL's highest ranking official. She is charged with supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

52. Defendant Office of Federal Contract Compliance Programs ("OFCCP") is part of the United States Department of Labor and is responsible for ensuring that employers that do business with the federal government comply with laws and regulations requiring nondiscrimination. OFCCP is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

53. Defendant Ashley Romanias is the Director of OFCCP and OFCCP's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 12
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

54.     Defendant Office of Management and Budget ("OMB") is the largest office within the Executive Office of the President of the United States of America.  OMB develops and publishes the President's budget and ensures that agency programs, policies, and procedures comply with the President's policies, including policies in the Executive Orders.  OMB is an "agency" within the meaning of the APA.  *See* 5 U.S.C. § 551(1).

55.     Defendant Russell Vought is the Director of OMB and OMB's highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.     THE ANTI-DIVERSITY AND GENDER ORDERS

**A.     The Anti-Diversity Order**

56.     On January 21, 2025, one day after his inauguration, President Trump issued the Anti-Diversity Order, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." The Anti-Diversity Order states that "diversity, equity, and inclusion," or "DEI," "diversity, equity, inclusion, and accessibility," or "DEIA" (diversity, equity, inclusion and accessibility) policies are "illegal," "dangerous," and "immoral" and *can* violate federal civil rights laws but also may not. Anti-Diversity Order, Section 1. As expressed in its title, the Anti-Diversity Order mischaracterizes DEIA efforts as contrary to merit-based opportunity.

57.     The Anti-Diversity Order, at Section 1, states that "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," and "DEIA" are "dangerous, demeaning, and immoral race- and sex-based preferences;" "illegal" in violation of "the text and spirit of … Federal civil-rights laws;" "undermine our national unity;" "deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system;" "threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit,

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 13
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society;" are "illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing;" and are "illegal preferences and discrimination."

58.    Section 2 of the Anti-Diversity Order directs "all executive departments and agencies … to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements" to "protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work" and "to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities."

59.    Section 3(b)(ii) of the Anti-Diversity Order instructs the OFCCP to "immediately cease … [p]romoting 'diversity;'" "[h]olding Federal contractors and subcontractors responsible for taking 'affirmative action;'" and "[a]llowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin."

60.    In an effort to raze DEI efforts even more broadly by improperly leveraging the federal False Claims Act ("FCA"), Section 3(b)(iv) requires each agency head to "include in every contract or grant award: (A) a term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code" and, concerningly, "(B) a term requiring such counterparty or recipient to certify that it does not operate *any* programs promoting DEI that violate any applicable Federal antidiscrimination laws." (emphasis added).

61.    Section 3729(b)(4) of Title 31 of the U.S. Code is a provision of the False Claims Act ("FCA").  In general, the FCA prohibits a person from submitting a false or fraudulent claim to the U.S. government for payment.  Liability can arise under the FCA if a person "knowingly

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 14
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The statute defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(2)(4).

62. The Anti-Diversity Order purports to amend the FCA's definition of "material" by establishing that a federal grant recipient's compliance with "all applicable Federal anti-discrimination laws" is, in all instances, material to the government's decision to pay out grant funds. In reality, the statute enacted by Congress says no such thing and the United States Supreme Court has made plain that the FCA's materiality standard is based on the underlying facts and circumstances. *See Univ. Health Servs. v. U.S.*, 579 U.S. 176, 191 (2016) ("[M]ateriality cannot rest on a 'single fact or occurrent as always determinative.'") (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)).

63. Indeed, the FCA's materiality standard is "demanding" and cannot be met "merely because the government designates a particular … requirement as a condition of payment." *Id.* at 194. Thus, the Supreme Court has already considered, and rejected, the Trump Administration's position that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 194.

64. The certification requirement in the Anti-Diversity Order represents an unlawful, *ultra vires* attempt by the Trump Administration to unilaterally amend the federal False Claims Act for the sole purpose of leveraging the prospect of the statute's enormous penalties to prevent federal grant recipients like Plaintiffs from engaging in lawful activities.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 15
No. 2:25-cv-01435-BJR

65.    Individuals who the government claims violate the FCA, including through execution of allegedly false certifications of compliance that are material to the government's decision to pay, face onerous investigations and, if found liable, are subject to treble damages and per-claim penalties of up to $28,619 per claim submitted.  31 U.S.C. § 3729(a)(1); 89 Fed. Reg. 106308 (Dec. 30, 2024).

66.    Despite the enormous potential liability for executing an inappropriate certification under the FCA, the Anti-Diversity Order does not define key terms such as "diversity," "equity," or "inclusion," nor does it identify which specific DEI programs, initiatives, or policies the Trump Administration may consider unlawful under existing anti-discrimination laws.  The President's own Deputy Chief of Staff has publicly declared that "[a]ll [Diversity, Equity and Inclusion] must be abolished nationwide." [5]  Yet, Section 3(b)(iv)(B) of the Anti-Diversity Order explicitly proscribes *only* those DEI programs that "violate any applicable Federal anti-discrimination laws," which raises the specter of the obvious and problematic rift between what is actually unlawful under statutory anti-discrimination law and caselaw, and the Trump Administration's subjective perspective on "unlawful DEI." In the absence of such guidance, contractors and grant recipients are at sea as to whether the programs they administer to promote diversity, or equity, or inclusion could result in termination of their grants or contracts, and/or subject them to civil investigations and/or liability under the FCA.

67.    The inscrutability and indeterminacy of the Anti-Diversity Order forces Plaintiffs to choose between the devastating financial consequences of losing grant money or the possibility of incurring massive costs and liability under the False Claims Act.

68.    Against this backdrop of legal uncertainty, Plaintiffs are faced with an impossible choice when accepting and spending federal grant money: either submit to the Administration's

---

[5] Stephen Miller (@StephenM), X (Jan. 12, 2025, 9:36 AM, https://x.com/StephenM/status/1878450912621994410.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 16
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

policies through unlawful means or forgo vital funding for major infrastructure and crucial health and safety initiatives, as detailed below.

**B.    The Gender Order**

69.    Through the Gender Order, the Trump Administration has taken the unprecedented step of directing federal agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications[,] or other messages." Gender Order, Section 3(e).

70.    Section 2(a) of the Gender Order states that a person's "sex" is an "immutable biological classification as either male or female" and that it "does not include the concept of 'gender identity.'" Specifically, Section 2 of the Gender Order establishes that it is the "policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." Section 2 further states that "the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy."

71.    Relevant to Plaintiffs' claims, Section 3(g) of the Gender Order prohibits the use of any federal funds "to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Section 7(a) of the Gender Order further requires each agency to submit an update on the Gender Order's implementation within 120 days, including "agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of" the Executive Order.

72.    Defendants, therefore, threaten to penalize federal contractors, grantees, and applicants such as Plaintiffs by withholding funds based on vague and overbroad criteria. It is entirely unclear under the Gender Order what action or inactions might run afoul of its prohibitions.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 17
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Defendants have no authority to impose such arbitrary and vague conditions on federal grant recipients.

73.     The Gender Order applies broadly to all federal grant recipients and applicants, regardless of whether the grant bears any relation to gender-related initiatives. And, even more problematically, the Gender Order provides no guidance as to what the government might view as "funding gender ideology."

## II.     IMPLEMENTATION OF ORDERS

74.     The following agency actions are just a few examples of the types of grant terms the Administration is attempting to implement to enforce its own policy agenda and circumvent the legal process. *All* federal grant scenarios pose the threat of having grant funds denied or revoked if federal agencies conclude that Plaintiffs' internal operations are at odds with the Trump Administration's ambiguous interpretation of the anti-discrimination laws, or its vague definition of "gender ideology."[6] Defendants' actions continue to raise alarm bells that these problematic grant terms will not be implemented in a manner consistent with courts' interpretations of federal anti-discrimination law, but rather in a manner consistent with the Trump Administration's own agenda. For example, Defendants have recently changed the process to require problematic FCA certifications that incorporate the vague and undefined terms from the Anti-Diversity Order prior to even applying for a grant using the SAM.gov registration system.

## A.     Department of Transportation Grants

75.     Congress has established grant programs administered by the United States Department of Transportation ("DOT"), acting through the United States Federal Transit Authority ("FTA"), Federal Highway Administration ("FHWA"), Office of the Secretary of Transportation

---

[6] Gender Order, Section 2(f) (defining "gender ideology" as "an ever-shifting concept of self-assessed gender identity" and as "internally inconsistent").

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 18
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

("OST"), Federal Aviation Administration ("FAA") and Federal Railroad Administration ("FRA") that provide federal funds to state and local governments for public transportation projects.

76.     The DOT has implemented the Orders to condition federal funds on compliance with the vague and overbroad DEI and gender ideology requirements.

77.     DOT grants are subject to the DOT FTA Master Agreement ("MA"). The current iteration—version 33—of the MA, published on April 25, 2025, is known as "MA 33" and contains new provisions that appear to be directed by the Orders, thus confirming the DOT's intention to adopt and enforce the policies outlined in the Orders.

78.     MA 33 at Section 12(n), for example, contains the following provisions under the heading "Federal Anti-Discrimination":

> (1) Pursuant to section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code. (2) Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.[7]

79.     The MA further states that a grant recipient must comply with all federal laws, regulations, and requirements. The MA defines a "federal requirement" as "[a]n applicable … executive order[.]" Section 15(i).

80.     Plaintiffs are the recipient of numerous FTA, FAA, FHWA, and FRA grants, which fund major infrastructure projects such as light rail, rapid transit, airport improvements, and projects improving street connectivity and safety.

---

[7] *See* FED. TRANSIT ADMIN., *FTA Master Agreement, Version 33* (Apr. 25, 2025), https://www.transit.dot.gov/funding/grants/grantee-resources/sample-fta-agreements/fta-master-agreement-version-33-april-25.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 19
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

81.    The DOT's intention to enforce the Orders against Plaintiffs is not a hypothetical threat.  On April 24, 2025, Secretary of Transportation Sean Duffy wrote a letter to "All Recipients of US Department of Transportation Funding"[8] (the "DOT Letter") clarifying the agency's intention to enforce the Orders.  The letter begins by ominously reminding grant recipients that "[a]s recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations."  Although claiming that the agency is merely trying to uphold the constitutional principles espoused in the Civil Rights Act of 1964, the letter goes on to threaten grant recipients who engage in diversity-promoting activities, stating that such activities "presumptively" violate Federal law:

> Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, ***presumptively violates Federal law***. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards- such as through contracts or the provision of other benefits-based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.[9]

82.    DOT proclaims that its letter "provides notice of the Department's existing interpretation of Federal law" and warns that "[n]oncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a

---

[8] *See* U.S. DEP'T OF TRANSP. *Follow the Law Letter to Applicants* (Apr. 24, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-05/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.
[9] *Id*. at p. 2 (emphasis added).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 20
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

loss of Federal funding from DOT."[10] The letter threatens that grant recipients may be subject to audits and "possible recovery of funds" or termination of funding for violations of the funding agreement.[11] The Court, Plaintiffs, and the public should take these statements at face value; after all, judges "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quotation marks omitted).

83.     As Plaintiffs continue to be presented with new funding opportunities that incorporate MA 33, they directly and repeatedly confront the quandary of accepting federal funding conditioned on execution of problematic FCA certifications that incorporate the vague and undefined terms from the Anti-Diversity Order.

**B.     Department of Housing and Urban Development Grants**

84.     The United States Department of Housing and Urban Development ("HUD") has also implemented the Orders to condition federal funds on compliance with the vague and overbroad DEI and gender ideology requirements.

85.     On April 29, 2025, a HUD press release decreed that the Department had "[a]ligned all programs, trainings, and grant agreements with the President's Executive Orders, removing diversity, equity, inclusion (DEI)" and that "HUD ended DEI."[12]

86.     On June 5, 2025, HUD General Deputy Assistant Secretary Claudette Fernandez circulated a letter which decreed that Community Planning and Development ("CPD") fiscal year 2025 formula grant agreements shall "emphasize conformity with applicable Administration priorities and executive orders," including the Gender Order, which is specifically referenced. Grantees are "encouraged" to review the Presidential executive orders as they develop plans, which must be submitted to HUD by August 16, 2025, to avoid losing funds for program year

---

[10] *Id.* at p. 3.

[11] *Id.*

[12] *See* U.S. DEP'T OF HOUS. & URBAN DEV., *HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days*, (Apr. 29, 2025) https://www.hud.gov/news/hud-no-25-059.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 21
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

2025. A grantee "shall not use grant funds to promote 'gender ideology,'" as defined in the Gender Order.[13]

87.    HUD uses a consolidated planning process to identify housing and community development priorities to align and focus funding from formula block grant programs.

88.    HUD's "Consolidated Plan" is a five-year plan which is carried out through "Annual Action Plans," which provide a concise summary of the actions, activities, and the specific federal and non-federal resources that will be used each year to address the priority needs and specific goals identified by the Consolidated Plan. Federal grantees report on accomplishments and progress toward consolidated plan goals in the Consolidated Annual Performance and Evaluation Report ("CAPER").

89.    In May 2025, HUD circulated a new 424-B Assurances and Certifications Form ("Certification"),[14] which Seattle's Housing Services Department must execute as part of the Annual Action Plan.  The Certification contains new language requiring grantees to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws." This language was not included in the 2024–2028 Consolidated Plan.

90.    Illustrating the imminent threat posed by vague and overbroad conditions, on September 23, 2025, HUD directly threatened Seattle's Community Development Block Grant ("CDBG") funds based on a purported lack of compliance with the Anti-Diversity and Gender orders. The problem, according to HUD's September 23 communication, was that part of Seattle's fiscal year 2025 budget plan discusses "equity" and support for marginalized communities. Just three days later, on September 26, HUD rejected Seattle's budget plan.

---

[13] *See* U.S. DEP'T OF HOUS. & URBAN DEV., Response to COSCDA and NCDA Regarding FY 2025 Consolidated Plan Guidance ("HUD Letter") (June 5, 2025) https://ncdaonline.org/wp-content/uploads/2025/06/6-5-2025-HUD-Response-to-COSCDA-NCDA.pdf.

[14] U.S. DEP'T OF HOUS. & URBAN DEV., *Form HUD 424-B: Applicant and Recipient Assurances and Certifications* (Jan. 27, 2023), https://www.hud.gov/sites/dfiles/OCHCO/documents/424-B.pdf.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 22
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

91.    In addition to facing the dilemma of accepting federal funding conditioned on execution of a problematic certification that incorporates the vague and undefined terms from the Anti-Diversity Order, Plaintiffs also faces significant budgetary uncertainty and programmatic uncertainty from the loss of these federal funds, as many programs, although financed directly by the Plaintiff cities, are reimbursable through HUD.

**C.    Department of Homeland Security Grants**

92.    The United States Department of Homeland Security ("DHS") has implemented the Orders to condition federal funds on compliance with the vague and overbroad DEI and gender ideology requirements.

93.    On April 18, 2025, DHS issued an update to its standard terms and conditions ("Standard Terms") that apply to the federal awards and grants issued by DHS. DHS's updated Standard Terms apply to "all new federal awards" in fiscal year 2025.[15]

94.    The Standard Terms, at section C, paragraph XVII(2)(A) provides: "By accepting the grant award, recipients are certifying that [t]hey do not and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws."

95.    The Standard Terms define DEI as "diversity, equity, and inclusion" and DEIA as "diversity, equity, inclusion, and accessibility." The Standard Terms define "discriminatory equity ideology," by reference to Executive Order 14190, as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations."[16] Executive Order 14190 provides examples of such ideology, including the idea that an individual's "status as privileged . . . is

---

[15] U.S. DEP'T OF HOUS. & URBAN DEV., *FY 2025 DHS Standard Terms and Conditions, Version 3* (Apr. 18, 2025), https://www.dhs.gov/sites/default/files/2025-04/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf.
[16] Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 23
No. 2:25-cv-01435-BJR

primarily determined by the individual's race, color, sex, or national origin" and the belief that people exhibit implicit, unconscious racial biases. *Id.* Section 2(b)(ii)–(iii).

96.    Section C, paragraph XXXI of the Standard Terms provides, "[r]ecipients must comply with all requirements of Presidential Executive orders related to grants, the full text of which are incorporated by reference."

97.    An example of an affected program is BioWatch, a system designed to provide early detection of airborne biological threats, particularly those linked to bioterrorism, operated by state and local governments.  When detection of a potential threat occurs, it sets in motion a coordinated effort by emergency responders, public health officials, and law enforcement.  As described further below, BioWatch is a critical counter-terrorism program for many local jurisdictions, including Plaintiffs Seattle and Cleveland.

98.    On June 4, 2025, the Director of BioWatch Field Operations announced that the April 18, 2025 version of the DHS Standard Terms will apply to fiscal year 2025 BioWatch applications.

99.    On January 27, 2026, Cleveland received a letter from a DHS Grants Officer informing the City that the April 18, 2025 version of the DHS Standard Terms and Conditions continued to apply to BioWatch grants.

