The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE; CITY OF CLEVELAND; CITY OF COLUMBUS; CITY OF DURHAM; CITY OF PORTLAND; ALLEGHENY COUNTY; HENNEPIN COUNTY; PRINCE GEORGE'S COUNTY; and RAMSEY COUNTY,

Plaintiffs,

v.

DONALD J. TRUMP, President of the United States; UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as the Secretary of Transportation; FEDERAL AVIATION ADMINISTRATION; BRYAN BEDFORD, in his official capacity as Administrator of the Federal Aviation Administration; FEDERAL HIGHWAY ADMINISTRATION; SEAN MCMASTER, in his official capacity as Administrator of the Federal Highway Administration; FEDERAL RAILROAD ADMINISTRATION; DAVID FINK, in his official capacity as Administrator of the Federal Railroad Administration; FEDERAL TRANSIT ADMINISTRATION;

No. 2:25-cv-01435-BJR

PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 1
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

MATTHEW WELBES, in his official capacity as Executive Director of the Federal Transit Administration; DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; HEALTH RESOURCES AND SERVICES ADMINISTRATION; THOMAS J. ENGELS, in his official capacity as Administrator of Health Resources and Human Services; DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of the Department of Agriculture; ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the Environmental Protection Agency; DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as Secretary of the Department of Energy; DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, in her official capacity as Secretary of the Department of Labor; OFFICE OF FEDERAL CONTRACTS COMPLIANCE PROGRAMS; ASHLEY ROMANIAS, in her official capacity as Director of Office of Federal Contracts and Compliance Programs; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget; and DOES 1–100,

Defendants.

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 2
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

# I.   INTRODUCTION[1]

At stake in this litigation is approximately $2.6 billion in federal grant funds which Plaintiffs City of Seattle ("Seattle"), City of Cleveland ("Cleveland"), City of Columbus ("Columbus"), City of Durham ("Durham"), City of Portland ("Portland"), Allegheny County, Hennepin County, Prince George's County, and Ramsey County have the legal authority to spend.[2] Plaintiffs' congressionally appropriated funds support critical infrastructure programs, public safety initiatives, nutritional support for vulnerable residents and families, emergency fire and rescue services, and other programs necessary to promote safety. President Donald Trump and his Administration continue to imperil these funds and dictate local policy through executive orders that unlawfully condition funding on Plaintiffs' compliance with the Administration's policy agenda. Executive Orders No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("Anti-Diversity Order")[3] and No. 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Order")[4] (together, "the Orders") are fatally unconstitutional and illegal, and leave Plaintiffs with the untenable choice of capitulating to the Administration's unlawful orders, accepting the funds and facing burdensome investigations and lawsuits under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, or declining the funds and navigating significant budgetary uncertainty and shortfalls. Additional Plaintiffs respectfully ask this Court to enjoin Defendants from enforcing

---

[1] This motion is being submitted contingent on the Court granting the Parties stipulated motion to exceed page limits, Dkt. 60.

[2] The Court already provided injunctive relief to the City of Seattle, which the Government appealed. *See* Dkts. 22, 24. Plaintiffs Allegheny County, Cleveland, Columbus, Durham, Hennepin County, Portland, Prince George's County, and Ramsey County ("Additional Plaintiffs") request similar relief in this motion.

[3] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[4] Exec. Order No. 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 3
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Section 3(b)(iv) of the Anti-Diversity Order and Section 3(g) of the Gender Order in connection with any grants to Additional Plaintiffs.

Per Court's Standing Order, counsel met and conferred on April 10, 2026. Counsel for Defendants intend to oppose the relief sought in this motion.

## II.     STATEMENT OF FACTS

### A.     The Trump Administration Issues Unlawful Executive Orders.

Upon taking office, President Trump issued two nebulous and illegal Executive Orders: the Anti-Diversity Order and the Gender Order. The Anti-Diversity Order purports to leverage the significant threat of investigations and penalties under the FCA to police the Administration's indeterminate concept of "illegal DEI and DEIA policies" by requiring all federal contract and grant recipients to certify that they "do[ ] not operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws." Anti-Diversity Order, Section 3(b)(iv)(B). The Anti-Diversity Order directs federal departments and agencies to end all "illegal" DEI policies, programs, and activities. *See id.*, Section 2.

Like the Anti-Diversity Order, the Gender Order incorporates a vague funding restriction which dictates that "[f]ederal funds shall not be used to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *See* Gender Order, Section 3(g). The Gender Order does not define what constitutes "promot[ing] gender ideology." But the prohibition would include workplace routines and policies that otherwise comply with federal law given the broad definition of "gender ideology."

The Orders and other representations from the Trump Administration make clear its position that *all* DEI-related policies or programs violate federal law, regardless of whether they accord with federal law. For example, during the State of the Union Address in February 2026,

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 4
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

President Trump informed the nation that he had "ended DEI in America."[5] The Administration's hostility to all DEI is palpable. Despite the injunctions against his administration for similar executive orders, President Trump just last month issued yet another executive order targeting "illegal" DEI activities. In Executive Order No. 14398, "Addressing DEI Discrimination by Federal Contractors" ("EO 14398"),[6] President Trump characterizes "DEI activities" as "unethical" and "often illegal." He requires all federal contractors to renounce any "DEI activities," provide agencies with access to company records to show compliance with the Order, report any subcontractors that may be in violation of the Order, and agree that compliance with the Order is material for purposes of the False Claims Act. *See generally* EO 14398, Section 3.[7]

**B.    The Anti-Diversity and Gender Orders Prompt Federal Agencies to Impose Unlawful Terms on Additional Plaintiffs' Grants.**

The potential loss of federal funds due to the unlawful Orders poses a significant threat to Additional Plaintiffs, who rely on federal monies to support everything from substance abuse treatment programs to nutrition programs for at-risk families to sexual assault kit testing initiatives.[8] The unlawful Orders have already compelled the Agency Defendants[9] to impose several unlawful conditions across the federal government, as detailed below. *See* Dkt. 7 at 4–6.