100.    Plaintiffs intend to continue to apply for future BioWatch grants.  As such, these scenarios pose the threat of having grant funds denied or revoked if executive agencies conclude that Plaintiffs' internal operations are at odds with the Trump Administration's interpretation of the anti-discrimination laws, or its vague definition and incoherent application of "gender ideology" and "discriminatory equity ideology."

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 24
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## D.    Department of Justice Grants

101.    In addition to agency-specific pronouncements that the Orders are being enforced with respect to federal grants, DOJ has implemented the Orders to condition federal funds on compliance with the vague and overbroad DEI and gender ideology requirements.

102.    On February 5, 2025, former U.S. Attorney General Pamela Bondi issued a memorandum ("DOJ Memo") reciting the Anti-Diversity Order and asserting that DOJ's Civil Rights Division "will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds."[17] Although Plaintiffs are not private entities, DOJ's interpretation of the administration's policy is clear: root out and punish anyone who engages in what it considers "illegal" DEI.

103.    Despite these serious and actionable threats, the Administration's Orders, federal agency directives such as the DOT Letter and HUD Letters, and the DOJ Memo, do not define or describe the prohibited activities that would subject a grant recipient to penalties such as the termination of its grants or contracts or FCA liability. Nowhere do these pronouncements define (1) "diversity, equity, and inclusion;" (2) "diversity, equity, inclusion, and accessibility;" (3) "environmental justice;" (4) "equity;" (5) "equity-related;" much less (6) what it means to be "promoting DEI." Nor do they define or describe the standards which these activities will be scrutinized against to determine permissibility.

104.    Moreover, the Anti-Diversity Order's reference to "illegal" DEI appears to be pretextual. What Plaintiffs may view as legal or illegal based on federal judicial interpretation of anti-discrimination law is at odds with the Administration's public comments. As new directives pour from these Orders, Plaintiffs are at a loss regarding the meaning of the Order, forcing

---

[17] *See* U.S. DEP'T OF JUST., OFFICE OF THE ATT'Y GEN., Remarks by Attorney General Merrick B. Garland on Uvalde Report Release (Jan. 18, 2024), https://www.justice.gov/ag/media/1388501/dl?inline.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 25
No. 2:25-cv-01435-BJR

Plaintiffs to choose between potential legal liability or self-censorship in the face of legal uncertainty. The potential loss of federal funds irreparably harms Plaintiffs not only by threatening the loss of federal funds, but also by creating acute budgetary and programmatic uncertainty. *See King Cnty. et al. v. Turner et al.*, No. 2:25-cv-00814-BJR, Dkt. 169 (Order Granting Plaintiffs' First and Second Motions for Preliminary Injunctions) (W.D. Wash. June 3, 2025).

**E.      Department of Health and Human Services Grants**

105.    The United States Department of Health and Human Services ("HHS") has also implemented the Orders to condition federal funds on compliance with the vague and overbroad DEI and gender ideology requirements.

106.    HHS and its operating divisions and agencies have implemented President Trump's Executive Orders by changing HHS policy and attaching new and unlawful conditions across HHS grants established by Congress and demanding grant recipients' agreement to those new conditions.

107.    For example, on April 16, 2025, HHS issued an updated HHS Grants Policy Statement applicable to discretionary grants that is "incorporated by reference in the official Notice of Award . . .  as a standard term and condition."  It applies to "awards and award modifications that add funding made on or after April 16, 2025," includes "supplements to award, competing and non-competing continuations," and applies to "all HHS recipients and the requirements flow down to subrecipients." The 2025 HHS Grants Policy Statement "is incorporated by reference as a standard term and condition of awards." The 2025 HHS Grants Policy Statement states that it does not apply to nondiscretionary awards, but that "HHS agencies have the discretion to apply certain parts of the [Grants Policy Statement] to non-discretionary awards and other policies to" non-discretionary awards.

108.    The 2025 HHS Grants Policy Statement imposed a new condition on HHS grants implementing President Trump's directive, as set out in the Anti-Diversity Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 26
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

is material for purposes of the FCA. Further, the 2025 HHS Grants Policy Statement states that "By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws . . . ."

109.    On May 14, 2025, HRSA issued updated general terms and conditions applicable to "all active awards." The revised HRSA terms and conditions incorporate the 2025 HHS Grants Policy Statement as applicable grants policy with which grants must comply.  The revised HRSA terms and conditions also include the following provision:

> By accepting this award, including the obligation, expenditure or drawdown of award funds, recipients, whose programs are covered by Title IX, certify as follows:
>
> - Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government. . . and Recipient will remain compliant for the duration of the Agreement.
>
> - The above requirements are conditions of payment that go the essence of the Agreement and are therefore material terms of the Agreement.
>
> - Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.
>
> - Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject the Recipient to liability under the False Claims Act, 31 U.S. C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

110.    In a May 14, 2025 statement to the Senate Committee on Health, Education, Labor, and Pensions regarding President Trump's FY 2026 budget, HHS Secretary Kennedy stated,

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 27
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

among other things, that HHS is "committed to restoring a tradition of gold-standard, evidence based science—not one driven by politicized DEI, gender ideology, nor sexual identity." Statement by Robert F. Kennedy, Jr. on the President's Fiscal Year 2026 Budget before Committee on Health, Education, Labor, and Pensions (May 14, 2025), https://www.help.senate.gov/imo/media/doc/b1b74b8b-0612-8b5d-1904-a50babc1deea/HELP%20Secretary%20Kennedy%20Testimony.pdf.

111.    In addition to facing the dilemma of accepting federal funding conditioned on execution of a problematic certification that incorporates the vague and undefined terms from the Anti-Diversity and Gender Orders, Plaintiffs also face significant budgetary and programmatic uncertainty from the loss of these federal funds.

112.    The potential loss of federal funds will inflict irreparable harm not only by threatening Plaintiffs with the loss of federal funds for vital programs that their residents and visitors depend on, but also by creating acute budgetary uncertainty and programmatic uncertainty as further described below.

### III.    THREATENED LOSS OF FEDERAL FUNDING

113.    Although Plaintiffs' claims in this action are generally not premised on any specific grant or contract, this section of the Complaint is intended to illustrate the reach of the unlawful Orders by the various federal agencies who award federal grant money and the means used by the Trump Administration to advance its policy agenda expediently but unlawfully.

### A.    City of Seattle

114.    Like other major United States cities, Seattle relies heavily on federal funding. Beginning January 1, 2025, Seattle has legal and appropriations authority to spend approximately $370 million in federal grant funds.

115.    Multiple critical programs for Seattle's residents and visitors are placed at risk due to the Executive Orders.  These programs include federal monies allocated from the Department

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 28
No. 2:25-cv-01435-BJR

of Justice and the Department of Homeland Security for the funding of items such as police tactical gear, fire department needs, health services, and more.

116. Among other priorities, these federal dollars also provide services for vulnerable residents needing access to food, medical care, shelter, and other housing assistance. If that funding were eliminated, harm would be felt by Seattle's most vulnerable residents immediately.

117. Seattle's internal budget guidance, for example, instructs that grants and other funding agreements are included in a proposed budget if they "have been received for at least three consecutive prior years and can reasonably expect to continue in the new year." Because Seattle cannot discern from the unconstitutionally vague Orders which activities the Defendants would consider lawful, they cannot predict which funding sources will continue and which founding sources will not.

118. The Executive Orders introduce significant budgetary uncertainty into Seattle's financial plans for fiscal year 2025–2026. Much of Seattle's federal funding is provided on a reimbursable basis. Seattle expends funds to provide programs and services that the federal government has agreed to reimburse. Seattle is currently funding large capital projects to build and maintain public infrastructure, as well as essential ongoing programs for its residents and visitors, based on the federal government's commitment to reimburse them for these costs. Threats and uncertainty regarding the federal government's funding presents an unacceptable fiscal and budgetary challenge.

**1.    Seattle's Transportation Funding**

119. The Seattle Department of Transportation ("SDOT") relies heavily on federal grant funds to support its transit and critical infrastructure projects.

120. Seattle's total active federal grants for transportation-related projects are valued at $440 million, funding important transportation programs and infrastructure capital projects.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 29
No. 2:25-cv-01435-BJR

Projects supported by these grants are in various phases, ranging from outreach, planning, and design, to construction and maintenance.

121. DOT provides federal funds to Seattle for critical road and street infrastructure projects. For example, Safe Streets and Roads for All ("SS4A") is a competitive grant program that provides funding for improving roadway safety through the development, refinement, and subsequent implementation of comprehensive safety action plans.

122. This essential infrastructure funding is threatened by DOT's unlawful attempts to impose the terms of the Orders upon grant recipients like Seattle.

123. For instance, on March 17, 2025, DOT updated the terms of the SS4A 2024 grant agreements which had been signed by grant recipients as far back as October 2024 in DOT's online grants award system, to incorporate a new version of that agreement with requirements related to DEI and gender ideology, which patently do not have anything to do with pedestrian and roadway safety. SDOT, which administers the existing SS4A grants for Seattle, did not receive notice from DOT that it was changing the terms.

124. Section 24.2 Federal Law and Public Policy Requirements of the revised SS4A grant terms and conditions, dated March 17, 2025, now states the following:

> (a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.
>
> (b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 30
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

(c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.[18]

125.    SDOT is a recipient of a fiscal year 2022 SS4A grant, which was executed in 2024, and has applied for and/or intends to apply for fiscal year 2025 SS4A grants.

126.    SDOT is also a recipient of a DOT RAISE ("Rebuilding American Infrastructure with Sustainability and Equity") grant, which was executed in 2023. RAISE is a competitive grant program that provides funding to advance capital investments in surface transportation infrastructure that will have a significant local or regional impact.

127.    On April 23, 2025, DOT updated the Federal Law and Public Policy Requirements associated with the SDOT's RAISE grant.  The new requirements, found at Section 19.2, are identical to the language quoted in Paragraph 13 above and expressly incorporate the Anti-Diversity Order and certification requirement.[19]

### 2.    Seattle's Housing Funding

128.    The Seattle Human Services Department ("HSD") administers tens of millions of federal dollars that connect Seattle residents with critical resources, including food and health care. Pursuant to a Master Services Agreement with the King County Regional Homelessness Authority ("KCRHA"), HSD also supports initiatives to provide outreach to people experiencing homelessness.  Further, HSD also provides federal grant money to the Office of Housing ("OH"), a Seattle executive office which administers affordable housing programs.

---

[18] *Id*. at p. 25.
[19] *See* U.S. DEP'T OF TRANSP., FED. HIGHWAY ADMIN., *RAISE FY2022 General Terms and Conditions* (Apr. 23, 2025) (PDF), raise-fy2022-fhwa-general-terms-and-conditions-20250423.pdf.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 31
No. 2:25-cv-01435-BJR

129.    HUD funds a number of critical programs under the Consolidated Plan and Annual Action Plan, including the Community Development Block Grant Program, Emergency Solutions Grants ("ESG") Program, Housing Opportunities for Opportunities for Persons with Aids ("HOPWA") Program, and the HOME Investment Partnerships ("HOME") Program.

130.    To take just one example of those mentioned, Community Development Block Grant ("CDBG") is a critical program funded by the federal government.  CDBG primarily serves low- to moderate-income populations in Washington.  The CDBG Program provides annual grants on a formula basis to cities to develop viable urban communities by providing safe housing and a suitable living environment.

131.    In 2025, $8,917,476 in federal funding was allocated by HUD to HSD's CDBG program.

132.    The CDBG Program has played a critical role in revitalizing low-income areas of Seattle.  The Program has had a substantial positive economic impact on Southeast Seattle, which is one of the nation's most diverse neighborhoods.

133.    All these programs covered under the Annual Action Plan are an economic investment in Seattle, as providing affordable housing within residents' means strengthens the job market and the economy.

134.    Based on its historical interactions with HUD, HSD relies on the continued availability of these funds in supporting the above-mentioned programs.  Furthermore, HSD and OH have incurred expenses for CDBG and HOME in anticipation of reimbursement from HUD.

135.    Thus, tens of millions of dollars of critical housing and services funds are at risk due to HUD's unlawful actions.  If these funds become unavailable, then HSD likely could not continue to support many of these vital services through state and local funding alone, and the financial repercussions would be felt immediately.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 32
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

136.    In other words, the Certification and HUD Letter create significant budgetary uncertainty for Seattle, thereby presenting an actual and imminent harm to these projects and services.

**3.    Seattle Fire Department and Seattle Police Department Funding**

137.    Seattle Fire Department ("SFD") and Seattle Police Department ("SPD") receive federal funds from the DHS and DOJ that they use to save lives and protect property.

138.    As discussed above, one critical program that is federally funded through a DHS grant is BioWatch, a system designed to provide early detection of airborne biological threats, particularly those linked to bioterrorism, operated by state and local governments.  Over the past decade, Seattle has relied on BioWatch funds to monitor the city's air for biohazards to help protect its residents. SFD pays the State Department of Health and a private laboratory to collect and analyze air samples from within the city. The BioWatch grant, in turn, refunds SFD for these costs. The program is designed to detect intentional, biological attacks.  If detection of a hazard were to occur, SFD would engage in a coordinated effort by emergency responders, public health officials, and law enforcement to address the hazard.  SFD's 2025 budget reflects approximately $2 million in funds from BioWatch.

139.    Continuation of the BioWatch monitoring program is an important component of our city's preparedness to counter a potential terrorist attack.  If deprived of these funds, SFD would lack access to technology to protect its community and prepare to respond to an airborne bioweapon.

140.    On June 4, 2025, SFD received a communication from the DHS Director of BioWatch Field Operations announcing that the updated DHS Standard Terms and Conditions (April 18, 2025 version) will apply to fiscal year 2025 BioWatch applications.  As of this date, the application for 2025 funds has not been released.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 33
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

141. Additionally, SPD is the regional lead agency for the Urban Area Security Initiative ("UASI") grant, and SFD, as well as other first responder and law enforcement agencies, receives these funds. Washington State is one of the largest UASI recipients.

142. UASI funding is primarily used for structural collapse training, including responses to bombings and earthquakes. UASI funds are also used for technical rescue team training, which prepares first responders to handle complex, high-risk emergencies that go beyond standard firefighting or emergency services operations. SFD offers its technical rescue team training to first responders throughout the region, so that many jurisdictions have an opportunity to train for the most dangerous of scenarios. A loss in funding for either technical rescue team or structural collapse training would have immediate and long-term effects on SFD and its neighboring first responders.

143. Without this critical training, SPD, SFD and other jurisdictions risk reduced readiness for high-stakes emergencies such as building failures and earthquakes—scenarios that require precision, coordination, and advanced skills.

144. DHS grants support a range of regional efforts to coordinate and prepare for natural disasters and terrorist acts, including planning, organization, equipment purchase, training exercises, management, and administration. Collectively, the adverse impacts of eliminating federal funding for public safety priorities would leave Seattle, and its regional area by extension, far less prepared to deal with threats such as forest fires, earthquakes, nuclear and biological attacks; or other terrorist actions.

**B.      City of Cleveland**

145. Like other major United States cities, Cleveland relies heavily on federal funding. For the year beginning January 1, 2025, Cleveland has legal authority to accept approximately $260 million dollars in federal funds, and these funds are appropriated for the purposes specified in the grants.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 34
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

146. Multiple critical programs for Cleveland's residents and visitors are placed at risk due to the Executive Orders. These programs include federal monies allocated from DOT, HUD, HHS, and DHS for the funding of items such as critical airport and roadway infrastructure projects, transportation safety, health services, antiterrorism and major disaster preparedness for critical port infrastructure, and early detection of bioterrorism.

147. Among other priorities, these federal dollars also provide services for vulnerable residents needing access to food, medical care, shelter, and other housing assistance. If that funding were eliminated, harm would be felt by Cleveland's most vulnerable residents immediately.

148. The Executive Orders introduce significant programmatic and budgetary uncertainty into Cleveland's financial plans for Fiscal Year 2025–2026. Much of Cleveland's federal funding is provided on a reimbursable basis. Cleveland expends funds to provide programs and services that the federal government has agreed to reimburse. Cleveland is currently funding large capital projects to build and maintain public infrastructure, as well as essential ongoing programs for its residents and visitors, based on the federal government's commitment to reimburse them for these costs. Threats and uncertainty regarding the federal government's funding presents an unacceptable fiscal and budgetary challenge.

149. Because Cleveland cannot discern from the unconstitutionally vague Orders which activities Defendants would consider lawful, it cannot predict which funding sources will continue and which funding sources will not. Without a reliable source of funding, and without clarity on how the federal government will choose to apply and interpret the Executive Orders, Cleveland faces the possibility of having to end certain programs or cease providing certain services altogether.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 35
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

### 1.    Cleveland's Transportation Funding

150.    Cleveland relies heavily on federal grant funds to support its transit and critical infrastructure projects.  Cleveland's total active federal grants for transportation-related projects are valued at approximately $234 million, funding important transportation programs and infrastructure capital projects.  DOT provides federal funds to Cleveland for critical road, street, and airport infrastructure projects.  This essential infrastructure funding is threatened by DOT's unlawful attempts to impose the terms of the Orders on Cleveland.