---

[5] *Read Trump's full 2026 State of the Union address*, PBS NEWS (Feb. 25, 2025), https://www.pbs.org/newshour/politics/read-trumps-full-2026-state-of-the-union-address.

[6] Exec. Order No. 14398, *Addressing DEI Discrimination by Federal Contractors*, 91 Fed. Reg. 16147 (Mar. 26, 2026).

[7] The "Fact Sheet" accompanying EO 14398 makes clear that the Administration does not intend to weed out solely "illegal" DEI programs. *See* THE WHITE HOUSE, *Fact Sheet: President Donald J. Trump Addresses DEI Discrimination by Federal Contractors* (Mar. 26, 2026), https://www.whitehouse.gov/fact-sheets/2026/03/fact-sheet-president-donald-j-trump-addresses-dei-discrimination-by-federal-contractors/ ("President Trump: 'We will terminate every diversity, equity, and inclusion program across the entire Federal Government.'").

[8] *See, e.g.*, Fornier Decl. (Allegheny County) ¶¶ 9–10 (substance abuse treatment programs and sexual assault kit testing initiative); *see also* Kotze Decl. (Ramsey County) ¶ 7 (nutritional support for at-risk families); Long Decl. (Columbus) ¶ 24 (sexual assault kit testing).

[9] The Agency Defendants include Defendants DHS, DOJ, DOT, FAA, FHWA, FRA, FTA, HHS, HUD, HRSA, USDA, EPA, DOE, DOL, OFCCP, and OMB.

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 5
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

### 1.    DHS Grants

The Department of Homeland Security ("DHS") modified its Standard Terms and Conditions to require grant recipients to certify that "[t]hey do not, and will not during the term of [a grant award], operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws."[10] Additional Plaintiffs have already been subjected to these certification requirements. For instance, as part of the Agreement Articles for the Oregon Department of Emergency Management's Fiscal Year 2025 Homeland Security Grant Agreement, Portland was required to certify that it would not "operate any programs that advance or promote DEI, DEIA, or discriminatory ideology" as a condition of grant acceptance. *See* Lee Decl. (Portland) ¶ 15.

Similarly, in January 2026, Cleveland received a Notice of Grant Award requiring that Cleveland "comply with all applicable anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. Section 372(b)(4)" and certify that it "do[es] not and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." Margolius Decl. (Cleveland) ¶¶ 36–37, Ex. F. The Notice of Grant Award also broadly requires Cleveland to "comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference." *Id.* ¶ 38. The penalties for noncompliance include suspension of payments and/or termination of financial assistance. *Id.* ¶ 39.

### 2.    DOJ Grants

The Department of Justice ("DOJ") Office of Justice Programs announced the "General Conditions" for virtually all awards, including a "Federal Civil Rights and Nondiscrimination

---

[10] U.S. DEP'T OF HOMELAND SEC., FY 2025 DHS STANDARD TERMS AND CONDITIONS, VERSION 3 (Apr. 18, 2025), https://www.dhs.gov/sites/default/files/2025-08/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf. *See also* Dkt. 7 at 4.

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 6
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Laws (certification)" section, which requires recipients, "by accepting this award," to "certify[y] that it does not operate any programs (including any programs components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws."[11]

### 3. DOT Grants

The Department of Transportation ("DOT") modified the Federal Transit Administration's Master Agreement governing several of Additional Plaintiffs' grants.[12] Defendant Secretary of Transportation Sean Duffy issued a letter to all DOT grant recipients (the "DOT Letter") clarifying that certain activities "presumptively" violate federal law, including "policies or practices designed to achieve so-called 'diversity, equity, and inclusion' or 'DEI' goals."[13]

### 4. HUD Grants

The Office of Housing and Urban Development ("HUD") amended its Applicant and Recipient Assurances and Certifications—which applicants are required to complete to receive grants and submit grant applications—to require recipients to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion ("DEI") mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws."[14]

### 5. FAA Grants

---

[11] U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, *"General Conditions" for OJP Awards in FY 2025* (May 12, 2025), https://www.ojp.gov/funding/explore/legaloverview2025/mandatorytermsconditions#2a; *see also* Mathews Decl. (Hennepin County) ¶ 15.

[12] FED. TRANSIT ADMIN., *FTA Master Agreement, Version 33* (Apr. 25, 2025), https://www.transit.dot.gov/funding/grants/grantee-resources/sample-fta-agreements/fta-master-agreement-version-33-april-25. *See also* Dkt. 7 at 5–6.

[13] U.S. DEP'T OF TRANSP., *Follow the Law Letter to Applicants* (Apr. 24, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-05/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

[14] U.S. DEP'T OF HOUS. & URBAN DEV., *Form HUD 424-B: Applicant and Recipient Assurances and Certifications* (Jan. 27, 2023), https://www.hud.gov/sites/dfiles/OCHCO/documents/424B.pdf. *See also* Dkt. 7 at 5; *City of Fresno, et. al. v. Turner, et al.*, No. 3:25-cv-07070 (N.D. Cal. Aug. 20, 2025) (HUD letter required City of Fresno affirm it shall not use grant funds to "promote 'gender ideology.'").

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 7
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

The Federal Aviation Administration ("FAA") proposed updates to its Airport Improvement Program ("AIP") grant assurances—conditions attached to applications and FAA grants—to reflect executive orders, including the Anti-Diversity Order and the Gender Order.[15] Each of the FAA's AIP grant assurances requires grant applicants to certify that they will comply with "all applicable Federal laws, regulations, [and] executive orders."[16]

These certification requirements are also found in AIP and Airport Infrastructure Grant ("AIG") agreements awarded in 2025. For example, the revised terms and conditions in paragraph 30 of the FY 2025 Airport Infrastructure Grant Agreements and FY 2024 Airport Improvement Program Supplemental Grant Agreements require Cleveland to certify that it "does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws," and to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of the False Claims Act. *See* Francis Decl. (Cleveland) ¶ 8; *id.* Ex. A at 12; *id.* Ex. B at 12; *id.* Ex. C at 12; *id.* Ex. D at 12; *id.* Ex. E at 13; *id.* Ex. F at 12.