151.    By way of example, in 2025, Cleveland's Department of Port Control, which operates the Cleveland International Airport, was awarded approximately $30 million in grant funding from the FAA, an agency within DOT, through Airport Infrastructure Grants ("AIG") and the Airport Improvement Program ("AIP") for various airport projects. These projects include reconstructing approximately 10 miles of the airport's surrounding wildlife fence to reduce the number of wildlife strikes, rehabilitating the terminal tunnel membrane at the pedestrian connector of the airport terminal, parking garages, and the Greater Cleveland Regional Transit Authority's rapid transit station, creating 630 feet of new taxiway, and improving stormwater management.

152.    Cleveland's AIG and AIP grant agreements incorporate the FAA's 2025 revised terms and conditions.  The revised terms and conditions require that Cleveland certify that it does not operate any programs promoting DEI initiatives and that it agrees that it will cooperate with immigration enforcement.

153.    As another example, Cleveland receives, or anticipates receiving, a total of approximately $4.7 million in funding from DOT's Safe Streets and Roads for All ("SS4A") grant program.  Cleveland received a 2023 SS4A grant of $2,328,908, for which it received the grant agreement on January 7, 2026.  The grant agreement references and incorporates the Anti-

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 36
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Diversity and Gender Orders, as well as Executive Order No. 14151, "Ending Radical Wasteful Government DEI Programs and Preferencing."[20]

154.    In addition to the 2023 SS4A grant award, Cleveland was also awarded $2.4 million for the 2024 SS4A grant cycle.  This grant would fund demonstration activities following the Roadway Safety Audits funded with the 2023 SS4A award; together, the SS4A grants are critical to saving human lives by improving high crash corridors.

155.    Cleveland has not yet received the 2024 SS4A grant agreement. FHWA informed Cleveland that it would draft the 2024 SS4A grant agreement once the 2023 SS4A grant agreement was finalized and executed.  Cleveland anticipates that this agreement will also reference and incorporate the Anti-Diversity and Gender Orders.

156.    Cleveland also receives Strengthening Mobility And Revolutionizing Transportation ("SMART") funding from DOT.  Cleveland currently has one active grant SMART grant for FY 2022 Stage 1, in the amount of $1,820,500, to fund technologies that improve emergency vehicle response times, pedestrian safety, and efficiency and on-timer performance of transit services, through projects such as state-of-the-art traffic signal technology to provide transit signal priority, emergency vehicle preemption, and passive bicycle and pedestrian detection at 25 intersections along two pilot corridors.

### 2.    Cleveland's Housing Funding

157.    Like Seattle, Cleveland relies on federal funding for important housing programs, including CDBG, ESG, HOME, and HOPWA.  Departments throughout Cleveland administer and rely on tens of millions of federal dollars in funding from HUD grants.

158.    City departments across Cleveland rely on CDBG funding for a variety of public service programs and neighborhood revitalization initiatives that make a direct impact on the

---

[20] Exec. Order No. 14151, *Ending Radical Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025),

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 37
No. 2:25-cv-01435-BJR

quality of life for low to moderate income households.  For example, Cleveland uses CDBG funding to support after-school programs, job readiness for at-risk youth, home repair projects, hunger and wellness programs, adult literacy, and senior socialization networks.  CDBG grant money is also a primary funding source for non-profit organizations offering first-time homebuyer and foreclosure prevention programs, technical assistance to small businesses, renter eviction and counseling support, furnace repairs during the winter months, legal aid services to low-income residents, transportation for seniors, and repair and clean-up of buildings and physical spaces across the city.

159.    For FY 2025, Cleveland received $19,463,970 in CDBG grant funding.  The FY 2025 CDBG grant agreement documents Cleveland received included conditions that include prohibiting the use of funds to "promot[e] 'gender ideology'" as defined in the Gender Order, agreeing that compliance with all applicable Federal anti-discrimination laws is material for FCA purposes, certifying that it does not operate any programs that violate any applicable federal anti-discrimination laws, and agreeing to certain immigration enforcement-related procedures.

160.    Since 2011, Cleveland has received ESG funds from HUD to address homelessness. Cleveland uses ESG funds to improve the number, quality, operation, and services of emergency shelters to prevent people from becoming homeless and to rapidly rehouse homeless people. Cleveland selects non-profit subrecipients through a competitive process to provide direct services to those in need.

161.    In the 2025 grant year, which provides funding for 2026, Cleveland was awarded an ESG grant of $1,842,356.  The FY 2025 ESG grant agreement documents Cleveland received included conditions that include prohibiting the use of funds to "promot[e] 'gender ideology'" as defined in the Gender Order, agreeing that compliance with all applicable Federal anti-discrimination laws is material for FCA purposes, certifying that it does not operate any programs

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 38
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

that violate any applicable Federal anti-discrimination laws, and agreeing to certain immigration enforcement-related procedures.

162.    Cleveland has received HOME funds since the program's beginning in 1990. HOME funds are used to acquire and/or rehabilitate both rental and home buyer housing, build new rental and home buyer housing, and provide direct financial assistance to homebuyers.

163.    For the last 35 years, Cleveland received between $3 million and $9 million dollars per year.  With HOME funds, an average of 300-500 units of affordable housing are produced in Cleveland every year, including an estimated 1,100 new units planned for the 2025 and 2026 program years.

164.    Approximately 80% of Cleveland's budget for developing affordable housing for low- and moderate-income residents comes from HUD's HOME funding.  The primary beneficiaries of Cleveland's affordable housing program are households earning between 30% to 60% of the area median household income, which are generally classified as very low-income to low-income.  These program beneficiaries often struggle to afford basic necessities.

165.    In 2025, Cleveland received a HOME grant award for $4,257,956.71 for FY 2025 through FY 2033.  The FY 2025 HOME grant agreement documents Cleveland received included conditions that include prohibiting the use of funds to "promot[e] 'gender ideology'" as defined in the Gender Order, agreeing that compliance with all applicable Federal anti-discrimination laws is material for FCA purposes, certifying that it does not operate any programs that violate any applicable Federal anti-discrimination laws, and agreeing to certain immigration enforcement-related procedures.

166.    In late 2025, HUD notified Cleveland that funds must be used to comply with Executive Order No. 14151, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing," and the Anti-Diversity Order.  HUD also demanded that Cleveland remove the

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 39
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

words "systemic" and "equity" when describing poverty and racism in its Department of Community Development's plan and operation.

167. Because the HOME Federal Award Agreement expressly made compliance a requirement under penalty of law, Cleveland complied with HUD's demand to remove the terms from the Department of Community Development's plan. But after removal of those terms, it remains unclear how the Orders and terminology apply to the Department of Community Development's operations, or what the terms even mean. Cleveland is forced to choose between accepting the requirement to comply with these ambiguous terms, or losing HOME funding.

168. Loss of HOME funds would dramatically reduce Cleveland's budget for the availability of affordable housing by 300-500 units. The impact would be felt most keenly by impoverished families, for whom affordable housing is key to improving health and safety.

169. Cleveland's HOPWA Program ensures that those with HIV/AIDS will not experience barriers to housing from their illness or physical disability. In terms of successful treatments, housing stability encourages adherence to treatment regimes, boosts overall health status, and promotes viral load suppression, which are all key to eliminating new infections.

170. Cleveland's HUD-funded HOPWA allocation for the 2025–26 program year is $2,368,588, which Cleveland will use to support rent and mortgage payments, utility payments, food and nutrition support, and transportation.

171. The FY 2025 HOPWA grant agreement documents Cleveland received included conditions that include prohibiting the use of funds to "promot[e] 'gender ideology'" as defined in the Gender Order, agreeing that compliance with all applicable Federal anti-discrimination laws is material for FCA purposes, certifying that it does not operate any programs that violate any applicable Federal anti-discrimination laws, and agreeing to certain immigration enforcement-related procedures.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 40
No. 2:25-cv-01435-BJR

172.    Cleveland's population is diverse, and a high percentage of residents live in poverty. Vague and incoherent terms and conditions regarding DEI, DEIA, and gender ideology place Cleveland in the harmful position of changing its comprehensive approach to reducing health disparities regardless of background, or risking disruptions, delays, or termination of funding used to provide direct services to Cleveland's communities.  These direct services save lives by preventing HIV infections, treating HIV-infected persons, and providing critical stable housing conditions and nutrition services.

### 3.    Cleveland's Healthcare Funding

173.    HRSA's Maternal and Child Health Bureau, Division of Healthy Start and Perinatal Services administers grants under its Healthy Start Initiative: Eliminating Disparities in Perinatal Health (Healthy Start) program, which is authorized by 42 U.S.C. § 254c-8 (section 330H of the Public Health Service Act).  Healthy Start is a community-based program dedicated to reducing disparities in maternal and infant health.  HRSA provides Healthy Start grants to communities with infant mortality rates at least 1.5 times the U.S. national average and with high rates of adverse perinatal outcomes (e.g., low birthweight, pre-term birth, maternal morbidity, and mortality). Healthy Start programs serve individuals of reproductive age, pregnant and post-partum people, fathers/partners, and infants from birth through 18 months.

174.    Founded in 1991, Cleveland's MomsFirst Project is one of the original 15 federally funded HHS HRSA Healthy Start Initiative sites aimed at reducing infant mortalities disparities, specifically targeting high-risk neighborhoods, adolescents, and marginalized women.  The Cleveland Department of Public Health administers the MomsFirst Project within its Division of Health, Equity, and Social Justice.

175.    As required by statute, MomsFirst's goals include reducing well-documented racial and ethnic disparities in infant mortality associated with poor and adverse perinatal health outcomes before, during, and after pregnancy.  *See* 42 U.S.C. § 254c-8(a)(2), (b)(2), (e)(2)(B);

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 41
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Healthy Start Reauthorization Act of 2007, Pub. L. No. 110-339, 122 Stat. 3733 (2008). The main purpose of MomsFirst is to see all infants survive to see their first birthday.

176.    Cleveland's infant mortality rate has been higher than the national average for decades, with a significant racial disparity.  For non-Hispanic white babies, the infant mortality rate is 6.6 infant deaths per every 1,000 live births; for Hispanic babies, the rate is 7.9 deaths; and for non-Hispanic Black babies, the rate is 19.3 deaths.  The leading causes of infant deaths in Cleveland are prematurity/low birth weight, congenital conditions, and Sudden Infant Death Syndrome.

177.    MomsFirst successfully tackles those issues head-on by providing support, education, and health resources to ensure healthy pregnancies and healthy birth outcomes.  The 2024 preliminary infant mortality rate for MomsFirst participants is 5.1 deaths per 1,000 live births, compared to the non-participant mortality rate of 12.6 deaths.

178.    MomsFirst employs trained community health workers to provide services to expectant and new parents, infants, and caregivers before, during, and after pregnancy.  MomsFirst services address health issues, nutrition, safe sleeping, smoking cessation, healthy birthweight, prenatal care, child development, fatherhood support, housing and income resources, childcare, and safety.

179.    Cleveland obtains Healthy Start Initiative funds by applying for a competitive HRSA grant every five years and then completing a noncompetitive process every year of the five-year award.  Cleveland is currently in the second year of a five-year grant that awards $1,100,000 annually for five years, from May 1, 2024 through March 2029.

180.    On August 27, 2025, in the middle of its five-year grant cycle, Cleveland received a Notice of Award from HRSA that included the new terms and conditions described above.  These new terms and conditions require compliance with the Gender Order, among other things.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 42
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

181.    The Healthy Start Initiative grant is the backbone of Cleveland's MomsFirst programming, accounting for approximately 50% of Cleveland's budget for MomsFirst. Loss of this funding would force Cleveland to discontinue services to a large part of the community, reversing the strides Cleveland has made in improving infant mortality rates and the health of parents and babies alike.

182.    The discontinuation of services will result in more of Cleveland's babies dying before they reach their first birthdays and an increase in premature births in the city.  It will result in more babies dying from unsafe sleeping conditions in the city.  It will result in more expectant mothers in the city dying from the complications of giving birth.  The trauma and loss of life inflicted from the loss of HRSA Healthy Start Initiative funding and associated discontinuation of services to a large part of the city is irreparable.

**4.    Cleveland's Security Funding**

183.    As discussed above, one critical program that is federally funded through a DHS grant is BioWatch, a program designed to provide early detection of airborne biological threats, particularly those linked to bioterrorism, operated by state and local governments. The program has operated since April 2003, and Cleveland is one of more than 30 BioWatch jurisdictions across the United States.

184.    As part of its Department of Public Health, the Cleveland Division of Air Quality has relied on BioWatch funding to protect its residents from exposure to hazardous biological agents likely to be used in a bioterrorism attack.  The funding is used to conduct local air monitoring for the program.  As required by the program, if an airborne hazard is detected, Cleveland's public health officials use the information to coordinate an emergency response, including prompt medical care and other actions to protect public health and safety.  The early warning system may allow for life-saving treatment to begin in a timely manner.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 43
No. 2:25-cv-01435-BJR

185. On January 27, 2026, Cleveland received letter and Notice of Grant Award from DHS approving its continued application for the BioWatch grant and approved a budget for January 28, 2026 through July 31, 2026 of $206,516.00.

186. The Notice of Grant Award contained terms and conditions that did not appear in past grant awards. The terms and conditions include vague and ambiguous definitions for DEI, DEIA, and "discriminatory equity ideology." The terms and conditions state that "[r]ecipients must comply with all applicable anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act]" and that "[b]y accepting the grant award, recipients are certifying that: (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and . . . (iii) They do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration."

187. The terms and conditions for Cleveland's BioWatch grant also contain a general broad requirement that "Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference."

188. Not only are the terms and conditions vaguely defined, but it is unclear how they are to be applied, and Cleveland cannot determine with reasonable certainty what actions the Administration will deem noncompliant.

189. The penalty for noncompliance with these terms and conditions includes suspension of payments in whole or in part and/or termination of financial assistance. In the event of suspension or termination, the terms and conditions dictate that "all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 44
No. 2:25-cv-01435-BJR

by law." The terms and conditions also state that Cleveland may be subject to administrative remedies for false claims under the False Claims Act.

190. These new vague terms and conditions and confusing directives regarding their materiality and application, while threatening Cleveland with False Claims Act enforcement and other penalties for non-compliance, forces Cleveland to choose between terms and conditions that cannot be reasonably understood or applied and terminating the BioWatch program, losing monitoring and activities that are critical to public health and safety.

## C.    City of Columbus[21]

191. Of the nearly $393 million dollars in federal funds Columbus has legal and appropriation authority to spend starting January 1, 2025, this Complaint concerns approximately $102 million dollars originating from agencies other than the HHS, HUD, and DOT.

192. A total of $101,419,020 has been expended by Columbus' departments in 2025: the Department of Public Utilities, the Columbus Public Health agency, the Columbus Recreation and Parks Department, the Department of Development, the Sustainable Columbus agency, and the Columbus Department of Public Safety.

193. Columbus faces a nearly impossible task in maintaining municipal operations if it is deprived of this $101.4 million, which represents over a quarter of its total federal funding.

194. In addition, Columbus was awarded $187 million in American Rescue Plan Act of 2021 ("ARPA") funding from the U.S. Department of Treasury ("Treasury"), of which $1.66 million is obligated but yet to be expended and includes a) $981,360 in ARPA funding for youth

---

[21] Plaintiff Columbus is a party to *King County et al. v. Turner et al.*, No. 2:25-cv-00814-BJR (W.D. Wash. 2025). In the *King County* case the relief granted by the Court appears to encompass all grants awarded by DOT, HUD, and DHHS. In view of this, and for the avoidance of doubt, Plaintiff Columbus brings this action against Defendants Donald J. Trump, the United States of America, DHS, Markwayne Mullin, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 45
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

programming; b) $355,729 in ARPA funding for human services programs; c) $224,695 in ARPA funding for community improvements; and d) $45,941 for public utility assistance programs.

195.    The Executive Orders place critical initiatives, programs and projects at risk, as described fully below, as the continued unavailability of grant funding constrains the City's ability to forecast fiscal obligations and impairs its capacity to grow the region's workforce.

**1.    Columbus' Workforce Innovation and Opportunity Funding**

196.    Columbus partners with Aspyr, a 501(c)(3) nonprofit workforce development organization, to drive economic growth and mobility throughout Columbus.  Aspyr is designated by the State of Ohio as the administrator for Local Workforce Development Area 11; it operates through a federal, state, and county partnership that receives federal funds.

197.    Aspyr established and manages the OhioMeansJobs Columbus-Franklin County center, a physical hub where adults can walk in to access career coaching and job search tools.

198.    While it operates independently, its collaboration with the City of Columbus is formalized through municipal service contracts and legislative actions by the Columbus City Council, which authorize Aspyr to distribute public funds, specifically $1.8 million dollars in CAREER 500 grants.

199.    In late 2024, however, the City of Columbus was forced to formally disengage as a "co-elected official" for the local workforce area after city leadership determined they could not execute the Executive Orders at issue.  Columbus' forced disengagement resulted in reduced visibility for the city into Aspyr's day-to-day operations, hindering the seamless integration of city-led economic goals with the organization's workforce execution.