### 6.   HHS Grants

The Department of Health and Human Services ("HHS") issued an updated HHS Grants Policy Statement applicable to discretionary grants that is "incorporated by reference in the official Notice of Award . . . as a standard term and condition."[17] It applies to "awards and award modifications that add funding made on or after April 16, 2025," includes "supplements to award, competing and non-competing continuations," and applies to "all HHS recipients and the requirements flow down to subrecipients." 2025 HHS Grants Policy Statement at 3. The 2025 HHS

---

[15] *Airport Improvement (AIP) Grant Assurances*, 90 Fed. Reg. 17501 (Apr. 25, 2025).

[16] *See, e.g.*, FEDERAL AVIATION ADMIN., *Assurances—Airport Sponsors* (Apr. 2025) at 2, https://www.faa.gov/airports/aip/grant_assurances/assurances-airport-sponsors-2025.

[17] U.S. DEP'T. OF HEALTH & HUM. SERVS., *HHS Grants Policy Statement* (Apr. 16, 2025) at 3, https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-april-2025-archived.pdf ("2025 HHS Grants Policy Statement").

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 8
(Case No. 2:25-cv-01435-BJR)

Grants Policy Statement states, "By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws . . . ." *Id.* at 19.

In October 2025, HHS issued another updated Grants Policy Statement.[18] Under the updated 2025 Grants Policy Statement, grant recipients must "certify compliance with all federal antidiscrimination laws" and states that compliance "is a material condition of receiving federal funding streams." *Id.* at 21. Grant recipients are responsible for ensuring that any "subrecipients, contractors, and partners also comply" with those restrictions. *Id.* The updated 2025 Grants Policy Statement explicitly makes compliance with the Gender Order a certification requirement. *Id.*

### 7.    HRSA Grants

On May 14, 2025, HRSA issued updated general terms and conditions applicable to "all active awards."[19] The revised HRSA terms and conditions require grant recipients to comply with the "terms and conditions included in the [2025] HHS Grants Policy Statement," which contains new and unlawful certification requirements related to the Orders at issue here.

### 8.    USDA Grants

On December 31, 2025, the United States Department of Agriculture ("USDA") amended its terms and conditions for federal awards to require grant recipients to "comply, and certif[y] that it will comply, with all applicable Federal anti-discrimination laws, regulations, and policies for the duration of the Federal award."[20] The updated terms and conditions also state that "[b]y accepting the award, the recipient certifies that it does not, and will not during the term of the

---

[18] U.S. DEP'T. OF HEALTH & HUM. SERVS., *HHS Grants Policy Statement* (Oct. 1, 2025), https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-oct-2025.pdf.

[19] HEALTH RES. & SERVS. ADMIN., *FY 2025 HRSA General Terms and Conditions* (May 14, 2025), https://www.hrsa.gov/sites/default/files/hrsa/grants/manage/update-hrsa-general-terms-condition-fy25-may.pdf.

[20] U.S. DEP'T. OF AGRIC., *General Terms and Conditions for Federal Awards* (Dec. 31, 2025), https://www.usda.gov/sites/default/files/documents/usda-general-terms-conditions-2025.pdf.

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 9
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

award, operate any programs that advance or promote Diversity, Equity, and Inclusion in violation of Federal anti-discrimination laws."[21] If a grant recipient fails to comply with the updated conditions, they may be subject to liability under the FCA and/or criminal liability.

Also on December 31, 2025, USDA Secretary Brooke Rollins issued a memorandum directing all USDA agencies and staff to adopt and implement updated terms and conditions "as expediently as possible, but no later than forty-five (45) calendar days after the issuance of [the] Memorandum . . . for all future awards."[22] USDA employees who fail to ensure that awarded projects comply with the new terms and conditions or fail to address noncompliance are subject to "disciplinary or adverse action, up to and including removal from Federal Service." *Id.*

### 9.     EPA Grants

On February 14, 2025, Environmental Protection Agency ("EPA") Administrator Lee Zeldin announced cancellation of nine contracts related to DEI, environmental justice, and more, totaling nearly $60 million.[23] The EPA's grant terms and conditions require grant recipients to certify that their "compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA]" and that they "do[] not operate any programs violating any applicable Federal anti-discrimination law or promoting any such violation."[24]

### 10.     DOE Grants

---

[21] *Id.* at 34–35 (referencing the Gender Order and the Anti-Diversity Order).
[22] U.S. DEP'T. OF AGRIC., *Secretarial Memorandum 1078-021, Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements* (Dec. 31, 2025), *available at* https://www.usda.gov/sites/default/files/documents/sm-1078-021.pdf?utm_medium=email&utm_source=govdelivery.
[23] U.S. ENVTL. PROT. AGENCY, *EPA Administrator Lee Zeldin Cancels Nine More Contracts, Saving Nearly $60 Million* (Feb. 14, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-nine-more-contracts-saving-nearly-60-million.
[24] U.S. ENVTL. PROT. AGENCY, *General Terms and Conditions* (Oct. 1, 2024) at 44, https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf.

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 10
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

On January 23, 2025, Acting Secretary of Energy Ingrid Kolb issued a memorandum ordering a suspension of any "diversity, equity, and inclusion (DEI) policies, procedures, programs, activities, and reviews involving or relating to DEI objectives and principles" per the Anti-Diversity Order. Per the secretary's memo, the suspension encompassed "a broad spectrum of activities, including . . . awarding and assessments of grants, loans, loan guarantees, cost sharing agreements, or other funding opportunities of any kind."[25]

At some point in 2025, the Department of Energy ("DOE") revised its standard terms and conditions to require grant recipients to comply with the Anti-Diversity Order and to certify that they "do[] not operate programs promoting diversity, equity, and inclusion that violate any applicable federal anti-discrimination laws."[26] The updated standard terms and conditions also note that "[c]ompliance with [anti-discrimination] Federal laws is material to DOE's payment decisions for purposes of [the FCA]."