200.    As a result, while Columbus still collaborates on specific grant-funded initiatives, it no longer holds the direct oversight role originally intended to ensure maximum alignment with its long-term strategic plans.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 46
No. 2:25-cv-01435-BJR

201.    Aspyr grants are awarded to community partners and local nonprofit organizations to execute high-volume job placement initiatives.

202.    This funding is specifically designed to bridge the training gap between unemployed or underemployed residents and high-growth employers in the manufacturing, healthcare, and logistics sectors, ensuring a steady supply of talent for the region's industrial backbone.

203.    Similarly, Aspyr manages a $4 million federal Apprenticeship Building America grant to strengthen the local talent pipeline.  This funding is distributed to a network of regional employers and training providers to subsidize technical instruction and on-the-job training.

204.    By aligning these resources, Aspyr helps sustain Columbus' critical industries—such as the emerging global semiconductor and IT sectors—by developing a skilled workforce that keeps these economic engines afloat.

205.    Columbus' ARPA grants currently support 2 Full Time Equivalent positions at Aspyr.  If this grant continues to be unavailable or would otherwise terminate, the city will have to terminate 2 Full Time Equivalent positions.

206.    Columbus' Aspyr CAREER 500 Grant Program funds must be expended by December 31, 2026.  Columbus' Aspyr Resiliency Bridge grant funds must be expended by September 2026.  The loss of this funding would result in immediate harm to the City of Columbus, jeopardizing critical economic recovery and stability.

207.    Forfeiting these resources would effectively dismantle the primary bridge connecting underemployed residents to the specialized manufacturing and healthcare job pipelines, industries that are part of the current backbone of the region's economic stability.

208.    Not having these resources would also compromise Columbus' critical thrust to supply the high-tech workforce required by the City of Columbus' emerging semiconductor and

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 47
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

IT sectors, leaving this global industry without the local talent necessary to sustain multi-billion dollar commitments.

209.    Loss of the workforce development federal funding is a financial rupture, and compounded by the City of Columbus' forced lack of municipal oversight of Aspyr, the city is strained and threatened without a viable pathway for its residents to become workers.

### 2.    Columbus' Public Health and Nutrition Funding

210.    Columbus faces a significant loss of nearly $7.8 million dollars in total funding from the Department of Agriculture.  This total includes a $7.39 million sub-grant for the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") Program, which sustains 63 FTE positions and 11 clinics serving 30,000 vulnerable participants annually.

211.    The loss of WIC funding would cause a substantial disruption in the continuum of care program designed in partnership with the federal government for pregnant women and children, likely leading to developmental delays and long-term preventable chronic diseases for the residents served.

212.    The Department of Agriculture total also includes a $2.5 million Summer Food Service Program (Go, Lunch!) that provides over 195,000 meals to children.

213.    Termination of this program would result in the loss of nearly 100 seasonal aides and FTE staff, leaving thousands of children without nutritional support or supervision.

214.    The hunger and lack of supervision resulting from thousands of lost meals to children will create a secondary burden on Columbus by increasing the load on already stretched public safety personnel, social services administrators and courts officials.

215.    In addition, Columbus received $2,300,000.00 in ARPA funding from the State of Ohio, as part of the ARPA, allocated to the city through the Ohio Department of Development's Lead Safe Ohio program to the Columbus Department of Public Utilities.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 48
No. 2:25-cv-01435-BJR

216.    The grant provides funding for lead-safe renovation, lead abatement and mitigation activities, and purchase of necessary equipment for abatement/mitigation activity for homes, congregate care settings, and childcare facilities built before 1978. Eligible households must have income at 80% or below the area median income, or if a household has an income over 80% AMI, they can qualify if they can document housing insecurity.

217.    The loss of this federal funding will significantly harm residents who rely on the program to remediate pipes and ensure safe drinking water.

218.    Additionally, it will hinder the Columbus Department of Public Utilities in its critical mission to eliminate lead from local schools, daycares, and homes.

### 3.    Columbus' Infrastructure and Environment Funding

219.    Columbus faces a severe threat to its and the region's infrastructure as $60,581,928 in federal Environmental Protection Agency funding is at issue.

220.    Of this allocation, the Columbus Department of Public Utilities was granted an initial $750,000 to engage professionals to evaluate and produce a study of the Southerly Wastewater Treatment Plant, and to assess ways to maintain water quality amid rapid regional growth.

221.    Since the city has already contracted with an engineering firm for this study, the inability to access federal reimbursement creates an immediate injury to Columbus' budget and its credibility.

222.    Forcing a fiscally tenuous budget to absorb this loss will diminish Columbus' capacity to provide essential services and undermine its reputation as a reliable business partner for future projects.

223.    This instability is compounded by the risk to a second $750,000 appropriation for 2026, creating a total funding gap that jeopardizes regional development and threatens a state-mandated building moratorium.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 49
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

224. The threat of injury further extends to a $1 million dollar Climate Pollution Reduction grant. The City of Columbus was awarded a grant of $1,000,000 for Climate Pollution Reduction Planning from the U.S. EPA. The grant project period is from June 1, 2023, through May 31, 2027.

225. The grant provides funding to develop regional climate mitigation plans to address greenhouse gas emissions and co-pollutants and to create reduction measures throughout the entire metropolitan area.

226. The loss of this $1 million dollar grant would cause the immediate injury of terminating multiple full-time staff positions, effectively halting the Comprehensive Climate Action Plan and leaving metric tons of pollution unaddressed in our most vulnerable communities.

### 4. Columbus' Public Safety and Justice Funding

227. The DOJ supplies $6,504,438.44 in vital funding that the Columbus Department of Public Safety and the City Attorney's Office rely on to maintain the city's essential law enforcement and court operations. Columbus relies on DOJ funding to support nine full-time equivalent positions within the Columbus Department of Public Safety.

228. Specifically, the DOJ granted Columbus $1,260,390.86 for the Comprehensive Opioid Stimulant, and Substance Use Site-based Program ("COSSUP"), as well as $1,600,000.00 for a COSSUP extension grant, $1,200,000.00 for a COSSA RREACT grant, and $429,416.99 for Adult Drug Court Discretionary Program funding.

229. Columbus uses these grants in partnership with the DOJ to address drug and addiction issues within the city and to provide services, including emergency services to persons affected.

230. The DOJ granted Columbus $957,015.00 for the 2025 DNA Capacity Enhancement for Backlog Reduction ("CEBR") program, $350,000.00 for Sexual Assault Kit Funding, a $52,713.55 Coverdell Forensic Science Improvements grant for backlog reduction; and

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 50
No. 2:25-cv-01435-BJR

a $180,000.00 Justice Assistance Grant for law enforcement hiring and training; this federal support alone directly impacts Columbus residents by providing the forensic and investigative resources needed to solve violent crimes. Losing this federal funding would delay the resolution of backlogs and crimes and embolden criminals.

231.    The DOJ also provided Columbus with grants of $223,158.61 for OVW ICJR – DV Strangulation Response implementation, $160,686.25 for VOCA Domestic Violence Victim Advocacy Services, $106,000.00 for VAWA Domestic Violence and Stalking Specialized Prosecution, and $83,724.55 for VAWA Law Enforcement and Stalking Victim Advocate.  This program provides domestic violence and victim advocacy to Columbus residents.

232.    In Columbus, nearly 40% of homicides are linked to domestic violence, and loss of this federal support will not only hamper the city's ability to serve victims of domestic violence and abuse, but also its efforts to substantially reduce violent crime in the city.

233.    The DOJ also provided Columbus with significant federal funds for court and community programs, specifically a $100,000.00 UP Program grant for youth mentoring and diversion programs; a $40,000.00 JAG Municipal Court Training and technology grant; a $45,000.00 ADS Franklin County OJPP Birth Certificates grant to help low-income persons with gaining identification documents; and a $123,813.38 for BJA Innovative Prosecution Solutions (IPS) – Community Engagement in Nuisance Abatement grant for training prosecutors.

234.    If these DOJ grants were terminated or otherwise unavailable, Columbus would have to terminate nine staff members.

235.    In addition, the U.S. Consumer Product Safety Commission ("CPSC") provides $200,000 for the 2024-2026 Columbus Department of Parks and Recreation Pool Safety Grant Program.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 51
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

236.   The CPSC federal funding is the only funding available and used to implement and enforce the safety standards that impact residential and commercial pool construction and maintenance.

237.   Lack of this federal funding leaves vulnerable children and residents susceptible to preventable injury and death by ending the inspections and safe swimming education campaigns required to keep local swimming facilities functional and safe.

**5.   Columbus Public Safety and Energy**

238.   The U.S. Department of Energy ("DOE") provided $778,900 for the Energy Efficiency and Conservation Block Grant ("EECBG"), which is administered by the Columbus Region Green Fund to assist residents in low-income and disadvantaged communities.

239.   This program provides the technical energy audits necessary for affordable housing building owners to lower utility costs for residents, some of which are able to reduce or altogether end their need for public energy assistance.

240.   The DOE also allocated $156,193 to the Columbus Recreation and Parks Department ("CRPD") for the Blackburn and Alum Industrial Energy Efficiency project to implement industrial-grade efficiency upgrades.

241.   These funds were used for energy-saving retrofits at the Blackburn Community Center, which serves up to 60,000 visits annually—including Columbus' toddlers in preschool and senior residents in fitness classes—and acts as a primary site for the city's summer food program.

242.   The threat to these funds negatively impacts Columbus' ability to ensure cost-savings at these locations and to provide a safe place for residents.

243.   An additional $250,000 from the DOE supports the Columbus Department of Public Utilities ("CDPU") in implementing energy efficiency retrofits, including high-efficiency HVAC and LED lighting, at the Espy Adaptive Sports Complex and the Cleo Dumaree Athletic Complex.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 52
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

244. Losing this funding for energy modernization for these complexes prevents the city from realizing the operational cost-savings required to manage its municipal budget and results in the degradation of the specialized climate-controlled environments that residents with disabilities rely on for therapeutic recreation.

**6.      Columbus' Fiscal and Budgetary Stability**

245. Columbus faces a threatened budgetary gap as various departments have already expended $101,419,020 in 2025 in reliance on the stability of federal grants and appropriations and are expecting reimbursement and the disbursement of even more funds.

246. To plug this hole, Columbus would be forced to incur additional loan funding and perform drastic financial maneuvering, placing an unsustainable debt burden on a capital plan that residents rely on for regional infrastructure.

247. This instability diverts funds away Columbus providing basic neighborhood services to its residents and forces the termination of multiple full-time equivalent positions.

248. Forcing Columbus to absorb these millions in lost support creates a ripple effect of economic decline, as the city must divert funds from other critical programs to cover these existing essential obligations.

249. This financial strain forces Columbus to choose between its existing fiscal commitments and the programs that keep the community running, ultimately stifling development and growth for every resident and business in the region.

**D.      City of Durham**

**1.      Durham's Housing Funding**

250. Through its Housing & Neighborhood Services Department, Durham receives approximately $2,000,000 annually in HUD CDBG funds to provide affordable housing and public services to extremely low-, low-, and moderate-income residents. This funding has supported case management services for individuals and families entering emergency shelters, which services are

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 53
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

devoted workforce development, achieving or maintaining recovery from addiction illnesses, preparing residents to be successful tenants, and life skills education. It has further enabled the City to ensure properties in low- and moderate-income neighborhoods comply with the City's Housing Code; to rehabilitate and preserve affordable rental housing within the City; to support low- and moderate-income residents to purchase and close on their first home; and to support site improvements for the development of new affordable housing units. Durham currently has $2,159,545.34 in active HUD CDGB and/or CDBG-CV grants, of which $1,818,165.71 has been fully committed. The City has been awarded an additional $1,936,725 in CBDG funds pending finalization of the grant agreement for 2025, and anticipates receiving a federal entitlement allocation in HUD CDBG funding within the next year.

251.    In order to obtain its 2025 federal entitlement allocation, the City submitted a Five-Year (2025-2029) Consolidated Plan and 2025 Annual Action Plan (hereinafter, the "Durham Plan") describing the City's community development priorities and multiyear goals based on an assessment of housing and community development needs, an analysis of housing and economic market conditions and available resources. The Durham Plan also described specific projects to be funded in 2025. On September 15, 2025, HUD's Office of Community Planning and Development, Office of Field Operations notified the City that it had identified language in the Durham Plan that appeared to be inconsistent with Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government. Specifically, HUD took issue with language in the Durham Plan stating, "[a]bout 73% (5,766 individuals) of the HIV infected population are male, 25% (1,978 individuals) are female, and 2% (121 individuals) are gender-diverse."

252.    In order for Durham to be able to certify that the CBDG funds described in the Durham Plan would be administered in conformity with applicable laws, including Executive Orders, HUD instructed the City to remove all references to "transgender" and include the

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 54
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

following statement in the Durham Plan: "[t]he City of Durham shall not use grant funds to promote 'gender ideology,' as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." The City was required to re-submit the Durham Plan with these changes by September 24, 2025.

253.    The Durham Plan described projects the City intended to accomplish with 2025 HUD CDBG funds, included rehabilitating fifty (50) rental housing units, reducing homelessness by providing case management services to individuals and families entering emergency shelters, and increasing affordable housing options in the City.  So not to hinder its ability to address the critical needs of housing affordability, availability, and stability, including for its homeless population, the City made the required changes to the Durham Plan.

254.    Subsequently, on September, 26, 2025, HUD transmitted the 2025 grant agreement for CDBG funds to the City.  The challenged conditions appeared as Addendum 1 to the federal funding agreement.  Though HUD has been the party to execute the grant agreement first in the past, the City was required to execute the agreement containing the challenged conditions first, with HUD signing second, as described in the transmittal letter sent with the agreement.  In order for HUD to release the CDBG funds to the City, the City was instructed to execute and return the grant agreement as soon as possible, which it did on October 20, 2025.

**2.    Durham's Continuum of Care Funding**

255.    Durham serves as the Lead Agency for the NC-502, the Durham City and County Continuum of Care ("CoC").  The Durham CoC promotes community-wide goals to end homelessness; provides funding to quickly re-house homeless people while minimizing trauma and dislocation; promotes access to and effective use of mainstream programs by homeless individuals and families; and optimizes self-sufficiency among individuals and families experiencing homelessness.  The CoC is a key aspect to Durham's Strategic Plan to End Homelessness, an initiative that launched in July 2025.  As the Lead Agency,  Durham receives

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 55
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

approximately $127,000 annually in HUD funds through its Community Safety Department to provide support staff time to run the CoC NOFO competition and writing of the Consolidated Application in response to the CoC NOFO. The City of Durham is listed as a collaborative applicant on all applications for NC-502. Funding received through this process is used to provide permanent housing assistance to City residents most in need. Durham currently anticipates applying for $3.9 million in HUD funding under the FY25 NOFO.

### 3. Durham's Transportation Funding

256. Since 2020, Durham ranks in the top fifty municipalities in the nation for population growth. The City's Transportation Department is responsible for meeting the urgent need to deliver infrastructure necessary to support this growth in a way that keeps residents safe, strengthens community connections and accessibility, and supports long-term economic development. Two major projects supported by federal grant funding in 2025 are Holloway Street: Safe Access to Durham's Busiest Transit Route ("Holloway Street Project") and the purchase of new buses, funded by the RAISE grant program and Low or No Emissions Grant programs respectively.

257. The Holloway Street Project centers on Holloway Street, which connects several established predominantly Black neighborhoods in East Durham. The Project area in East Durham is made up of historic development and new growth with communities of color who experience poverty and depend on public transportation. The Holloway Street Project will create new and enhanced pedestrian connections, improve thirty-three intersections by installing ADA curb ramps, provide mid-block crossings with safety beacons, upgrade thirty-two bus stops with shelters, lighting, and ADA-accessible waiting areas, and deploy additional buses. The corridor provides residents vital access to commercial, economic, and public services, such as grocery, retail, food, health services, and the US Post Office. The City received a twelve million dollar grant to fund this project.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 56
No. 2:25-cv-01435-BJR

258. The Transportation Department also received over six million dollars of federal grant funding to purchase nine new buses to use in their GoDurham bus system. GoDurham provides residents and visitors with an affordable and reliable transportation option and is essential for riders, who are often workers, seniors, students, people of color, and low-wealth individuals. According to 2019 on-board ridership surveys, eighty percent of GoDurham riders are people of color and the majority are African American. Over seventy percent of GoDurham customers report household incomes of less than twenty-five thousand dollars, with almost half of those customers reporting incomes of less than ten thousand dollars. Nearly seventy percent of GoDurham riders report having no vehicles available to them and rely on bus transit for their mobility.

### 4. Durham's Police Funding

259. The vision of the Durham Police Department is to be a progressive law enforcement agency committed to reducing crime by providing the best quality of service, fostering public confidence, and maintaining the highest standards of excellence as a community partner for positive change. In pursuit of this vision, the Police Department has frequently pursued and received federal grant funding through the COPS micro-grant. Over the last three years, the Police Department has been granted COPS micro-grant funding to use towards more diverse recruiting, focusing on increasing female and Hispanic representation within the Department in order to better represent the demographic makeup of the Durham community. Grant funding is used for recruitment, public engagement, and marketing strategies to encourage a more diverse workforce.