**11.    DOL Grants**

On January 22, 2025, Acting Deputy Assistant Secretary of Labor Michelle Paczynski issued a notice directing "all recipients of federal financial assistance awards . . . to cease all activities related to [DEI] or [DEIA] under their federal awards, consistent with the requirements of the [Orders]," effective immediately.[27]

**C.    Additional Plaintiffs Face Imminent Harm.**

Additional Plaintiffs face imminent harm and severe budgeting uncertainty from the

---

[25] U.S. DEP'T. OF ENERGY, *Memorandum for Heads of Departmental Elements and National Laboratories* (Jan. 23, 2025), https://www.energy.gov/sites/default/files/2025-02/Memorandum%20signed%20by%20Acting%20Secretary%20of%20Energy%20Ingrid%20C.%20Kolb%20dated%20January%2023%202025%20%28002%29.pdf.

[26] U.S. DEP'T. OF ENERGY, *Standard Terms and Conditions* (2025) at 22, https://www.energy.gov/node/4857326.

[27] U.S. DEP'T OF LABOR, *Training and Employment Notice* (2025), https://www.dol.gov/sites/dolgov/files/ETA/advisories/TEN/2024/TEN%2021-24/TEN%2021-24%20%28Accessible%20PDF%29.pdf.

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 11
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

unlawful Orders and Defendants' subsequent imposition of new funding conditions, jeopardizing essential public services and programming these funds support. *See generally* Section III.B, *infra*.

**D.    Relevant Procedural History.**

In July 2025, Plaintiff Seattle sued Defendants Trump, DOJ, DHS, OFCCP, OMB, DOT, FTA, HUD, as well as the secretaries and directors of those agencies, seeking to enjoin enforcement of the Anti-Diversity and the Gender Orders on the grounds that they were illegal and unconstitutional. *See* Dkt. No. 1. Seattle sought a preliminary injunction enjoining enforcement of the Orders as to any grants to Seattle. *See* Dkt. No. 7. In opposition, the government asserted that Seattle faced no imminent harm and that any funding consequences were merely speculative. *See* Dkt. 18 at 1. But in the short period of time between the government's opposition and Seattle's reply, Seattle suffered *actual* harm from the Orders: HUD directly threatened—and ultimately rejected—Seattle's Community Development Block Grant funds based on the Orders, citing Seattle's use of the term "equity" and general support for marginalized communities as problematic. *See* Dkt. 19 at 2; Dkt. 20, Exs. A–C. It is against this backdrop that Additional Plaintiffs now seek the same protection already awarded to Seattle by this Court.

**III.    ARGUMENT**

A preliminary injunction is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All these factors heavily favor Additional Plaintiffs.

**A.    Additional Plaintiffs Are Likely to Prevail on the Merits of Their Claims.**

Additional Plaintiffs are likely to prevail on the merits—the most important *Winter* element—because the Orders are facially unconstitutional and violate the Administrative Procedure Act ("APA"). *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). This Court

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 12
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

already concluded that Plaintiff Seattle is likely to prevail on the merits of its claims for similar reasons and should do so again for the Additional Plaintiffs, who are similarly situated to Seattle. *See* Dkt. No. 22 at 10.

### 1.   The Orders and Grant Conditions Violate the APA.

The APA requires the Court to "hold unlawful and set aside agency action" that is "arbitrary," "capricious," "not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2); *see also Nat'l Urban League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020). Both the Orders and the grant conditions promulgated by the Agency Defendants to implement the Orders must be set aside under the APA because they (1) exceed statutory of authority and (2) are arbitrary and capricious.[28]

### a.   Defendants' Actions Exceed Statutory Authority and Are Unconstitutional.

The grant conditions flowing from the Orders are "in excess of statutory authority" and "not in accordance with law" because they are not the result of a congressional delegation of authority and violate the Separation of Powers doctrine. 5 U.S.C. § 706(2). As this Court explained, "the Separation of Powers doctrine and APA's 'in excess of statutory authority' standard both turn on the same essential question—whether the agency acted within the bounds of its authority, either as conferred by the Constitution, or delegated by Congress." Dkt No. 22 at 11.

The Separation of Powers doctrine recognizes that the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing the Appropriations Clause, U.S. CONST. art. I, § 9, cl. 7). "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress

---

[28] Imposition of the grant conditions constitutes a "final agency action" under 5 U.S.C. § 704 because it "mark[s] the consummation of the agency's decision-making process" and is a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 13
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990)). "Without it . . . 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure.'" *Id.* (quoting *Richmond*, 496 U.S. at 427). On the other hand, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). It follows that "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effect its own policy goals." *San Francisco*, 897 F.3d at 1235.

As this Court has recognized, the Orders unconstitutionally infringe upon Congress's power to set funding conditions because both they direct federal departments and agencies to attach additional spending conditions to Plaintiffs' grants. *See* Dkt. 22 at 14–18. Specifically, the Anti-Diversity Order directs agencies to require grant recipients to certify that they "do[] not operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws." Section 3(b)(iv)(B). Similarly, the Gender Order instructs agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Section 3(g). Congress did not authorize these conditions, and the Executive may not unilaterally declare otherwise. *See also* Order Granting Plaintiffs' Third Mot. for Prelim. Inj. at 1–2, *King County et al. v. Turner et al.*, No. 2:25-cv-00814-BJR (Aug. 12, 2025) ("These budget decisions are not mere technical exercises, they reflect difficult judgments (and compromises) about how best to allocate our nation's resources . . . . [U]nder the constitution, it is Congress—not the President—that has the authority to make those judgments.").