260. The City of Durham is put in the difficult position of either removing language and change services informed by evidence-based strategies that align with its values or else risk losing millions of dollars in funding to combat homelessness and provide affordable housing.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 57
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**E.      City of Portland[22]**

**1.      Portland's Safety and Security Funding**

261.    Portland currently manages 11 active grant awards funded by DHS's Federal Emergency Management Agency, totaling nearly $12 million.  While most of these grants are administered through the State of Oregon, three are awarded directly to Portland.  These grants fund a range of emergency management planning efforts, from flood mitigation to regional natural disaster response planning.

262.    Portland is also the primary grant recipient and coordinator for federal Urban Area Security Initiative Program grants for the Portland Metropolitan Region, covering Clackamas, Columbia, Multnomah, and Washington counties in Oregon and Clark County in Washington (the "Regional Disaster Preparedness Organization" or "RDPO").  Oregon has received the FY25 Homeland Security Grant Program (HSPG) award, which includes the UASI FY25 award for the RDPO.  This award is approximately $5,362,594.  The inability of Portland to accept the UASI FY25 grant would significantly impact security and disaster preparedness planning for not just Portland, but the entire region.

263.    Portland currently has eight active grants funded through Department of Justice ("DOJ") Bureau of Justice Assistance, totaling approximately $8.6 million.  Portland uses these grant funds for programs designed to address and reduce gun violence, increase enforcement related to unlawful street racing, use evidence-based practices to identify stolen vehicles, implement a body worn camera program, provide de-escalation and crisis response training, and

[22] Plaintiff Portland is a party to *King County et al. v. Turner et al.*, No. 2:25-cv-00814-BJR (W.D. Wash. 2025).  In the *King County* case the relief granted by the Court appears to encompass all grants awarded by DOT, HUD, and DHHS.  In view of this, and for the avoidance of doubt, Plaintiff Portland brings this action against Defendants Donald J. Trump, the United States of America, DHS, Markwayne Mullin, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 58
No. 2:25-cv-01435-BJR

to leverage forensic technology to decrease the number of unresolved violent crime cold cases and increase public safety.

264.    In addition to the active grants, Portland is regularly evaluating new grant opportunities through the Office of Justice Programs.  Updated general terms and conditions for these grant awards include a provision that: "The recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by accepting this award, certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws."  There is no further guidance.

**F.    Allegheny County[23]**

265.    Like the other metropolitan jurisdictions in this action, Allegheny County relies heavily on federal funding.  For fiscal year 2025, Allegheny County received approximately $618 million in federal funds, which constituted more than 20 percent of the County's combined operating and capital budgets.

266.    For fiscal year 2026, that budget has been scaled down due to federal funding cuts, threats to funding, and the government's requirement of grant conditions.  Allegheny County's 2026 budget includes approximately $541 million in federal funding, roughly 18.3% of the combined budget.

---

[23] Plaintiff Allegheny County is a party to *King County et al. v. Turner et al.*, No. 2:25-cv-00814-BJR (W.D. Wash. 2025).  In the *King County* case the relief granted by the Court appears to encompass all grants awarded by DOT, HUD, and DHHS.  In view of this, and for the avoidance of doubt, Plaintiff Allegheny County brings this action against Defendants Donald J. Trump, the United States of America, DHS, Markwayne Mullin, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 59
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

267. Critical programs for the residents of Allegheny County have been placed at risk due to the Executive Orders. These programs include federal monies allocated from the Department of Justice (DOJ) and the Department of Homeland Security (DHS) for the funding of items such as health services, public safety services and more.

268. The Orders introduced significant budgetary uncertainty into Allegheny County's projected financial plans for the fiscal year 2026. The budget process was lengthy and agonizing. Most of the County's federal funding awards are reimbursed to the County after actual expenditures on services and programs. Allegheny County strives to maintain essential programs for its residents based on the federal government's commitment to reimburse these expenditures on manpower, equipment, and service needs. Persistent threats and uncertainty regarding the federal government's funding are an untenable imposition on municipal budgeting and fiscal responsibility.

269. Allegheny County's budget considerations include the continuation of multi-year grants. Because Allegheny County cannot reasonably discern from the language of the unconstitutionally vague Orders (and the grant terms which are now appearing in Notice of Funding Opportunities and recertifications of multi-year awards) which conduct the Defendants would consider lawful, Allegheny County cannot predict which funding awards will continue and which will be curtailed. Additionally, in some instances, Defendants have demanded that Allegheny County provide additional certification relating to DEI terms even after awards have been granted, services provided, and reimbursements are pending.

270. The Allegheny County Department of Human Services ("ACDHS") administers several hundred million of federal dollars of grants for service to the residents of Allegheny County. These include direct service to the community for substance abuse abatement, mental health services for residents in crisis, and services for individuals and youth who have suffered a range of negative impacting life experiences.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 60
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

271.    DOJ funds a number of ACDHA's critical programs including, but not limited to, a $1.6 million for a four year "LEAD" program grant which is a Comprehensive Opioid, Stimulant and Substance Use Site-Based Program; "READI" a $2 million grant for three years of Community based Violence Interventions and Prevention Initiative; and a Bureau of Justice Assistance (a division of the DOJ) grant award for Substance Abuse Disorder Treatment and Recovery Outcomes for Adults in Reentry.

272.    These grants have proven to have positive impacts on program users and are integral to improving communities in Allegheny County.

273.    These programs strengthen the resilience of Allegheny County residents and ultimately reduce the County's expenditure on prosecution and supervision for individuals who are at risk.

274.    These programs also make communities safer and increase the individual participants' opportunities to engage in meaningful employment and establish and maintain relationships within the community, all of which improve the quality of life and economic outcomes for residents throughout Allegheny County irrespective of their ethnic, cultural, or racial background: substance abuse effects all classes of residents.

275.    Additionally, the Allegheny County medical examiner's office has historically received one million dollars in Office of Justice Program (OJP) funding for the National Sexual Assault Test Kit Initiative, "SAKI", which is a pass through from the Allegheny County Police Department and DNA Capacity Enhancement for Backlog Program grants.

276.    Such grants serve all residents of Allegheny County, as well as persons outside of the jurisdiction, because data recovered from these grants can be used to prosecute individuals who are repeat offenders anywhere.

277.    Allegheny County is comprised of numerous small boroughs, townships and several small cities, many of which have police departments consisting only of several officers.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 61
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

278. These municipalities have limited resources and, aside from the City of Pittsburgh, municipalities do not have homicide investigation units and rely on the Allegheny County Police Department for their expertise.

279. The Allegheny County Police Department has historically been awarded Justice Assistance Grants, such as the Edward Byrne Memorial grant and JAG grants for essential law enforcement purposes. These grants are historically approximately $200,000.

280. Some of the grants are due for recertification or applications for new funding since the grant terms have expired.

281. Due to DOJ's unlawful actions described herein, tens of millions of dollars of these important services funds are at risk. If these funds become unavailable, Allegheny County would be compelled to make cuts to services and in some instances cease services entirely. The Commonwealth of Pennsylvania, which has seen its own federal funding curtailed under this administration cannot fill the void and local funding is already stretched thin.

282. Allegheny County Emergency Services receives federal funds from the DHS. These funds are used for services, staff, training and equipment to protect public safety.

283. Allegheny County is a major metropolitan area with many universities, two large hospital systems with medical research facilities, two airports, river barge and rail transit of industrial materials, including hazardous items.

284. Allegheny County has historically had an industrial manufacturing base, including steel production.

285. Allegheny County Emergency Services is trained and has responded to barge events, train derailments, a major airline crash, and recently a fatal explosion at the Clairton works.

286. Allegheny County receives funding under the Urban Area Security Initiative ("UASI") grant along with adjacent jurisdictions' law enforcement and first responder service departments.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 62
No. 2:25-cv-01435-BJR

287.    As stated herein, UASI funding is primarily used for technical rescue team training, which prepares first responders to handle complex, high-risk emergencies that go beyond standard firefighting or emergency services operations, such as would be encountered in industrial accidents or commercial transit incidents.

288.    If deprived of these funds, Allegheny County would have to reduce staff, forego training exercises, and curtail equipment acquisition necessary to protect the community and property when faced with these catastrophic events.

**G.    Hennepin County[24]**

289.    As with many units of local government, federal funding is very important to Hennepin County.  Hennepin County has budgeted approximately $273.6 million in federal funds in 2026.  Specifically, Hennepin County's budget includes $1.9 million in DOJ grants and $19.9 million in United States Department of Agriculture ("USDA") grants.

290.    These federal grants directly benefit Hennepin County residents. For example, included in the 2026 budget is a pass-through grant from the USDA to support nutrition for mothers and babies; a pass-through grant from the USDA to participate in the National School Lunch Program and School Breakfast Program; and a grant from the DOJ to process DNA samples.

291.    The USDA pass-through grant is Hennepin County's WIC nutrition and breastfeeding program, which serves low-income residents of Hennepin County who are pregnant women, new mothers, babies, and children ages 0-5.  Nutrition education and counseling are essential to the County's public health program.  WIC helps families to make positive nutrition

---

[24] Plaintiff Hennepin County is a party to *King County et al. v. Turner et al.*, No. 2:25-cv-00814-BJR (W.D. Wash. 2025) and *Chicago v. Noem* (N.D.Ill. 25-cv-12765).  In the *King County* and *Chicago* cases the relief granted by the Courts appears to encompass all grants awarded by DHS, DOT, HUD, and DHHS.   In view of this, and for the avoidance of doubt, Plaintiff Hennepin County brings this action against Defendants Donald J. Trump, the United States of America, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 63
No. 2:25-cv-01435-BJR

and health decisions and put healthy and fresh food on the table. The WIC program also offers breastfeeding support and referrals to health and social services.

292. Hennepin County participates in the National School Lunch Program, a federally assisted meal program. Hennepin County operates this program in its juvenile detention center to provide a small offset to the cost of food. The County operates this program via an agreement with the Minnesota Department of Education.

293. The County's DOJ grant supports DNA processing operations by funding three positions with the Hennepin County Sheriff's Office. Hennepin's DNA processing is divided into separate workflows, one for processing DNA swabs taken directly from crime scenes, and the other for processing physical items requiring pre-processing. The federal grant funding allows for specialized staff focus, which improves efficiency and predictability in case management.

294. Hennepin County anticipates requiring funding from the USDA and the DOJ in the future and on an ongoing basis.

295. None of these programs involve what the County would consider a diversity, equity or inclusion effort or effort promoting gender ideology, and yet, to accept awards, the County must certify that it "will comply . . . with all applicable Federal anti-discrimination laws, regulations, and policies for the duration of the agreement, to include the following without limitation: [the Gender Order]," and that it does not "operate any programs that promote Diversity, Equity, or Inclusion (DEI) that violate any applicable Federal anti-discrimination laws." USDA General Terms and Conditions for Mutual Interest Agreements, nos. 11.2, 12.6, 12.7, available at https://www.usda.gov/sites/default/files/documents/usda-mia-general-terms-conditions-2025.pdf.; *see also* "General Conditions" for OJP Awards in FY 2025, U.S. Dept. of Justice Programs, "Federal Civil Rights and Nondiscrimination Laws (certification)", available at https://www.ojp.gov/funding/explore/legaloverview2025/mandatorytermsconditions#federal-civil-rights-and-nondiscrimination-laws-certification ("The recipient . . . by accepting this award,

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 64
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.") (emphasis added).

296.    Hennepin County plans to seek funding from the USDA and the DOJ in the future and on an ongoing basis.  The Orders made it difficult to budget for 2026 and continue to introduce significant budgetary uncertainty into Hennepin County's financial plans.

**H.    Prince George's County**

**1.    Prince George's County's Housing Program**

297.    The Prince George's County Housing Authority and the Department of Housing and Community Development ("DHCD") administer hundreds of millions of federal dollars that connect County residents with critical resources, including affordable housing and rental assistance.  DHCD implements the County's affordable housing portfolio and is the recipient of federal Community Development Block Grant Funds ("CDBG").  Further, DHCD also provides housing opportunities to vulnerable persons such as low-income and County residents living with AIDS.

298.    HUD funds a number of critical County programs including the Section 8 Housing Choice Voucher ("HCV") Program, Community Development Block Grant ("CDBG") Program, Emergency Solutions Grants ("ESG") Program, and HOME Investment Partnerships ("HOME") Program.

299.    As an example of one of the programs mentioned above, the Section 8 HCV Program is a critical program funded by the federal government.  The HCV Program primarily serves low-income populations in the County.  The HCV Program provides annual grants to counties to manage public housing facilities and supports family sufficiency and economic independence for public housing participants.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 65
No. 2:25-cv-01435-BJR

300.    In 2025, $109,681,585 in federal funding was allocated by HUD to the Prince George's County Housing Authority's Section 8 HCV program.

301.    In 2025, $14,795,028 in federal funding was awarded by HUD to the County's CDBG Program, HOME Program, and Hearth Emergency Solutions Grant.

302.    The HCV Program has played a critical role in providing housing opportunities to County residents of limited means.  The Program has had a substantial positive economic impact in the Central and Southern parts of the County, which border Washington, D.C.

303.    The programs discussed above represent an economic investment in Prince George's County because providing affordable housing strengthens the job market and the economy.

304.    Based on its historical interactions with HUD, the Housing Authority relies on the continued availability of these funds in supporting the above-mentioned programs.  Furthermore, DHCD has incurred expenses for CDBG and HOME in anticipation of reimbursement from HUD.

305.    Thus, hundreds of millions of dollars of critical housing and services funds are at risk due to HUD's unlawful actions.  If these funds become unavailable, then the Prince George's County Housing Authority and DHCD likely could not continue to support many of these important services through state and local funding alone, and the financial repercussions would be felt immediately.  Reducing Section 8 funding due to the County's diversity and inclusion programs would increase homelessness and destabilize communities that are reliant on Section 8 funding.  Section 8 funding cuts would result in significant financial harm to the County because many landlords, tenants and housing providers would be deprived of a major source of revenue to pay rent and maintain their rental properties.

306.    In other words, the Certification and HUD Letter create significant budgetary uncertainty for Prince George's County, thereby presenting an actual and imminent harm to these programs and services.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 66
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## 2. Prince George's County's Health Programs

307. The Prince George's County Health Department administers tens of millions of federal dollars that enables Prince George's County residents to receive critical health care services, including immunizations, maternal health, behavioral and mental health services and medical assistance transportation.

308. In FY 2025, the Health Department received approximately $25 million dollars in funding from the HHS.

309. HHS funding supports a significant number of County health programs including the Women, Infants and Children ("WIC") program, the System of Care Program, the Healthy Transitions Program, the Bright Beginnings Program, the Tobacco Control Program, and Chronic Disease Management Program, among others. These programs provide targeted support to vulnerable groups including infants, people with substance use disorders and people with chronic diseases.

310. As an example of one of the programs mentioned above, the System of Care Program is a critical program funded by the federal government. The System of Care Program helps 350 children and teenagers (up to age 21) with emotional troubles and their families. The Program focuses on mental health and provides interventions for youth at risk of getting into trouble. It has helped to reduce delinquency rates among County youths.

311. The programs discussed above provide material health and economic benefits to the people of Prince George's County. They strengthen the County's economy because they result in less time missed from work due to illnesses and other health conditions.

312. Based on historical interactions with HHS, the Health Department relies on the continued availability of these funds in supporting the above-mentioned programs. Furthermore, the Health Department has incurred expenses for many of these programs in anticipation of reimbursement from HHS.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 67
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

313.    Accordingly, tens of millions of dollars of critical health care services funds are at risk due to HHS's unlawful actions.  If these funds become unavailable, then the Prince George's County Health Department likely could not continue to support many of these important services through state and local funding alone, and the financial repercussions would be felt immediately.

314.    In other words, the executive orders create significant budgetary uncertainty for Prince George's County, thereby presenting an actual and imminent harm to these programs and services.

**3.    Prince George's County Transportation Funding**

315.    The Prince George's County Department of Public Works and Transportation ("DPWT") relies heavily on federal grant funds to support its transit and critical infrastructure projects.

316.    In 2025, the U.S Department of Transportation (DOT) provided $24,780,652 in federal funds to DPWT to support important programs and infrastructure improvement projects.

317.    Projects supported by these grants are in various phases, ranging from planning, and design, to construction and maintenance.

318.    DOT provides federal funds to the County for critical road and street infrastructure projects.  The funds support transit facility studies, local bus operations, multimodal safety improvements and pedestrian and bike access along the County's high-injury roadways.

319.    For example, DOT awarded Safe Streets and Roads for All ("SS4A") grant funding to the County to improve roadway safety through the development, refinement, and subsequent implementation of comprehensive safety action plans.  The County has used SS4A funding to make pedestrian safety upgrades along high-injury roads including Alelphi Road and Metzerott Road in Hyattsville, Maryland.