Defendants cannot credibly argue that the additional funding conditions contemplated by the Anti-Diversity Order are constitutional and within statutory authority simply because they require grant recipients to certify compliance with existing federal antidiscrimination law. This

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Court already considered and rejected this argument due to the wealth of evidence indicating that Defendants interpret federal antidiscrimination laws in a manner "that is inconsistent with well-established legal precedent." Dkt. No. 22 at 14 (quoting *King County, et al. v. Turner*, 2025 WL 2322763, at *12–13 (W.D. Wash. Aug. 12, 2025)). Nor can Defendants rely on broad statutory authority to place performance-based conditions on federal grant recipients to defend the Orders. This Court noted: "A condition barring recipients from 'promoting gender ideology,' or any other politically charged policy matter, bears no resemblance to the administrative, procedural, and performance-based conditions enumerated by Congress." *Id.* at 17–18.

Moreover, the Orders violate the Separation of Powers doctrine in two other respects. First, the Anti-Diversity Order unconstitutionally exceeds the President's powers under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*. The Act prohibits discrimination based on race, color, and national origin in programs and activities receiving federal financial assistance. The Anti-Diversity Order unilaterally attempts to expand the definition of "federal anti-discrimination law" by decreeing any DEI or DEIA initiative to be a form of illegal discrimination, or at a minimum is designed to chill legitimate practices by Additional Plaintiffs for fear of running afoul of the Administration's insistence that all DEI or DEIA is unlawful. *See, e.g.*, DOT Letter (declaring "presumptively" illegal "policies or practices designed to achieve so-called 'diversity, equity, and inclusion' or 'DEI' goals"). Only Congress may amend legislation, not the Executive.

Second, the Anti-Diversity Order improperly seeks to impose FCA liability on Additional Plaintiffs by revising the FCA to impose a new statutory materiality standard that is inconsistent with existing case law interpreting the FCA. The FCA imposes liability on anyone who "knowingly makes, uses or causes to be made or used, a false record or statement *material* to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (emphasis added). The statute defines "material" as "having the natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id*. at § 3729(b)(4). The Anti-Diversity Order expands this

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 15
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

definition by forcing Additional Plaintiffs to certify "that [their] compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decision for purposes of section 3729(b)(4) of Title 31, United States Code." Anti-Diversity Order, Section 3(b)(iv)(A). This certification requirement is unlawfully being applied to Additional Plaintiffs' grants for a variety of projects unrelated to DEI. *See, e.g.*, Mathews Decl. (Hennepin County) ¶¶ 6–10 (nutrition and DNA processing); Francis Decl. (Cleveland) ¶¶ 6–7 (aviation and airport projects); Lee Decl. (Portland) ¶¶ 13–15 (security and disaster preparedness).

The wholesale declaration that compliance with "all applicable Federal anti-discrimination laws" is material to the federal government's decision to pay *all* federal grant dollars is an *ultra vires* amendment of the FCA definition of "materiality," which requires that the false statement have a "natural" tendency to influence the receipt of government money. The Supreme Court recognizes that the materiality standard is "demanding" and is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Services v. Escobar*, 579 U.S. 176, 194 (1989). The materiality standard is enforced "rigorously" by the federal courts "to shield government contractors from 'onerous and unforeseen FCA liability as the result of noncompliance with any of potentially hundreds of legal requirements established by contract.'" *United States ex rel. Bashir v. Boeing Co.*, 765 F. Supp.3d 1111, 1128 (W.D. Wash. 2025) (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010)).

Moreover, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 579 U.S. at 194. Although "the Government's decision to expressly identify a provision as a condition of payment is relevant," it is "not automatically dispositive" for purposes of the FCA. *Id.* The Anti-Diversity Order's certification requirement is inconsistent with the text of the

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 16
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

FCA and its judicial interpretation. It violates separation of powers because it declares through executive order that compliance with all antidiscrimination laws (as interpreted by the Administration) is "material" to Congress's decision to dispense federal dollars, regardless of the nature of the grant.

### b.    The Grant Conditions Are Arbitrary and Capricious.

The grant conditions are also arbitrary and capricious because they are not the result of "reasoned decisionmaking" and are neither "reasonable" nor "reasonably explained." *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *Ohio v. EPA*, 603, U.S. 279, 292 (2024) (cleaned up). An agency must offer "a satisfactory explanation for its action," and cannot rely on "factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This Court already determined that the Agency Defendants cannot demonstrate that their grant conditions were the result of "reasoned decision-making," and the conditions are therefore arbitrary and capricious. Dkt. No. 22 at 19. The Additional Plaintiffs are similarly situated to Seattle and have been subjected to identical treatment. Agency Defendants offer no reasonable explanation for imposing new grant conditions on Additional Plaintiffs. As such, the Court's prior reasoning that the Agency Defendants' actions are arbitrary and capricious applies in similar force to Additional Plaintiffs.

### 2.    The Orders Violate the Spending Clause.[29]

The Orders also violate the Spending Clause. First, the Orders allow the Administration to retroactively impose unclear requirements related to "illegal" DEI and "gender ideology" on preexisting federal funding awards. When Congress imposes conditions on federal funds, "it must

---

[29] Additional Plaintiffs recognize that this Court found Defendants' violation of the APA sufficient to justify relief in the form of a preliminary injunction, and that the Court may reach the same conclusion with respect to this motion. Nevertheless, Additional Plaintiffs include the additional arguments to preserve them and as additional grounds for granting relief.

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 17
(Case No. 2:25-cv-01435-BJR)

do so unambiguously" so that jurisdictions can "exercise their choice knowingly, cognizant of the consequences of their participation." *S. Dakota v. Dole*, 483 U.S. 203, 203 (1987) (quotation and citation omitted). "Because states must opt-in to a federal program willingly, fully aware of the associated conditions, Congress cannot implement new conditions after-the-fact." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017); *Nat'l Fed. of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 577 (2012). The Orders impose novel conditions that Additional Plaintiffs were unaware of and could not have assented to when choosing to receive federal funding.