320.    This essential infrastructure funding is threatened by DOT's unlawful attempts to impose the terms of the Orders upon grant recipients like Prince George's County.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 68
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

321.    As Prince George's County directly borders Washington, D.C., a loss of transportation funding would eliminate or reduce the County's ability to conduct necessary infrastructure maintenance and improvements thereby adversely affecting the greater Washington, D.C. Metropolitan Region.

## I.    Ramsey County[25]

### 1.    Ramsey County's USDA Funding

322.    Ramsey County receives funding from the United States Department of Agriculture ("USDA") in pass-through multi-year grant awards totaling more than $16 million from 2022 through 2026.  The awards fund key projects within Ramsey County.  These funds directly support Ramsey County residents in vital ways, including but not limited to supplemental food, nutrition and breastfeeding program that helps eligible pregnant women, new mothers, babies and young children eat well, learn about nutrition and stay healthy.  Ramsey County provides health assessments, nutrition education and counseling, breastfeeding support and referrals to health and other services in the community.

323.    Ramsey County also receives additional USDA funds for SNAP administrative costs.  In Minnesota, counties pay 50 percent of their SNAP administrative costs, and the remaining 50 percent is reimbursed with federal funds.  Ramsey County's SNAP administrative costs through USDA each quarter are roughly $3.6 million in total, and Ramsey County would expect to receive roughly $1.8 million in federal reimbursement for the first quarter of 2026.

---

[25] Plaintiff Ramsey County is a party to *King County et al. v. Turner et al.*, No. 2:25-cv-00814-BJR (W.D. Wash. 2025) and *Chicago v. Noem* (N.D.Ill. 25-cv-12765).  In the *King County* and *Chicago* cases the relief granted by the Courts appears to encompass all grants awarded by DHS, DOT, HUD, and DHHS.  In view of this, and for the avoidance of doubt, Plaintiff Ramsey County brings this action against Defendants Donald J. Trump, the United States of America, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 69
No. 2:25-cv-01435-BJR

## 2.    Ramsey County's DOJ Funding

324.    Ramsey County also receives DOJ funding in both direct and pass-through multi-year awards, totaling more than $7 million from 2022 into 2027.  These funds directly support Ramsey County residents in vital ways, including but not limited to: development of sexual assault response protocols and monitoring the implementation of same using a sexual assault multi-disciplinary action response team ("SMART"); the Ramsey County Violence Reduction Initiative; improving the delivery of and access to mental health and wellness services for law enforcement; crime victim services; and, development and acquisition of effective equipment, technologies and interoperable communications that assist in responding to and preventing crime, improving police effectiveness and the flow of information among law enforcement agencies, local government service providers, and the communities they serve.

325.    Ramsey County has received pass-through DOJ Violence Against Women Formula ("VAWA") Grants and DOJ Crime Victim Services ("CVS") funding via the State of Minnesota for over two decades.  For the current federal fiscal year, the VAWA award is $13,000 and the CVS award is $175,000 in federal funding.  The allocations of CVS funding within the State are based on previous awards.  The Minnesota Department of Public Safety notifies Ramsey County of the amount the county is eligible to apply for, then the county responds to the RFP on an annual basis.  Ramsey County is receiving these funds through 2026 fiscal year, with continuation opportunities expected in summer 2026 for FY 2027.  The grant funds pay for sexual assault services in Ramsey County, providing victims of sexual violence 24/7 crisis advocacy, ongoing individual advocacy, counseling and support, community outreach, and information and education.  Services are provided to approximately 900 victims of sexual violence annually.

## 3.    Ramsey County Department of Labor Funding

326.    Ramsey County receives funding from the United States Department of Labor ("DOL") in pass-through multi-year grant awards totaling more than $1.2 million into 2026. The

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 70
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

awards fund key projects within Ramsey County from the Workforce Innovation and Opportunities Act ("WIOA") programs. These funds support Ramsey County residents through the WIOA Dislocated Worker program to deliver employment and training services to individuals who have lost a job due to a layoff. A second grant program, the WIOA Young Adults grant, provides funding to deliver employment and training services to Ramsey County young adults between the ages of 14-24. Historically, Ramsey County has also received WIOA program funds for a separate program for adults, funding employment and training services for adults age 18 and over who face significant barriers to employment.

327.    Ramsey County anticipates requiring funding from the USDA, the DOJ, and the DOL in the future and on an ongoing basis.

328.    If Ramsey County were to lose this or other federal funding as a result of the Anti-Diversity Order and the Gender Order, programs funded would cease altogether or result in a reduction of services impacting victims of crime and weaken the County's ability to adequately support both residents of Ramsey County and the County's employees.

329.    The Anti-Diversity Order and Gender Order would force Ramsey County to choose between accepting those conditions or losing access to an expected $7,000,000 in Federal funding from the DOJ, along with potentially other federal funds and anticipated federal funding.

330.    In addition to the above-listed program-specific consequences of potential funding cuts based on the terms and conditions at issue, Ramsey County has also been forced to spend considerable resources and staff time assessing the risks posed by the new terms and conditions – both for already awarded and upcoming federal funding opportunities – tracking new developments related to the implementation of and litigation surrounding them, and managing and coordinating internal and external stakeholders, communications, and responses related to the new terms and conditions.  The implementation of these terms and conditions, and the surrounding uncertainty, has also hamstrung the County's budgeting and financial planning processes.  If

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 71
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

federal funding is terminated or suspended, the County simply does not have other revenue streams available to backfill the resulting gaps in its budget.  Reflecting the significant needs of its communities and the services provided to them, Ramsey County's property tax rates are already well above the national average.

### IV.   PLAINTIFFS' LAWFUL EFFORTS TO PROMOTE DIVERSITY

331.   Plaintiffs comply with federal anti-discrimination laws as interpreted in binding judicial opinions by the United States Supreme Court and lower federal courts and as lawfully promulgated in applicable statutes and regulations. For the avoidance of any doubt, Plaintiffs have complied, are complying, and will continue to comply, with these laws.

332.   The Trump Administration's gloss on what constitutes "unlawful discrimination" in violation of federal anti-discrimination law does not change the lawfulness of these programs, as determined by Congress and the judicial branch. That is, the current administration cannot override the law by Executive fiat.

**A.    The City of Seattle**

333.   Seattle displays its lawful commitment to local diversity through multiple programs, including Seattle's Race and Social Justice Initiative ("RSJI"), which is codified by City of Seattle Ordinance 126799.  Seattle Municipal Code § 3.14.943(A)–(C) (2025) authorizes the Seattle Office for Civil Rights to, among other tasks: develop analytical tools to help identify equity impacts of policies, practices, and decision making; develop guidelines for outreach, communication, and community engagement to improve the scope and effectiveness of external efforts to ensure all communities receive information and have an opportunity to shape city policies and services; and assist departments in policy development and actions that improve fairness and opportunity in employment, business, and other government organizational practices. Seattle's RSJI program complies with federal and state anti-discrimination law.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 72
No. 2:25-cv-01435-BJR

334. Likewise, Seattle supports the Women- and Minority-Owned Businesses ("WMBE") Program, which promotes access, consideration, and economic opportunities for women and minority-owned businesses. Seattle actively supports utilization of WMBE on contracts and supports the Citywide WMBE Program through the Department of Finance and Administrative Services. Seattle departments have outreach plans for engagement, each department has an outreach plan for engagement with the WMBE community, and the Department of Finance and Administrative Services studies and publishes performance indicators regarding WMBE utilization.

335. Seattle is entitled to continue its efforts to promote diversity in its workforce and its programs. It is committed to following existing civil rights laws and in fact bases its efforts on its desire to value and protect the civil rights of all its employees, residents, and visitors.

336. The Trump Administration, through the abovementioned unlawful Anti-Diversity Order, is attempting to suppress Seattle's lawful DEI efforts by threatening loss of federal funding and potential monetary sanctions if it promotes "equitable" treatment, even if that means nothing more than advocating for objectively fair treatment, equal opportunity, or compliance with federal civil rights laws.

**B.    The City of Cleveland**

337. Several Cleveland city ordinances expressly prohibit discriminatory practices, including discrimination based on "gender identity or expression."

338. Cleveland Codified Ordinances Chapter 667 addresses unlawful discriminatory conduct, and employs the following definition: "'Gender identity or expression' means the gender-related identity, external presentation of gender identity through appearance, or mannerism or other gender-related characteristics of an individual, regardless of the individual's designated sex at birth." Cleveland, Ohio, Code §§ 667.011(b) (2000), 665.02(g) (2015).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 73
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

339.    Section 667.01 of the Cleveland Codified Ordinances, entitled "Unlawful Discriminatory Public Accommodation Practices," prohibits discriminatory practices in a place of public accommodation "because of race, religion, color, sex, sexual orientation, gender identity or expression, national origin, age, disability, ethnic group, or Vietnam-era or disabled veteran status." Cleveland, Ohio, Code § 667.01 (2016).

340.    Section 667.05 of the Cleveland Codified Ordinances, entitled "Unlawful Discrimination in Employment," prohibits employment discrimination "because of race, religion, color, sex, sexual orientation, gender identity or expression, national origin, age, disability, ethnic group, or Vietnam-era or disabled veteran status." Cleveland, Ohio, Code § 667.05 (2009).

341.    Section 187.22 of the Cleveland Codified Ordinances, entitled "Equal Opportunity Clause; Terms in Contracts," requires Cleveland's contractors to ensure that "applicants are employed and that employees are treated during employment without regard to race, religion, color, sex, sexual orientation, gender identity or expression, national origin, age, disability, ethnic group, or Vietnam-era or disabled veteran status." Cleveland, Ohio, Code § 187.22 (2009).

342.    Among other express duties included in Section 143.02 of the Cleveland Codified Ordinances "Duties of the Director of Human Resources," is the all-inclusive requirement that the Director of Human Resources:

> (3) [F]ormulate a plan of education or promote fair employment practices by employers, labor unions, employees, employment agencies and the general public to eliminate employment discrimination based on race, religion, color, sex, sexual orientation, gender identity or expression, national origin, age, disability, ethnic group or Vietnam-era or disabled veteran status;
>
> (4) [C]onfer and cooperate with and furnish technical assistance to employers, labor unions, employment agencies and other public and private agencies in formulating educational programs for the elimination of employment discrimination based on race, religion, color, sex, sexual orientation, gender identity or expression, national origin, age, disability, ethnic group or Vietnam-era or disabled veteran status, and in connection herewith, the Director of Human Resources may stimulate the establishment of committees

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 74
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

in industry, labor and other areas; and

(5) [P]erform such other equal employment opportunity and affirmative action related duties as the Mayor may require.

343.    In addition to regular male and female restrooms, Cleveland also maintains a gender-inclusive restroom at its public City Hall that can be used by people of any sex or gender identity.  This restroom also meets ADA accessibility standards.

344.    Similarly to Seattle, the Cleveland Office of Equal Opportunity's Minority Business Enterprises and Female Business Enterprises ("MBE-FBE") Program promotes access, consideration, and economic opportunities for women- and minority-owned businesses. Section 187.06 of the Cleveland Codified Ordinances provides that "each Contracting Department shall use its best efforts to utilize certified MBEs and FBEs as Contractors or subcontractors for all contracts" over $50,000, consistent with the City's goal of increasing the level of MBE and FBE participation in city contracts when there is evidence of past or present discrimination against such type of MBEs or FBEs or category of contract.

C.    City of Columbus

345.    Columbus' lawful efforts to promote its human-centered approach to diversity are codified in foundational legal frameworks and administrative protocols, with the Columbus City Charter serving as the primary governing authority for these efforts.  The City of Columbus Charter guarantees that no "officer, employee, or agent of the city shall deny equal access to city services, or equal opportunity in employment and promotion, or the benefits thereof, to any person on the basis of race, sex, sexual orientation, gender identity or expression, color, religion, ancestry, national origin, age, disability, family or military status, or any other status that is protected by federal, state, or local law or ordinance."  Columbus, Ohio, Charter § 238 (2020).  Columbus Mayor Andy Ginther has also issued an Executive Order that prohibits any type of employment discrimination on the basis of any of the categories listed in the Charter.  City of Columbus, DEP'T

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 75
No. 2:25-cv-01435-BJR

OF HUM. RES., Policy No. 0.06, Policy on Equal Employment Opportunity (rev. Feb. 20, 2020), https://www.columbus.gov/files/sharedassets/city/v/1/human-resources/executive-orders/po06-policy-on-equal-employment-opportunity.pdf.  Another part of that Executive Order mandates that this same principle of non-discrimination applies to all independent contractors, customers or vendors, individuals who work on city premises employed by temporary agencies, or any other organization or firm that does business with the city.  Columbus has codified this in Columbus City Code § 2331.03.

346.    In addition to prohibiting employment discrimination, Columbus City Code prohibits housing discrimination on the basis of race, sex, sexual orientation, gender identity or expression, color, religion, ancestry, national origin, age, disability, familial status or military status of any prospective owner, occupant, or user" of housing accommodations.  Columbus City Code § 2331.02.

347.    The city's Department of Human Resources continues to support and provide continued guidance to an open network of Employee Resource Groups ("ERGs"), including the Black ERG, Women's Interactive Network (WIN), All Out (LGBTQ+), Nosotros (Latino/a), Veterans, Young Professionals, and Caregivers. ERGs operate pursuant to individual charters and act as open-to-all, voluntary, and employee-led groups that foster a professional environment aligned with the city's mission.  This activity builds on the Equal Employment Resources division's work to implement the city's policies regarding equal opportunity training.  While some implicit bias training serves as legacy training, such instruction is available as self-serve, non-mandatory training on-demand and has not been scheduled in 2026.  Other lawful training for newly hired employees is used for informational and compliance purposes.

348.    Columbus has also mandated hiring and recruitment operations to be competitive, fair, and open to all qualified applicants.  Pay Transparency requires employers to provide a reasonable salary range or scale for potential employment in postings, an effort that addresses

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 76
No. 2:25-cv-01435-BJR

wage gaps through standardized disclosure. *See* Columbus, Ohio City Code § 2335.03. City recruitment outreach, request for proposals, and business programming also emphasizes open and competitive activity to aid small local and regional business enterprises that are seeking contract and procurement participation. Programs such as the Sheltered Market Program and Prime Mentoring update the legacy Women Business Enterprise and Minority Business Enterprise programs to ensure that those in disadvantaged economic corridors have full access and transparent participation in the city's economic engines for growth.

**D.      City of Durham**

349.    The City of Durham's City Council has perennially reaffirmed its commitment to diversity, equity and inclusion. In January 2021, Durham's City Council unanimously passed a nondiscrimination ordinance that expands protections under federal law to "safeguard the rights and opportunities of all persons to be free from discrimination in employment and public accommodations, based upon race, color, religion, national origin, sex, handicap, familial status, sexual orientation, gender identity, and protected hairstyle."

350.    Through an assortment of initiatives and programs, Durham promotes equitable community engagement by involving historically disenfranchised individuals in decision-making and breaking down barriers to the contracting marketplace.

351.    The City of Durham's Equitable Community Engagement Blueprint ("the Blueprint"), created in 2019 in partnership with members of the Durham community, establishes practices to advance equitable community engagement in every facet of city planning, programming, and governance. With the goal of increasing participation among marginalized groups and reducing historical barriers to engagement, the Blueprint outlines concrete action plans on identifying and addressing opportunity gaps, allocating resources equitably, and measuring involvement of community groups.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 77
No. 2:25-cv-01435-BJR

352.    As part of Durham's Equal Business Opportunity Program (EBOP), the City established policies and practices to ensure equal opportunity for underutilized business enterprises (UBEs) owned by minorities and women to contract with the City.  Rather than establishing a preference or priority for contracting with UBEs, the City of Durham has worked to use only race- and gender-neutral measures so as not to exclude UBEs from city contracting activities.  Durham also retains a list of UBEs on its website, as well as other resources for minority- and women-owned business aimed at preventing their exclusion from the marketplace.

353.    In addition to the Blueprint and EBOP, the City of Durham lawfully advances diversity and inclusion in countless other ways.  Some recent examples include the MiFi Distribution program, which provides free internet hotspots to low-income households; the Language Access Plan, which ensures access to municipal services, programs and resources for those who are Limited English Proficient; and the Youth Listening Project, which uses feedback from young Durham residents to make city services and programs more accessible for Durham youth.

**E.    City of Portland**

354.    Portland has long recognized equity and anti-racism as foundational values, deeply embedded in its planning, policies, and governance.  Through comprehensive plans, policy commitments, and the establishment of a dedicated office to lead this work, Portland has articulated a clear mandate to confront systemic inequities and advance justice for historically marginalized communities.

355.    This commitment is reflected in Portland's formal adoption of equity-focused goals, the creation of the Office of Equity and Human Rights, and the establishment of core values that serve as a lens of how Portland makes decisions and serves the community.  Together, these efforts demonstrate Portland's resolve to address historic disparities, dismantle institutional racism, and foster a more inclusive and just city for all Portlanders.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 78
No. 2:25-cv-01435-BJR

356.    Portland's 2035 Comprehensive Plan identifies Equity as one of its five Guiding Principles.  It commits the City to promoting equity and environmental justice by reducing disparities, extending community benefits, increasing affordable housing, affirmatively furthering fair housing, addressing displacement, and improving opportunities for underrepresented populations.  The Plan emphasizes intentional engagement with underserved communities and the need to prevent repeated injustices, particularly toward communities of color.