Second, the Orders improperly impose conditions wholly unrelated to the funds. It is well-established that conditions placed on congressional spending must have some nexus with the purpose of the implicated funds. *Dole*, 482 U.S. at 208 (conditions may be illegitimate if unrelated to the program). The Orders' attempt to condition all federal funds on compliance with the Administration's DEI and "gender ideology" policy views runs afoul of the nexus requirement, as there is no nexus between the Orders and Additional Plaintiffs' threatened funding in the areas of, for example, transportation, nutrition support, public safety planning, law enforcement, emergency preparedness, and housing. This is precisely the opposite of what the nexus test requires.

Finally, the Orders are unduly coercive. "Congress cannot use the spending power in a way that compels local jurisdictions to adopt certain policies." *Santa Clara*, 250 F. Supp. 3d at 533. Offering a financial inducement that is "so coercive as to pass the point at which pressure turns into compulsion" is unacceptable. *Dole*, 482 U.S. at 211. The Orders are just that kind of coercive inducement. Conditioning *all* federal funding—nearly $2.6 billion—on compliance with the Administration's anti-DEI and gender agenda crosses the line from pressure to compulsion.

### 3.    The Orders are Unconstitutionally Vague.

Additional Plaintiffs are likely to succeed in showing that the Orders violate the Fifth Amendment's vagueness doctrine because the Orders impose unclear prohibitions that leave Additional Plaintiffs guessing as to how to comply. "It is a basic principle of due process that an

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 18
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). To satisfy due process, laws must (1) "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and (2) "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108.

The Orders contain "expansive, standardless language" that "creates huge potential for arbitrary and discriminatory enforcement." *Santa Clara*, 250 F. Supp. 3d at 535. The Anti-Diversity Order requires certification that a grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," yet fails to define any specific activities that would constitute promotion of DEI. Anti-Diversity Order, § 3(b)(iv)(B). Likewise, the Gender Order bans the use of federal funds to "promote gender ideology," but does not define what it means to "promote" such ideology. Gender Order, § 3(g).

### 4.    The Orders Violate the Tenth Amendment.

Additional Plaintiffs will succeed in showing that the Orders violate the Tenth Amendment because the potential loss of hundreds of millions of federal dollars is akin to "a gun to the head." *NFIB*, 567 U.S. at 581 (2012). The Tenth Amendment prohibits the federal government from commandeering state and local officials to enforce federal laws. *Printz v. United States*, 521 U.S. 898, 935 (1997). The federal government may not compel states to enact or administer a federal regulatory program. *New York v. United States*, 505 U.S. 144, 188 (1992). This is true regardless of whether the federal government "directly commands" a state to regulate or "indirectly coerces" a state to adopt a federal regulatory system as its own. *NFIB*, 567 U.S. at 578. Coercion occurs where executive orders "would have significant effects on [localities'] ability to provide services to their residents and … they may have no legitimate choice regarding whether to accept the government's conditions in exchange for those funds." *Santa Clara*, 250 F. Supp. 3d at 533.

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 19
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Here, the Orders coerce Additional Plaintiffs to adopt the Administration's view of DEI and "gender ideology" by ordering that all federal funding be withheld unless Additional Plaintiffs comply with the Administration's vague and unlawful Orders. The Orders wield critical federal funding as a gun with which to coerce Additional Plaintiffs into accepting the Administration's conditions in exchange for funds promised, appropriated, and expected to receive.

**B.      Additional Plaintiffs Will Suffer Irreparable Harm If the Orders Are Not Enjoined.**

The threat of federal funding loss immediately and irreparably harms Additional Plaintiffs, as detailed below, through continuous budget uncertainty. *See* Dkt. 22 at 21 (confirming that "looming risk" of acute budgetary uncertainty due to Defendants' unlawful actions is an injury in of itself); *see also* Fair Decl. (Prince George's County) ¶¶ 5–7; Flora Decl. (Durham) ¶ 14.

**1.      Cleveland**

Cleveland relies on a broad array of federal grants from HUD, DOT, FAA, HHS, HRSA, and DHS. Losing any of this funding would be disastrous for the city. For instance, Cleveland receives four formula grants annually from HUD, including the Federal Community Development Block Grant ("CDBG"), which provides consistent and essential funding for public service programs and neighborhood revitalization initiatives that make a direct impact on the quality of life for Cleveland's low to moderate income households. Anderson Decl. ¶ 5. If Cleveland were to lose CDBG funding, the impact on low-income households and neighborhoods would be devastating and irreparable, as without CDBG funding, many residents' basic housing, food, education, employment, and social needs would go unmet. *Id.*

Cleveland also relies on FAA funding to support various projects at Cleveland-Hopkins International Airport. Francis Decl. ¶ 5. Projects supported by FAA funds include reconstructing ten miles of wildlife fence around the airport; reconstructing one of Cleveland's three runways to safely hold air traffic; and rehabilitating parts of the terminal tunnel membrane at the pedestrian connector of Cleveland's terminal, parking garages, and rapid transit station. *Id.* ¶ 7. Losing FAA

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 20
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

funds would halt all airport infrastructure reconstruction and modernization. *Id.* ¶¶ 14–15.

Likewise, the loss of HUD and HHS funding endangers many of Cleveland's public health initiatives, such as its HRSA Healthy Start Initiative, which supports other important programming for vulnerable families and aims to reduce infant mortality rates. Margolius Decl. (Cleveland) ¶¶ 17–18. The loss of these funds, which Cleveland has relied upon for the past 34 years, would have a significant adverse impact on infant and maternal mortality rates. *Id.* ¶¶ 11, 19.