357.    In 2011, Portland established the Office of Equity and Human Rights to lead its equity efforts, with a focus on race, disability, and LGBTQIA2S+ equity through an intersectional lens.  According to City Code, the Office's purpose is to promote equity and reduce disparities within City government; and, to collaborate with communities and institutions to eliminate racial inequity in all areas of government, including education, criminal justice, environmental justice, health, housing, transportation, and economic success.

358.    In 2020, the Portland City Council unanimously adopted Resolution 37492, establishing Anti-Racism, Equity, Transparency, Communication, Collaboration, and Fiscal Responsibility as the City's Core Values. The values of Anti-Racism and Equity are defined as follows:

  i.    Anti-Racism: The City commits to being an anti-racist institution. Addressing anti-Blackness is a priority, and dismantling systemic racism is the shared responsibility of all employees and residents.  Discrimination, bias, and hate are condemned.

  ii.    Equity: The City values the diverse identities and experiences of its workforce and residents.  Acknowledging Oregon's history of exclusion, Portland commits to reconciliation, restorative justice, and removing systemic barriers.  The sense of belonging, ownership, support, and safety are vital for a diverse, equitable, and inclusive city and workforce.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 79
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

359.    Portland is entitled to continue these efforts to promote Portland's core values of Anti-Racism and Equity.  Portland is committed to following existing civil rights laws and bases its efforts on its desire to value and protect the civil rights of all its employees, residents, and visitors.

360.    The Trump Administration, through the abovementioned unlawful Anti-Diversity Order, is attempting to suppress Portland's lawful DEI efforts by threatening loss of federal funding and potential monetary sanctions if it promotes "equitable" treatment, even if that means nothing more than advocating for objectively fair treatment, equal opportunity, or compliance with federal civil rights laws.

## F.    Allegheny County

361.    For more than forty years, Allegheny County has demonstrated its lawful commitment to local diversity in employment and procurement through its Minority, Women and Disadvantaged Business Enterprise Program, (MWDBE) the most recent iteration adopted in 2016 by ordinance in Chapter 435 of the Allegheny County Code.

362.    The County's MWDBE promotes access to opportunities for women and minority-owned businesses.  Allegheny County utilizes MWDBE for County procurement and services contracts.

363.    The Allegheny County Home Rule Charter was amended in 2009, at Article V, and by Ordinance No. 26-09 established the County Human Relations Commission, which authorizes investigation of discrimination based on race, disability, religion and explicitly gender discrimination, including "Self-perception, or perception by others whether accurate or not, as male or female, including a person's appearance, behavior, or physical characteristics, that may be in accord with, or opposed to, one's physical anatomy, chromosomal sex, or sex assigned at birth." Art. V, §§215.30, 215.31 in employment and public accommodation.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 80
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

364. Allegheny County has a diverse population and is entitled to continue its efforts to promote diversity in its workforce and its programs.  Allegheny County is committed to following existing civil rights laws and legal precedent in these efforts.

365. Allegheny County protects the civil rights of all its employees, residents, business partners, and visitors.

366. As pleaded above, this Administration, through its unlawful Anti-Diversity Order and the Gender Ideology Order is attempting to coerce Allegheny County to abandon its lawful DEI efforts by threatening loss of federal funding, and with threats of civil penalties under the False Claims Act and other sanctions for programs that comply with federal civil rights law.

**G.    Hennepin County**

367. Since 2013, Hennepin County has anchored its work in reducing and eliminating racial disparities in our region, so all residents have a chance to thrive. This work occurs in seven key disparity domains: Connectivity, Education, Employment, Health, Housing, Income, and Justice:

    i.    Connectivity: Ensuring our technology, transit and transportation systems are accessible, affordable and climate ready.

    ii.    Education: Supporting greater achievement and whole-being outcomes for youth and families through educational success.

    iii.    Employment: Promoting meaningful employment opportunities that provide a living wage and comprehensive benefits.

    iv.    Health: Providing access to high-quality, affordable services that promote whole health and well-being.

    v.    Housing: Opening doors to safe, stable, affordable, permanent housing.

    vi.    Income: Striving to advance inclusive and equitable economic opportunities that give individuals and businesses of every size the ability to prosper.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 81
No. 2:25-cv-01435-BJR

vii.    Justice: Supporting a legal system that is equitable and prioritizes individual success and community safety through early intervention and prevention strategies.

368.    Each year, Hennepin County prepares a report summarizing its work towards disparity elimination.

369.    For example, Hennepin County is devoting significant resources to eliminating disparities for Native American children who are in out-of-home placement due to concerns of maltreatment.  Native American children are over 60 times more likely to enter out-of-home placement than white children in Hennepin County.  To address this alarming disparity, the County is providing culturally responsive prevention resources, using proven programs to promote healing and repair, supporting parents with one-on-one relationships, and increasing access to mental and chemical health services that keep families together, among other efforts.

370.    Another example of the County's commitment to disparity elimination is its contracting practices supporting small and emerging vendors.  Through its contract inclusion program, Hennepin County looks for small vendors that are minority- and woman-owned who have registered in the County's database of certified businesses.  The County's work is supported by a disparity study that evaluated not only Hennepin County's contracting and marketplace, but also those of fifteen other governmental organizations in Minnesota.

371.    Hennepin County supports contract inclusion in several ways.  The County sets goals to include small, minority-owned, or women-owned businesses in projects exceeding $100,000. The County operates sheltered market programs for small and emerging small businesses, in accordance with State laws.  Where possible, the County breaks large contracts up into several smaller contracts.  Finally, the County engages in targeted outreach to small and emerging businesses.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 82
No. 2:25-cv-01435-BJR

## H. Prince George's County

372.    Prince George's County is committed to diversity and inclusion programs that expand opportunities for County-based Women and Minority Owned Businesses ("WMBE").  For example, the County has several initiatives focused on procurement, access to capital and mentoring including the Mentor-Protégé Program, the Level-Up/C-Suite Accelerator and the Minority Business Enterprise program, among others.  These initiatives are local business development programs designed to enhance the capabilities of County-based WMBEs.

373.    The Prince Geoge's County Code reflects the County's commitment to diversity and inclusion programs through contracting requirements involving County-based WMBEs. *See* Prince George's County Code, §§ 10A-101, et seq.

374.    Prince George's County is committed to following existing civil rights laws and believes that our programs for WMBE's are narrowly tailored to address specific disparities in a lawful manner.

375.    The Trump Administration, through the abovementioned unlawful Anti-Diversity Order, is attempting to suppress Prince George's County's lawful diversity and inclusion efforts by threatening loss of federal funding and potential monetary sanctions if it promotes "equitable" treatment.  The Order is not only unlawful, it frustrates a legitimate governmental interest by local governments to reduce specific disparities that exist within their jurisdictions.

## I. Ramsey County

376.    Ramsey County's 2026-27 strategic plan advances the organization's mission, vision and goals of well-being, prosperity, opportunity, and accountability.  It also reflects the overarching values guiding Ramsey County's work each day in service to a community of over 500,000 residents in the most racially diverse urban county in Minnesota.  The strategic plan builds on progress made and outlines seven strategic priorities that include tangible, timebound goals and actionable strategies.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 83
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

377.    Under the Racial & Health Equity & Shared Community Power priority, one of the seven priorities in the Ramsey County 2026-27 strategic plan, Ramsey County commits to focus on creating an environment that advances racial, health and digital equity.  This requires continued engagement and shared community power, equity strategy management, culturally specific enhancement, and site visits so that all residents have an opportunity to thrive.  Ramsey County is committed to include communities that are most in need and disproportionately impacted, which continue to be the racially and ethnically diverse communities.

## CAUSES OF ACTION

### COUNT I
### Separation of Powers

**(Plaintiffs Seattle, Cleveland, Durham, and Prince George's County Against All Defendants)**

**(Plaintiffs Columbus, Portland, and Allegheny County Against Defendants Donald J. Trump, the United States of America, DHS, Markwayne Mullin, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

**(Plaintiffs Hennepin County and Ramsey County Against Defendants Donald J. Trump, the United States of America, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

378.    Plaintiffs repeat and incorporate by reference each and every allegation previously alleged as if fully set forth herein.

379.    Plaintiffs state this cause of action against all Defendants, seek preliminary and permanent injunctions, and challenge the Orders and any agency action seeking to implement the Orders both facially and as applied to it.

380.    Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments from enforcing illegal, *ultra vires* Presidential action.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 84
No. 2:25-cv-01435-BJR

381.    The U.S. Constitution vests Congress, not the President, with the exclusive authority over federal spending under Article I, Section 8, and Article I, Section 9, Clause 7.  The Anti-Diversity and Gender Executive Orders usurp this power by directing federal agencies to unilaterally terminate or modify federal grants and contracts, in ways in which they lack any congressional authorization to do so.

382.    Article I of the Constitution vests Congress with the powers to make laws and control the public fisc.  The Presentment Clause provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States."  U.S. CONST. art. I, § 7, cl. 2.  The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. CONST. art. I, § 7, and the Spending Clause vests Congress with the power to use Treasury funds for the "general Welfare of the United States," U.S. CONST. art. I, § 8, cl. 1.

383.    Thus, it is Congress, not the President, which is vested with the power of the purse. The President does not have unilateral power to withhold federal funds that have been previously appropriated by Congress and signed into law, and the President does not have the power to impose his own conditions on the use of funds when Congress has not delegated to him the power to do so.

384.    As part of its power over the public fisc, Congress appropriates billions of dollars every year in social service, research, healthcare, and educational grants.  Congress may specify how its grants are used, generally bypassing statutes, or in the annual appropriations bill.  None of the congressional conditions placed on the grants administered or disbursed contain the unique restrictions described in the Orders relating to "diversity, equity, inclusion, and accessibility," or the promotion of "gender ideology."

385.    No provision of the U.S. Constitution authorizes the Executive to enact, amend, or repeal statutes, including appropriations approved by Congress and signed into law by the

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 85
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

President.  The Executive cannot unilaterally amend or cancel appropriations that Congress has duly enacted without the requisite delegated authority.  By directing agencies to terminate congressionally appropriated grants based on the President's own policy preferences, and beyond the scope of their congressionally delegated authority, the Orders violate the Separation of Powers in attempting to amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations.  These mandates exceed the President's powers under Article II, and his powers under the constitutive statutes, and thus unconstitutionally infringe upon those powers vested in Congress and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses.  *See* U.S. CONST. art. I, § 7, cl. 2, 3; *see also* U.S. CONST. art. II.

386.    The Executive Branch does not have the authority to condition the payment of federal funds in adherence to its policy priorities and without any statutory authority to do so.  Indeed, even Congress may not "'surprise[] states with post acceptance … conditions' on federal funds and 'impose conditions on federal grants that are unrelated to the federal interest in particular national projects or grants.'"  *Washington v. Trump*, 768 F. Supp. 3d 1239, 1262 (W.D. Wash. 2025) (quoting *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019) (brackets and ellipses in original).  "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effect its own policy goals."  *City & Cnty. of San Francisco v. Trump*, 987 F.3d 1225, 1235 (9th Cir. 2018).  When "Congress [does] not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers."  *Id.*

387.    By directing agencies to terminate or withhold congressionally appropriated funds in these ways, the Orders attempt to leverage public funds to advance the President's policy preferences, against the directives of Congress.  This exceeds the President's powers under Article II and unconstitutionally infringes upon those powers vested in Congress.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 86
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

388.    The Anti-Diversity Order also independently unconstitutionally exceeds the President's powers as the federal courts have interpreted Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, which prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance, insofar as it purports to expand the reach of federal anti-discrimination law.

389.    The Anti-Diversity Order also improperly seeks to amend the Federal False Claims Act by amending the definition of "material" under the statute.  Not only does the President lack power to adopt or amend legislation, the proposed revision to the materiality standard conflicts with the existing definition of materiality as interpreted by the U.S. Supreme Court in *Univ. Health Servs. v. United States*, 579 U.S. 176, 191 (2016).

390.    The general statement in the Orders about nominal adherence to the law does not suffice to evade judicial review.  The Administration's assertions that its policy preferences have legal force undermines any credible claim that it acts solely against conduct that violates federal law as interpreted by the courts.

391.    These actions exceed the President's powers under Article II, unconstitutionally infringe upon those powers vested in Congress, and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses.

392.    Plaintiffs are entitled to a declaration that the Orders violate the constitutional principles of the separation of powers doctrine and impermissibly claim for the executive, power that is reserved to Congress.

393.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from enforcing or implementing the Orders against Plaintiffs.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 87
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**COUNT II**
**Spending Clause**

**(Plaintiffs Seattle, Cleveland, Durham, and Prince George's County Against All Defendants)**

**(Plaintiffs Columbus, Portland, and Allegheny County Against Defendants Donald J. Trump, the United States of America, DHS, Markwayne Mullin, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

**(Plaintiffs Hennepin County and Ramsey County Against Defendants Donald J. Trump, the United States of America, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

394.    Plaintiffs repeat and incorporate by reference all previously alleged allegations as if fully set forth herein.

395.    Plaintiffs state this cause of action against all Defendants, seek preliminary and permanent injunctions, and challenge the Orders and any agency action seeking to implement the Orders both facially and as applied to it.

396.    The Taxing and Spending Clause of the United States Constitution is one of Congress's enumerated powers. *See* U.S. CONST. art. I, § 8, cl. 1. Under the Spending Clause, "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States…"

397.    "Incident to this power, Congress may attach conditions on the receipt of federal funds and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980) (opinion of Burger, C.J.)).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 88
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

398.    However, the Executive does not have the authority to arbitrarily refuse to spend the funds Congress has appropriated. *City & Cnty. of San Francisco*, 897 F.3d at 1232 (citing *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)).

399.    For the reasons discussed above, *supra* Count I, Defendants have violated the Spending Clause for the same reasons they have violated Separation of Power principles; that is, by purporting to allow the Executive to arbitrarily elect not to spend federal funds that Congress has allocated to Plaintiffs through its appropriations powers.

400.    Additionally, the Executive Orders are independently unconstitutional under the Spending Clause because they do not meet several factors under *Dole* for attaching conditions to federal grants.

401.    Under *Dole*, "(1) the expenditure must 'advance the general welfare'; (2) any attached condition must be 'unambiguous[ ]'; (3) conditions must relate 'to the federal interest in particular national projects or programs'; (4) conditions cannot violate another constitutional provision; and (5) conditions cannot 'be so coercive … [that] pressure turns into compulsion.'" *W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1141 (11th Cir. 2023) (quoting *Dole*, 483 U.S. at 207–11).

402.    As discussed above, the Executive Orders purport to impose conditions on the expenditure of funds that are not reasonably related to the federal interest in many significant grant objectives and therefore do not pass muster under the Spending Clause.  For instance, the Executive's interest in banning DEI has nothing to do with whether Plaintiffs should receive BioWatch funding for early detection of airborne biological and bioterrorism threats.

403.    The Executive Orders are additionally unlawful under the Spending Clause because their terms are ambiguous.  For instance, the Anti-Diversity Order does not define "DEI," nor does the Gender Order define "promoting gender ideology," leaving Plaintiffs in the untenable position of speculating whether their programs and policies comport with the Orders.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 89
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

404.    The Orders are also unlawful because they are unduly coercive, as they threaten significant percentages of Plaintiffs' budgets and introduce significant uncertainty into their financial programs and planning.

405.    Plaintiffs are entitled to a declaration that the Orders violate the Spending Clause and impermissibly seize for the executive branch power that is reserved to Congress.

406.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from enforcing or implementing the Orders.

**COUNT III**
**Fifth Amendment Due Process Clause (Vagueness)**

**(Plaintiffs Seattle, Cleveland, Durham, and Prince George's County Against All Defendants)**

**(Plaintiffs Columbus, Portland, and Allegheny County Against Defendants Donald J. Trump, the United States of America, DHS, Markwayne Mullin, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

**(Plaintiffs Hennepin County and Ramsey County Against Defendants Donald J. Trump, the United States of America, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

407.    Plaintiffs repeat and incorporate by reference each and every allegation previously alleged as if fully set forth herein.

408.    Plaintiffs state this cause of action against all Defendants, seek preliminary and permanent injunctions, and challenge the Orders and any agency action seeking to implement the Orders both facially and as applied to them.

409.    Plaintiffs' cause of action arises from the principle of non-statutory review to enjoin Executive Officers and Departments seeking to enforce illegal, *ultra vires* Presidential action.

410.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 90
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

411. Due process requires that parties "know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Clear guidance ensures "those enforcing the law do not act in an arbitrary or discriminatory way." *Id*.

412. Under the Fifth Amendment to the United States Constitution, a governmental enactment, such as the Orders, is unconstitutionally vague if it fails to provide a person of ordinary intelligence with fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement. Differently stated, governmental enactments are unconstitutionally void for vagueness when their prohibitions are not clearly defined.