### 2.    Columbus

Columbus relies on a broad array of federal grants from USDA, DOE, DOJ, and the EPA to support important city initiatives and programs. For example, funds from USDA support the Women, Infants, and Children ("WIC") Program, which in turn supports eleven WIC clinics throughout Franklin County, Ohio, as well as 63 full-time equivalent staff positions to support those clinics. Long Decl. ¶¶ 16–17. Each year, Columbus' WIC clinics provides care for nearly 30,000 WIC participants. *Id.* ¶ 17. Reduction or elimination of USDA funding would negatively impact Columbus' delicate health care system and compromise patient care. *Id.*

Likewise, Columbus uses EPA funds to develop regional climate mitigation plans to address greenhouse gas emissions, co-pollutants, and reduction measures throughout the city. Long Decl. (Columbus) ¶ 14. Columbus's EPA grant requires and enables work on the mitigation plan through 2027; a loss of EPA funds would jeopardize the reduction of millions of metric tons of pollution that the mitigation plan is expected to yield and would work against Columbus' efforts to protect its residents from environmental hazards. *Id.*

Columbus also counts on funding from DOE's Energy Efficiency and Conservation Block Grant ("EECBG") program to provide energy audits to non-profit organizations, facilitate the reduction of greenhouse gas emissions, and to help commercial and multi-family residential business owners develop plans to lower utility costs. *Id.* ¶ 20. The EECBG program also enables Columbus to upgrade its streetlights to LED bulbs, increasing city energy efficiency and improving

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 21
(Case No. 2:25-cv-01435-BJR)

visibility and safety in Columbus's neighborhoods. *Id.* ¶ 21. If DOE grant funds were terminated, Columbus's businesses and affordable housing facilities would not be able to access the energy audits necessary to facilitate energy use reductions and cost savings, and Columbus's residents would be denied the safety and efficiency benefits of LED bulb conversion. *Id.* ¶¶ 20–21.

**3.    Durham**

Durham relies on myriad federal grants, including CDBG and Continuum of Care grants from HUD, Rebuilding American Infrastructure with Sustainability and Equity (RAISE) and Low or No Emissions grants from DOT, and Community-Oriented Policing Services (COPS) Micro-Grants from the DOJ. Flora Decl. ¶¶ 7–8. Durham receives approximately $2 million annually in CDBG funds to provide affordable housing and public services to extremely low- and moderate-income residents. *Id.* ¶ 9. Durham also receives approximately $127,000 annually to operate the Continuum of Care plan, which is a key aspect in Durham's strategic plan to end homelessness. *Id.* ¶ 10. Among the many major transportation projects supported by federal funding, several focus on improving infrastructure in Durham's predominantly Black neighborhoods and communities of color, such as the $12 million Holloway Street Project, which is being funded by the RAISE grant program. *Id.* ¶ 11. Durham has received $6 million through the Low or No Emissions Grant Program to purchase additional GoDurham buses, which are primarily utilized by Durham's low-income residents and communities of color. *Id.* ¶ 12. And Durham uses annual COPS Micro-Grants to increase diversity in recruiting, with a focus on increasing female and Hispanic representation within the Durham Police Department. *Id.* ¶ 13.

Because of instructions from HUD received in September 2025, Durham has been put in the difficult position of either eliminating or significantly altering evidence-based projects, or risking losing millions of dollars in funding to combat homelessness and provide affordable housing. *Id.* ¶ 8. All of these projects rely on the availability of federal funding, and the ongoing uncertainty of this funding impedes Durham's ability to plan and provide these services. *Id.* ¶ 14.

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 22
(Case No. 2:25-cv-01435-BJR)

### 4. Portland

Portland relies on funds from DHS and DOJ to fund a range of programs, from public safety initiatives to disaster preparedness trainings. For example, DHS grants fund many of Portland's emergency management planning efforts, such as flood mitigation and regional natural disaster response planning. Lee Decl. ¶ 13. The loss of DHS funding would significantly impact Portland's security and disaster preparedness and cause upheaval for dozens of disaster preparedness projects related to public health, infrastructure, and more. *Id.* ¶ 14.

Portland also uses funds from DOJ grants for programs designed to address and reduce gun violence, increase enforcement related to unlawful street racing, use evidence-based practices to identify stolen vehicles, implement a body worn camera program, provide de-escalation and crisis response training, and to leverage forensic technology to decrease the number of unresolved violent crime cold cases and increase public safety. *Id.* ¶¶ 16–17.

### 5. Allegheny County

Allegheny County counts on federal grant funding from DOJ and DHS to fund essential items such as health services, public safety projects, and law enforcement initiatives. Funds from DOJ grants fund critical county projects such as the National Sexual Assault Test Kit Initiative, which enables Allegheny County to collect better data to prosecute repeat offenders, as well as programs that support substance abuse abatement and mental health services for residents in crisis. Fournier Decl. ¶¶ 8–10.

Funds from DHS grants, such as the Urban Area Security Initiative ("UASI") grant, are used by the County for technical rescue team training, which prepares first responders to handle complex, high-risk emergencies that go beyond standard firefighting or emergency services operations, such as would be encountered in industrial accidents. *Id.* ¶ 18. If deprived of these funds, Allegheny County would have to reduce staff, forego training exercises, and curtail equipment acquisition necessary to protect the community. *Id.* ¶ 19. The ever-evolving grant

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 23
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

conditions undermine Allegheny County's budget process and interject substantial fiscal uncertainty. *Id.* ¶ 22.

### 6.    Hennepin County

Hennepin County relies on both USDA and DOJ grant funds to support its residents. Funds from USDA make possible Hennepin County's WIC Program, which serves low-income residents of Hennepin County who are pregnant women, new mothers, babies, and children ages zero to five, and provides nutrition education and counseling. Mathews Decl. ¶ 7. If the WIC Program were eliminated due to lack of funds, nutritional needs of already high-risk families would not be met, residents seeking WIC services would have to travel greater distances, and the County's infant mortality risk would increase. *Id.*

Hennepin County's DOJ funds support DNA processing operations by funding three positions with the Hennepin County Sheriff's Office, allowing for specialized staff focus, which improves efficiency and predictability in case management. *Id.* ¶ 9. The loss of DOJ grant funds would impact how quickly and accurately Hennepin County is able to solve crimes and significantly slow down rape kit processing. *Id.* ¶ 10.

By September 30 of each year, Hennepin County must determine how much revenue it must raise in the following budget year through the ad valorem property tax levy. *Id.* ¶ 11. Lack of clarity and certainty around federal funding sources impedes Hennepin County's ability to set its budget. *Id.* ¶ 12. Already, Hennepin County's budgeting process for 2026 was significantly more difficult than in prior years due to the uncertainty created by the Orders. *Id.* ¶ 15.