413. The Anti-Diversity Order requires certification, enforceable through the FCA, that a contractor and grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," without definition or guidance as to what these terms mean. There is significant confusion generated by the clear difference between the Trump Administration's view of what constitutes unlawful discrimination and the views of the courts. Likewise, the Anti-Diversity Order directs the Attorney General to take "appropriate measures . . . to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify … potential civil compliance investigations" to accomplish such "deter[rence]."

414. The vagueness of the Anti-Diversity Order's terminology requires subjective interpretation by the President and federal agencies and therefore lends itself to discriminatory enforcement. By the Anti-Diversity Order's terms (or lack thereof), each agency head is authorized to exercise unfettered discretion to determine whether any aspect of a federal grant, training or program is "equity-related."

415. Similarly, the Gender Order does not explain what it means to "promote" "gender ideology," which can result in loss of federal grant funding.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 91
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

416. Accordingly, Plaintiffs have not received fair—or any—notice of what is prohibited under the Orders, which makes it impossible to come into compliance with the Orders.

417. For example, the Orders leave Plaintiffs guessing about whether they may accept federal grants and continue to train employees on best practices for serving their diverse populations of residents and visitors.

418. Specifically, the Orders leave Plaintiffs confounded about whether they can accept federal grants and continue to lawfully operate their existing and lawful programs, such as Plaintiff City of Seattle's Race and Social Justice Initiative, which is the "City's policy and goal to end institutional racism within City government, working toward a vision where racial disparities will be eliminated and racial equity achieved" throughout Seattle. *See* City of Seattle Ordinance 126799.

419. Similarly, the Gender Order provides no definition of what constitutes "promotion" of "gender ideology," leaving Plaintiffs to guess as to what actions Defendants would consider a violation of the Order. Likewise, the Anti-Diversity Order provides no definition of "illegal DEIA," leaving Plaintiffs to guess as to whether the Trump Administration would view legitimate diversity efforts as unlawful discrimination.

420. The DOT Letter, however, makes clear that the DOT will view *any* DEI-related program as inherently suspect and presumptively unlawful: "Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates federal law."[26]

421. Despite the Orders' breadth and vagueness, they include a range of penalties, including cancellation of existing contracts, loss of eligibility for future government contracts, discontinuation of federal grants, and potential liability under the FCA. The Orders require contractors and grantees to agree that compliance with the government's vague terms is "material"

---

[26] DOT Letter at 2.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 92
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

to funding for purposes of the FCA, thus invoking the specter of vexatious whistleblower litigation carrying enormous litigation expense and the threat of significant monetary damages.

422.    Plaintiffs conduct trainings, perform research, provide services, and engage in advocacy to serve diverse populations.  Plaintiffs do not know which of their activities are prohibited by the Orders.  As the DOT Letter states, even "neutral" policies and activities will be considered "presumptively illegal" if they serve unspecified "DEI goals."  Because of this uncertainty, Plaintiffs are justifiably fearful that conducting these activities might imperil their direct or indirect federal funding.

423.    The Orders violate the Due Process Clause of the Fifth Amendment to the Constitution and are void for vagueness because they infringe on Plaintiffs' constitutionally protected rights to operate lawful programs and because they provide inadequate notice of the conduct they purport to prohibit.

424.    Plaintiffs are entitled to a declaration that the Orders are unconstitutionally vague in violation of the Fifth Amendment.

425.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants from enforcing or implementing the Orders.

**COUNT IV**
**Tenth Amendment**

**(Plaintiffs Seattle, Cleveland, Durham, and Prince George's County Against All Defendants)**

**(Plaintiffs Columbus, Portland, and Allegheny County Against Defendants Donald J. Trump, the United States of America, DHS, Markwayne Mullin, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

**(Plaintiffs Hennepin County and Ramsey County Against Defendants Donald J. Trump, the United States of America, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 93
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

426.    Plaintiffs repeat and incorporate by reference all previously alleged allegations as if fully set forth herein.

427.    Plaintiffs state this cause of action against all Defendants, seek preliminary and permanent injunctions, and challenge the Orders and any agency action seeking to implement the Orders both facially and as applied to them.

428.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited to it by the States, are reserved to the States respectively, or to the people." U.S. CONST. amend X.

429.    Under the Tenth Amendment, the federal government may not "coerce[ ] a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012). Coercion occurs when "pressure turns into compulsion." *Id.* at 580.

430.    Courts in the Ninth Circuit have found coercion under the Tenth Amendment where the application of executive orders "would have significant effects on [localities'] ability to provide services to their residents and … they may have no legitimate choice regarding whether to accept the government's conditions in exchange for those funds." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 533 (N.D. Cal. 2017).

431.    The potential loss of all federal funding placed at risk by the Orders here is coercive under the Tenth Amendment.  The Orders thus violate the anti-commandeering principle of the Tenth Amendment.

432.    Plaintiffs are entitled to a declaration that the Gender Order and Anti-Diversity Order violate the anti-commandeering principle of the Tenth Amendment.

433.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing all federal departments and agencies from enforcing or implementing the Orders by taking any action to withhold, freeze, or condition federal funds from Plaintiffs.

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 94
No. 2:25-cv-01435-BJR

**COUNT V**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**(Contrary to Constitution, Excess of Statutory Authority, Arbitrary, and Capricious)**

**(Plaintiffs Seattle, Cleveland, Durham, and Prince George's County Against All Defendants)**

**(Plaintiffs Columbus, Portland, and Allegheny County Against Defendants Donald J. Trump, the United States of America, DHS, Markwayne Mullin, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

**(Plaintiffs Hennepin County and Ramsey County Against Defendants Donald J. Trump, the United States of America, DOJ, Todd Blanche, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought)**

434.    Plaintiffs repeat and incorporate by reference all previously alleged allegations as if fully set forth herein.

435.    Plaintiffs state this cause of action against all Defendants except Donald J. Trump, seek preliminary and permanent injunctions, and challenge agency actions seeking to implement the Orders both facially and as applied to them.

436.    Plaintiffs bring this claim for relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

437.    Defendants have taken actions to eliminate grant funding for recipients such as Plaintiffs that have DEIA programs and activities without defining what types of programs and activities are banned as "DEI" or "DEIA" and without any prior determinations of their illegality by the federal courts.

438.    They have also conditioned federal funds on a requirement that recipients refrain from engaging in "gender ideology," a vague term used by the federal government making it unclear how Plaintiffs are to comply.

439.    These agency actions cut off federal funding, through contracts or grants, to any program or activity that is "DEI" or "DEIA"—or related to "DEI" or "DEIA"—without any prior

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 95
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

determination of (a) why they are considered to be "DEI" or "DEIA" or (b) why they are illegal pursuant to criteria that is articulable, discernible, and publicly known.

440.    The agencies' actions in response to the unlawful Orders constitute final agency actions, subject to the APA that should be set aside for at least three reasons:

(1)    The agencies' actions taken pursuant to the Orders are contrary to constitutional right, power, privilege, or immunity in violation of 5 U.S.C. § 706(2)(B), as more particularly described in Counts I, II, and IV, above.

(2)    The agencies' actions taken pursuant to the Orders are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C), as more particularly described in Count III, above. *See Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 868 (W.D. Wash. 2020) ("[A]dministrative agencies may not act outside the scope of the authority delegated to them by Congress.").

(3)    The agencies' actions are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).  The Orders include vague and subjective terms that lend themselves to conflicting interpretations and appear designed to authorize discriminatory and arbitrary enforcement.  The arbitrariness and capriciousness of the Orders is further demonstrated by the utter lack of nexus between the subject matter of the Orders and the grant-related activities of Plaintiffs.  *See Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 96
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

441.    The Court should hold unlawful and set aside the actions of the Defendant agencies acting pursuant to the Orders.

## V.    PRAYER FOR RELIEF

WHEREFORE, all Plaintiffs respectfully request the following relief:

a.    A declaratory judgment under 28 U.S.C. § 2201(a) that the Orders and the directed agency actions are unlawful and unconstitutional;

b.    Costs and reasonable attorneys' fees as permitted by law; and

c.    Any such further relief as the Court may deem just and equitable.

WHEREFORE, Plaintiffs Seattle, Cleveland, Durham, and Prince George's County respectfully request the following relief:

a.    Preliminary and permanent injunctions enjoining all Defendants except Donald J. Trump, their officials, agents, employees, assigns, and all persons acting in concert or participating with them and all other federal Departments and Agencies from implementing and enforcing the Orders against Plaintiffs

b.    A permanent injunction mandating that Defendants except Donald J. Trump, and all other federal Departments and Agencies modify or otherwise rectify contracts, subcontracts, agreements, and/or any other such binding documents entered into with Plaintiffs that contain unlawful terms, clauses, or provisions in furtherance of the Orders;

c.    Any such further relief as the Court may deem just and equitable.

WHEREFORE, Plaintiffs Columbus, Portland, and Allegheny County respectfully request the following relief:

a.    Preliminary and permanent injunctions enjoining Defendants DHS, Markwayne Mullin, DOJ, Todd Blanche, HRSA, Thomas J. Engels, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP,

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 97
No. 2:25-cv-01435-BJR

Ashley Romanias, OMB, and Russell Vought *only*, their officials, agents, employees, assigns, and all persons acting in concert or participating with them, from implementing and enforcing the Orders against them.

b.    A permanent injunction mandating that Defendants DHS, Markwayne Mullin, DOJ, Todd Blanche, HRSA, Thomas J. Engels, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought *only,* modify or otherwise rectify contracts, subcontracts, agreements, and/or any other such binding documents entered into with them that contain unlawful terms, clauses, or provisions in furtherance of the Orders;

c.    Any such further relief as the Court may deem just and equitable.

WHEREFORE, Plaintiffs Hennepin County and Ramsey County respectfully request the following relief:

d.    Preliminary and permanent injunctions enjoining Defendants DOJ, Todd Blanche, HRSA, Thomas J. Engels, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought *only*, their officials, agents, employees, assigns, and all persons acting in concert or participating with them, from implementing and enforcing the Orders against them.

e.    A permanent injunction mandating that Defendants DOJ, Todd Blanche, HRSA, Thomas J. Engels, USDA, Brooke Rollins, EPA, Lee Zeldin, DOE, Chris Wright, DOL, Lori Chavez DeRemer, OFCCP, Ashley Romanias, OMB, and Russell Vought *only,* modify or otherwise rectify contracts, subcontracts, agreements, and/or any other such binding documents entered into with them that contain unlawful terms, clauses, or provisions in furtherance of the Orders;

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 98
No. 2:25-cv-01435-BJR

f.       Any such further relief as the Court may deem just and equitable.


DATED this 7th day of April, 2026.

                                        CORR CRONIN LLP


                                        s/ Jeffrey B. Coopersmith
                                        Jeffrey B. Coopersmith, WSBA No. 30954
                                        Emily J. Harris, WSBA No. 35763
                                        Eric A. Lindberg, WSBA No. 43596
                                        Kathryn Joy, WSBA No. 60056
                                        Renee M. Howard, WSBA No. 38644
                                        1015 Second Avenue, Floor 10
                                        Seattle, Washington  98104-1001
                                        Ph: (206) 625-8600 | Fax: (206) 625-0900
                                        jcoopersmith@corrcronin.com
                                        eharris@corrcronin.com
                                        elindberg@corrcronin.com
                                        kjoy@corrcronin.com
                                        rhoward@corrcronin.com

                                        ERIKA J. EVANS
                                        SEATTLE CITY ATTORNEY

                                        s/ Ghazal Sharifi
                                        Ghazal Sharifi, WSBA No. 47750
                                        Kerala Cowart, WSBA No. 53649
                                        Rebecca Widen, WSBA No. 57339
                                        Seattle City Attorney
                                        701 Fifth Avenue, Suite 2050
                                        Seattle, WA 98104-7095
                                        Tel: (206) 684-8200
                                        Ghazal.Sharifi@seattle.gov
                                        Kerala.Cowart@seattle.gov
                                        Rebecca.Widen@seattle.gov

                                        Attorneys for Plaintiff City of Seattle


                                        LAWYERS FOR GOOD GOVERNMENT

                                        s/ Gary DiBianco
                                        Gary DiBianco, DC Bar No. 458669 (pro hac vice
                                        application forthcoming)
                                        Amy Powell, NY Bar No. 4339743 (pro hac vice
                                        application forthcoming)

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 99
No. 2:25-cv-01435-BJR

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Kunyu Ching, CA Bar No. 292616 (*pro hac vice* application forthcoming)
1319 F St. NW Ste 301, PMB 181
Washington, DC 20004
Tel: (404) 913-5529
gary@lawyersforgoodgovernment.org
amy@lawyersforgoodgovernment.org
kunyu@lawyersforgoodgovernment.org

CITY OF CLEVELAND

*s/ Mark Griffin*
Mark Griffin, OH Bar No. 0064141 (*pro hac vice* application forthcoming)
Elena N. Boop, OH Bar No. 0072907 (*pro hac vice* application forthcoming)
Shirley Tomasello, OH Bar No. 0059593 (*pro hac vice* application forthcoming)
Alejandro Gonzalez Mercado, OH Bar No. 0105416*
City of Cleveland, Department of Law
601 Lakeside Avenue, Room 106
Cleveland, Ohio 44114
Tel: (216) 664-2800
MGriffin@clevelandohio.gov
EBoop@clevelandohio.gov
STomasello@clevelandohio.gov
AGonzalez2@clevelandohio.gov

*Attorneys for Plaintiff City of Cleveland, Ohio*

CITY OF COLUMBUS

*s/ Richard N. Coglianese*
Richard N. Coglianese, OH Bar No. 0066830 (*pro hac vice* application pending)
Assistant City Attorney
77 N. Front Street, 4th Floor
Columbus, Ohio 43215
Tel: (614) 645-0818
rncoglianese@columbus.gov

*Attorneys for Plaintiff City of Columbus*

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 100
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

CITY OF DURHAM

*s/ Sofia Hernandez*
Sofia Hernandez, NC Bar No. 46583 (*pro hac vice* application pending)
Sarah Laws, NC Bar No. 57971 (*pro hac vice* application pending)
City of Durham Attorney's Office
101 City Hall Plaza
Durham, NC 27701
Tel: (919) 560-4158
sofia.hernandez@durhamnc.gov
sarah.laws@durhamnc.gov

*Attorneys for Plaintiff City of Durham*


CITY OF PORTLAND

*s/ Naomi Sheffield*
Naomi Sheffield, OR Bar No. 170601 (*pro hac vice* application pending)
Caroline Turco, OR Bar No. 083813 (*pro hac vice* application forthcoming)
Portland Office of the City Attorney
1221 SW Fourth Ave., Room 430
Portland, OR 97204
Tel: (503) 823-4047
Naomi.Sheffield@portlandoregon.gov
Caroline.Turco@portlandoregon.gov

*Attorneys for Plaintiff City of Portland, Oregon*


ALLEGHENY COUNTY

*s/ Lisa G. Michel*
Lisa G. Michel, PA Bar No. 59997 (*pro hac vice* application pending)
Assistant County Solicitor
Allegheny County Law Department
445 Fort Pitt Boulevard, Suite 300
Pittsburg, PA 15219
Tel: (412) 350-1167
lisa.michel@alleghenycounty.us

*Attorneys for Plaintiff Allegheny County*

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 101
No. 2:25-cv-01435-BJR

HENNEPIN COUNTY ATTORNEY

*s/ Rebecca L.S. Holschuh*
Rebecca L.S. Holschuh, MN Bar No. 0392251 (*pro hac vice* application pending)
David M. Gorski, MN Bar No. 0392208 (*pro hac vice* application pending)
Assistant County Attorneys
300 South Sixth Street
Minneapolis, MN 55487
Tel: (614) 348-4797
rebecca.holschuh@hennepin.us
brittany.mccormick@hennepin.us

*Attorneys for Plaintiff Hennepin County*


PRINCE GEORGE'S COUNTY

*s/ Anthony D. Jones*
Anthony D. Jones, MD Bar No. 1905210002 (*pro hac vice* application pending)
Prince George's County Office of Law
1301 McCormick Drive, Suite 4100
Largo, MD 20774
Tel: (301) 952-5225
ADJones@princegeorgescountymd.gov

*Attorney for Plaintiff Prince George's County*


JOHN J. CHOI
RAMSEY COUNTY ATTORNEY

*s/ Bradley Cousins*
Bradley Cousins, MN Bar No. 0400463 (*pro hac vice* application pending)
Stacey D'Andrea, MN Bar No. 0388320 (*pro hac vice* application pending)
Jada Lewis, MN Bar No. 0391287 (*pro hac vice* application pending)
Assistant Ramsey County Attorneys
360 Wabasha St. N., Suite 100

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 102
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Saint Paul, MN 55102
Tel: (651) 266-3081 (Cousins)
Tel: (651) 266-3051 (D'Andrea)
Tel: (651) 266-3149 (Lewis)
bradley.cousins@co.ramsey.mn.us
stacey.dandrea@co.ramsey.mn.us
jada.lewis@co.ramsey.mn.us

*Attorneys for Plaintiff Ramsey County*

FIRST AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF – 103
No. 2:25-cv-01435-BJR

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900