### 7.    Prince George's County

Prince George's County relies on nearly $194 million in federal grant funds to support a wide variety of important housing, transportation, and health services programs. Fair Decl. ¶ 8. For example, funding from HUD supports vital affordable housing and urban renewal projects, including the Section 8 Housing Choice Voucher Program, which provided over $100 million

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 24
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

dollars in funding for rental assistance to County residents in fiscal year 2025. *Id.* ¶ 11. If funds for the Section 8 program were reduced or eliminated, thousands of residents would experience severe hardship from a loss of rental assistance, leading to increased rates of homelessness and destabilizing communities that are reliant on Section 8 funding. *Id.*

Prince George's County also depends on HHS funding to finance necessary community health programs, such as the WIC Program, the System of Care Program, the Healthy Transitions Program, the Bright Beginnings Program, the Tobacco Control Program, and Chronic Disease Management Program, among others. *Id.* ¶ 13. These programs provide targeted support to vulnerable groups including infants, people with substance use disorders, and people with chronic diseases. *Id.* For example, the System of Care Program helps hundreds of children and teenagers with mental health issues and emotional troubles, reducing delinquency rates. *Id.* ¶ 14. Losing this funding would either end or vastly reduce these important County programs. *Id.* ¶ 14.

Likewise, Prince George's County relies on DOT grant funds to support critical transit and infrastructure projects, such as pedestrian safety upgrades along high-injury roads within the County. *Id.* ¶ 17. Losing DOT funds would force the County to significantly curtail essential roadway maintenance and repair projects. *Id.* These critical funds make possible important pedestrian safety updates and support local public transportation systems, which in turn support jobs and economic growth throughout Prince George's County. *Id.*

**8.     Ramsey County**

Ramsey County relies on federal grant funding from USDA, DOJ, and DOL to support myriad critical programs and projects. For example, funding from USDA supports Ramsey County residents through a supplemental food, nutrition, and breastfeeding program that helps eligible pregnant women, new mothers, babies and young children eat well, learn about nutrition, and stay healthy. Kotze Decl. ¶ 7. Losing USDA funding would either end or sizably reduce Ramsey County's health and health education programming. *Id.*

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 25
(Case No. 2:25-cv-01435-BJR)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Funding from DOJ grants pays for necessary public safety programs in Ramsey County, such as the county's sexual assault support services. *Id.* ¶ 10. With help from DOJ funds, Ramsey County annually provides approximately 900 victims of sexual violence 24/7 crisis advocacy, ongoing individual advocacy, counseling and support, community outreach, and education. *Id.* Loss of DOJ funding would potentially eliminate or greatly reduce the availability of these important support programs. *Id.*

Finally, funding from DOL supports Ramsey County's workforce and economy through the Workforce Innovation and Opportunities Act Dislocated Worker program, which delivers employment training services to individuals who have lost their jobs due to layoffs. *Id.* ¶ 11. Loss of these funds would eliminate or greatly reduce these services for dislocated workers, young adults, and others facing significant barriers to employment. *Id.*

**C.      The Equities Weigh in Additional the Additional Plaintiffs' Favor.**

The final factors, equities and public interest, which merge here, weigh heavily in the Additional Plaintiffs' favor. *Baird*, 81 F.4th at 1040 ("When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'" (quoting *Nken*, 556 U.S. at 435)). The Additional Plaintiffs are in the same position as the City of Seattle., and This Court's previous finding applies with equal force to Additional Plaintiffs. *See* Dkt. 22, at 22–23.

The ongoing deprivation of Additional Plaintiffs' constitutional rights significantly outweighs the Administration's interest in vague spending restrictions that violate the Constitution and the APA. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (cleaned up); *see also Zepeda v. U.S. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983) (noting that the government cannot claim it is "harmed in any legally cognizable sense by being enjoined from constitutional violations."). And preserving Additional Plaintiffs' constitutional rights is squarely within the public interest. *Melendres*, 695 F.3d at 1002. As this Court already held, "the

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 26
(Case No. 2:25-cv-01435-BJR)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

government has no legitimate interest in enforcing conditions that were likely imposed in violation of the Constitution or the APA" and monetary relief could not remedy the likely harm from the illegal executive orders. Dkt. 22, at 22–23. A preliminary injunction is necessary to prevent violations of Additional Plaintiffs' rights and to protect the safety and interests of their residents.

## IV.    CONCLUSION

For the foregoing reasons, the Additional Plaintiffs respectfully ask this Court to enjoin all Defendants from enforcing Section 3(b)(iv) of the Anti-Diversity Order and Section 3(g) of the Gender Order in connection with any of Additional Plaintiffs' grants. However, as stated in Plaintiffs' Amended Complaint, certain Plaintiffs are also parties to *King County et al. v. Turner et al.*, No. 2:25-cv-00814-BJR (W.D. Wash. 2025) and *Chicago v. Noem*, No. 25-cv-12765 (N.D. Ill.). The proposed order accompanying this Motion reflects that these certain Plaintiffs are not seeking relief from Defendants against which they already have obtained relief in other matters.

DATED this 1st day of May, 2026.

CORR CRONIN LLP

*s/ Jeffrey B. Coopersmith*
Jeffrey B. Coopersmith, WSBA No. 30954
Emily J. Harris, WSBA No. 35763
Eric A. Lindberg, WSBA No. 43596
Kathryn Joy, WSBA No. 60056
Renee M. Howard, WSBA No. 38644
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Ph: (206) 625-8600 | Fax: (206) 625-0900
jcoopersmith@corrcronin.com
eharris@corrcronin.com
elindberg@corrcronin.com
kjoy@corrcronin.com
rhoward@corrcronin.com

*Attorneys for Plaintiffs*

PLAINTIFFS' SECOND MOTION FOR
PRELIMINARY INJUNCTION – 27
(Case No. 2:25-cv-01435-BJR)